UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHAY HORSE,<br>JUDAH ARIEL,<br>ELIZABETH LAGESSE, and<br>MILO GONZALEZ,[*]<br><br>                         Plaintiffs,<br>         v.<br><br>DISTRICT OF COLUMBIA<br>c/o Office of the Attorney General<br>441 4th Street NW<br>Washington, D.C. 20001,<br><br>JOHN/JANE DOE MPD OFFICERS 1-150,<br>*in their individual capacities*<br>c/o Office of the Attorney General<br>441 4th Street NW<br>Washington, D.C. 20001,<br><br>JOHN/JANE SOE SUPERVISORY MPD<br>OFFICERS 1-20, *in their individual<br>capacities*<br>c/o Office of the Attorney General<br>441 4th Street NW<br>Washington, D.C. 20001, and<br><br>PETER NEWSHAM<br>Chief, Metropolitan Police Department,<br>*in his individual capacity*<br>c/o Office of the Attorney General<br>441 4th Street NW<br>Washington, D.C. 20001,<br><br>                         Defendants. | Civil Case No. _____<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DAMAGES**
(Violation of constitutional and D.C.-law rights of Inauguration Day demonstrators)

---

[*] A motion for leave to omit plaintiffs' addresses is being filed contemporaneously.

**INTRODUCTION**

On January 20, 2017, Donald J. Trump was sworn in as President of the United States. Exercising their constitutional right to freedom of speech and assembly, people from all over the country took to the streets of the nation's capital to express their disapproval of his policies. Journalists came to report on the demonstrations. Legal observers came to document any violations of the demonstrators' legal rights.

During the course of demonstrations in the District of Columbia that day, several acts of vandalism occurred. In response, the District's Metropolitan Police Department (MPD) rounded up and arrested hundreds of people, including people who engaged in no illegal activity, by chasing them and blocking streets so as to force them into a confined area (a "kettle") on a D.C. street corner. During the chase and then while detaining demonstrators for hours, police fired pepper spray, tear gas, and flash-bang grenades at crowds of demonstrators, journalists, and legal observers, frequently without warning or justification. In the course of the roundup and subsequent processing of demonstrators, police held detainees for hours without food, water, or access to toilets; handcuffed detainees so tightly as to cause injury or loss of feeling; and subjected some detainees to manual rectal probing. Much of MPD's misconduct has been independently documented by the District of Columbia's Office of Police Complaints.

Plaintiffs are two individuals who came to the District to express their views concerning the inauguration, a photojournalist who covered the demonstrations, and a legal observer who was present at the scene. Each of them suffered one or more of the constitutional, statutory, and common law violations described here.

Among the violations committed by MPD and its officers were the following: Plaintiff Horse, a photojournalist, was pepper-sprayed while he was taking a photograph of demonstrators and neither posing a safety threat nor breaking the law; he was subsequently arrested even though he was not participating in any unlawful activity. Plaintiff Lagesse was arrested even though she did not participate in any acts of vandalism and was not even close enough to witness any; she was marching to express her views when she was caught up in the stampede created by MPD's pursuit of the demonstrators and its use of chemical irritants. Plaintiff Ariel, a clearly identified legal observer, was pepper-sprayed without warning and for no apparent reason other than standing near the corner where MPD was detaining demonstrators.  Pepper spray and tear gas were used against all plaintiffs without justification and without warning. While Plaintiffs Lagesse, Horse, and Gonzalez were detained on a D.C. street corner and later in police transport vehicles, they were unreasonably denied food, water, and access to a toilet for periods ranging from 7 to 16 hours; arresting officers unnecessarily prolonged the arrest process in order to keep detainees in a state of anxiety, hunger, thirst, and other discomfort. Plaintiffs Lagesse and Horse were handcuffed so tightly that one of Plaintiff Lagesse's wrists bled and Plaintiff Horse lost feeling in several fingers, some of which were numb for months afterward. During processing, Plaintiffs Horse and Gonzalez were subjected to intrusive, humiliating, and unjustified manual rectal probing and grabbing of their testicles.

To obtain compensation for their injuries and to vindicate their rights under the First, Fourth, and Fifth Amendments to the Constitution, the D.C. First Amendment Assemblies Act, and the common law, plaintiffs now seek relief in this Court.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the plaintiffs' claims arise under the First, Fourth and Fifth Amendments to the United States Constitution and are asserted here pursuant to 42 U.S.C. § 1983. Plaintiffs' claims under the statutory and common law of the District of Columbia arise from the same events as the constitutional claims and are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because the events giving rise to all claims occurred in the District of Columbia.

## PARTIES

3.      Plaintiff Shay Horse is an adult resident of New York and a freelance photojournalist whose work has been purchased by Getty Images and Associated Press and published in a variety of outlets including Rolling Stone, Al Jazeera America, and The Intercept. On January 20, he was in Washington, D.C. to photograph the Inauguration Day demonstrations.

4.      Plaintiff Judah Ariel is an adult resident of the District of Columbia and a licensed attorney. On January 20, he was serving as a legal observer to document any violations of the rights of counter-inaugural demonstrators.

5.      Plaintiff Elizabeth Lagesse is an adult resident of Maryland. On January 20, she traveled to Washington, D.C. for the purpose of expressing her opposition to the policy positions of the new President.

4

6.      Plaintiff Milo Gonzalez is an adult resident of New York. On January 20, he was in Washington, D.C. for the purpose of expressing his opposition to the policy positions of the new President and assisting journalists covering the demonstrations.

7.      Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C. It operates and governs the MPD pursuant to the laws of the District of Columbia. In this case, the District of Columbia acted through its agents, employees, and servants, including all of the individual Defendants.

8.       Defendant MPD Officers John/Jane Doe 1-150 are sworn officers who are employed by the MPD and whose real names are unknown at this time. At the time of the events at issue, all Doe officers were acting within the scope of their employment and under color of law of the District of Columbia. They are sued in their individual capacities.

9.      Defendant MPD Supervisory Officers John/Jane Soe 1-20 are sworn officers who are employed by the MPD and whose real names are unknown at this time. The Soe defendants supervised the Doe defendants as indicated herein. At the time of the events at issue, the Soe defendants were acting within the scope of their employment and under color of law of the District of Columbia. They are sued in their individual capacities.

10.     Defendant Peter Newsham is the Chief of the D.C. Metropolitan Police Department. At the time of the events at issue, he was the Interim Chief of Police and was acting within the scope of his employment and under color of law of the District of Columbia. He is sued in his individual capacity.

## FACTS

*Police Weapons*

11.     On Inauguration Day 2017, MPD officers who interacted with demonstrators were equipped with several types of non-lethal weapons, including:

    a.     Oleoresin Capsicum spray dispensers, which resemble small fire extinguishers containing 14-48 ounces of solution, depending on the model, with a typical range of 25-30 feet. The solution, commonly known as pepper spray, produces a burning sensation on a person's skin and in a person's eyes and lungs, vision problems, and breathing problems including coughing and choking.

    b.     "Stingers," which are explosive devices that release smoke, rubber pellets, and a chemical irritant within a radius of approximately 50 feet.

    c.     Smoke flares, which are explosive devices that release smoke.

    d.     Concussion grenades, which are devices that produce loud explosive noises.

    e.     Flash-bang grenades, which are devices that produce loud explosive noises and bright flashes of light.

    f.     Long range acoustic devices, or LRADs, which are devices that emit an excruciatingly loud tone.

*Demonstrators March Down 13th Street NW*

12.     On January 20, 2017, thousands of people demonstrated in the District of Columbia to express their opposition to the new President.

13.     The overwhelming majority of the demonstrators were peaceful and law-abiding.

14.     Between 10 and 11 a.m. on January 20, hundreds of demonstrators walked south on 13th Street NW from Logan Circle toward the National Mall.

15.     Plaintiff Shay Horse was walking alongside the demonstrators in order to photograph the demonstration for journalistic purposes. He intended to sell his photographs commercially, and had a well-founded expectation that he would be able to do so.

16.     Mr. Horse was wearing dark jeans, a hooded sweatshirt with the hood down, a leather jacket, and a camera around his neck. He carried a bag onto which he had affixed silver duct tape to make the bag more identifiable.

17.     Between 10 and 11 a.m. on January 20, some demonstrators engaged in acts of vandalism on or near 13th Street NW between Logan Circle and Franklin Square.

18.     The individuals who engaged in vandalism were dressed in all-black clothing with hoods over their heads and masks over their faces.

19.     Mr. Horse was not wearing a hood or a mask.

*Police Confront the Demonstrators*

20.     As demonstrators walking south on 13th Street NW reached Franklin Square, they encountered a group of MPD officers, who diverted protestors away from Franklin Square to the east.

21.     Many demonstrators and Mr. Horse moved away from the police down streets to the east and south of Franklin Square.

22.     Additional police officers converged on the demonstrators as they were diverted down side streets, and some began discharging pepper spray and various types of noise-emitting devices at the demonstrators.

23.     Plaintiff Horse continued to take photographs of the events, including photographs of a few demonstrators in hoods and masks breaking a storefront window and a photograph of Defendant Officer John Doe 1 as he pepper-sprayed demonstrators. A photograph of Officer John Doe 1 is attached to the complaint as Exhibit A.

24.     Although Officer John Doe 1 had observed Mr. Horse with a large, professional-quality camera around his neck taking photographs, Office John Doe 1 pepper-sprayed Mr. Horse without warning.

25.     At the time Officer John Doe 1 pepper-sprayed Mr. Horse, Mr. Horse was not engaged in any unlawful or dangerous activity. He was not disobeying any orders by any police officer.

26.     As a result of the pepper spray, Mr. Horse choked and gasped for breath. As the pepper spray flooded his eyes, they began to burn.

27.     As Mr. Horse and a number of demonstrators ran away from the police assault, Defendant Officers Doe 1-60 confronted them on the streets immediately east and/or south of Franklin Square and discharged pepper spray, flash-bang grenades, concussion grenades, stingers, smoke flares, and LRADs at demonstrators and other individuals in the vicinity, including Plaintiff Horse.

28.     Neither Defendant Officers Doe 1-60, nor any other MPD officers or officials, ordered anyone to disperse, halt, or turn back, before Does 1-60 deployed their weapons.

29.     Defendant Officers Doe 1-60 deployed pepper-spray, flash-bang grenades, concussion grenades, stingers, smoke flares, and LRADs against individuals (including Mr. Horse) in many instances in which the officers faced no threat to themselves or to public safety or disobedience of any commands they had given.

30.     Defendant Supervisory Officers Soe 1-10 directed the Doe defendants to deploy their weapons against individuals (including Mr. Horse) in many instances in which the Doe defendants faced no threat to themselves or to public safety or disobedience of any commands they had given.

31.     Using pepper spray, flash-bang grenades, concussion grenades, stingers, smoke flares, and LRADs, Defendant Officers Doe 1-60 chased Mr. Horse and many of the demonstrators back to the north and west.

*Plaintiff Lagesse Marches Down 13th Street NW*

32.     Plaintiff Elizabeth Lagesse arrived at Logan Circle later than most of the demonstrators. She walked south down 13th Street NW from Logan Circle approximately thirty minutes after most of the demonstrators had begun marching.

33.     Ms. Lagesse was wearing a black and white T-shirt, a bright-colored inner jacket, and a long grey rain jacket that she removed as she marched, and she was carrying a multi-colored bag. She did not wear a hood or mask. Having encountered overzealous police officers using pepper spray at prior demonstrations, Ms. Lagesse brought a bandana and a pair of lab safety goggles she owned. They were not on her face as she walked south from Logan Circle.

34.     Ms. Lagesse did not engage in or witness any acts of vandalism.

*Continued Police Assault and Mass Detentions*

35.　　On or near 13th Street NW, Defendant Officers Doe 1-60 deployed pepper spray and/or tear gas against individuals, including Mr. Horse and Ms. Lagesse, without warning or a dispersal order, and in many instances in which the officers faced no threat to themselves or to public safety or disobedience of any commands they had given.

36.　　Defendant Supervisory Officers Soe 1-10 directed the Doe defendants to deploy pepper spray against individuals (including Mr. Horse and Ms. Lagesse) in many instances in which the Doe defendants faced no threat to themselves or to public safety or disobedience of any commands they had given.

37.　　The pepper spray caused Mr. Horse's and Ms. Lagesse's eyes to burn.

38.　　Ms. Lagesse put on her safety goggles and pulled her bandana from around her neck to cover her mouth in an attempt to protect herself from the pepper spray that MPD officers were discharging.

39.　　Although neither Ms. Lagesse nor Mr. Horse had committed any unlawful act, the police conduct put each of them in fear for their safety and so they ran away from the police, ultimately heading north on 14th Street NW.

40.　　Defendant Officers Doe 61-90 strategically blocked numerous alternative egress routes in order to force Mr. Horse, Ms. Lagesse, and many demonstrators to flee north up 14th Street NW and then east on L Street NW to the corner of 12th and L Streets NW.

41.　　At the corner of 12th and L Streets NW, Defendant Officers Doe 91-140 established a blockade to trap individuals running east on L Street NW.

42.     Although some individuals on L Street NW managed to escape by evading the MPD blockade before it closed in, Ms. Lagesse, Mr. Horse, and most of the other individuals on L Street NW were detained by police at the northwest corner of 12th and L Streets NW and on L Street NW itself.

43.     Defendant Officers Doe 91-140 detained more than 200 individuals in the cordoned area (the "kettle") they had created at 12th and L Streets NW.

44.     Defendant Supervising Officers Soe 11-15 supervised and/or commanded MPD officers to act in a coordinated manner to funnel individuals into the kettle by chasing them to 12th and L Streets NW and by blocking off alternative routes of dispersal.

45.     Neither Defendant Officers Doe 61-140 nor Defendant Supervisory Officers Soe 11-15 took any actions to try to ensure that only individuals whom they had probable cause to believe had committed crimes would be detained in the kettle.

46.      Defendant Supervising Officers Soe 11-15 were well aware that the police had no ability to identify which, if any, of the kettled individuals had committed crimes.

47.     Defendant Newsham later acknowledged to the Washington Post that his officers strategically maneuvered the demonstrators to trap them in the kettle.  On information and belief, Defendant Newsham ordered or approved this action at the time it took place, and/or approved the continued detention and arrest of the kettled demonstrators despite becoming aware that the police had no ability to identify which, if any, of these individuals had committed crimes.

48.     Because of Defendants' intentional and coordinated action in chasing individuals north on 14th Street NW, then east on L Street NW, while driving them on by using pepper spray, flash-bang grenades, concussion grenades, and stingers, and blocking

their egress via different routes, the individuals who were trapped in the kettle at 12th and L Streets NW were not there by virtue of having acted unlawfully but merely because they were present on particular downtown D.C. streets on the morning of January 20 and then tried to disperse when police chased and assaulted them.

49.     Mr. Horse did not engage in any vandalism or other unlawful activity on the streets of Washington, D.C. on January 20, 2017. He did not encourage anyone to do so or cheer for anyone who did so. He was not dressed the same as anyone who did so.

50.     Mr. Horse was detained in the kettle without probable cause and merely because he was exercising his First Amendment right to document the demonstrations as a photojournalist, was present on particular downtown D.C. streets on the morning of January 20, and tried to run away when police officers chased and assaulted him.

51.     Ms. Lagesse did not engage in any vandalism or other unlawful activity on the streets of Washington, D.C. on January 20, 2017. She did not encourage anyone to do so or cheer for anyone who did so. She was not dressed the same as anyone who did so.

52.     Ms. Lagesse was detained in the kettle without probable cause and merely because she wished to exercise her First Amendment right to demonstrate peacefully in opposition to the Inauguration, was present on particular downtown D.C. streets on the morning of January 20, and tried to run away when police officers chased and assaulted her.

*In the Kettle*

53.     The kettle of detainees at 12th and L Streets NW was formed by Defendants at about 10:45 a.m.

54.     Plaintiffs Horse and Lagesse were detained there along with approximately 200 other individuals, one of whom was Plaintiff Milo Gonzalez.

55.     Plaintiffs, Horse, Lagesse, and Gonzalez were detained in the kettle for hours.

56.     While individuals were detained in the kettle, Defendant Officers Doe 91-140 repeatedly deployed pepper spray and tear gas against individuals or groups of individuals in the kettle, including Plaintiffs Horse, Lagesse, and Gonzalez.

57.     Many of these deployments came without warning or dispersal order—indeed, the individuals in the kettle were physically prevented from dispersing—and were carried out in the absence of any threat to officer or public safety or any disobedience of police orders on the part of the detainees.

58.     Defendant Supervisory Officers Soe 16-20, overseeing the conduct of officers at the kettle, directed the Doe defendants to deploy pepper spray against individuals (including Plaintiffs Horse, Lagesse, and Gonzalez) in many instances in which the Doe defendants faced no threat to themselves or to public safety or disobedience of any commands they had given.

59.     The pepper spray and tear gas were so thick that at times they created a haze over the kettle and all the individuals detained there.

60.     The repeated deployment of chemical irritants caused panic among the kettled detainees, including Plaintiffs Horse, Lagesse, and Gonzalez, because they were having difficulty breathing, were tightly pressed together with other detainees, and could not escape the kettle.

61.     Each time Plaintiffs Horse and Gonzalez were hit with pepper spray or tear gas, their eyes began to burn painfully, and they began to cough and to gasp for breath.

62.     Because Plaintiff Lagesse had goggles on by this time, her eyes were protected, but the pepper spray caused her to cough, to have difficulty breathing, and to experience a burning sensation on the uncovered part of her face.

63.     While Plaintiffs Horse, Lagesse, and Gonzalez were detained in the kettle, the defendants failed to provide them with food, water, or access to a toilet.

64.     Many demonstrators, including Ms. Lagesse and Mr. Gonzalez, specifically requested food, water, and access to a toilet.

65.     While the detainees were kettled, Defendant Officers Doe 91-95 threw edible food in a garbage can in view of the detainees, including Plaintiffs Horse and Gonzalez, to taunt them. Mr. Gonzalez specifically asked the officers for food that they were throwing away and they refused to provide it. Defendant Officers Doe 91-95 laughed at Mr. Gonzalez as they threw their food away.

66.     Hungry, Mr. Horse and Mr. Gonzalez both resorted to rummaging in a city trashcan for the food the officers had discarded.

67.     One of the MPD officers, Defendant Officer John Doe 96, made clear to the detainees that no toilets would be made available by stating in response to one detainee's request that she should "shit [her] pants" to prove she needed a toilet.

68.     Having no other place to urinate, some of the demonstrators urinated on the street or against the side of buildings. Some demonstrators rummaged in the trash for empty bottles in which to urinate. At least one demonstrator crouched against the side of a building and defecated into a paper bag.

69.     Mr. Gonzalez badly needed to use a toilet, but, fearing that he could be charged with public urination, did not dare to urinate on the street.

70.     Holding his bladder was painful for Mr. Gonzalez.

71.     Defendant Officer John Doe 97 taunted Mr. Gonzalez, saying "If you wanted to go to the bathroom, you shouldn't have gotten arrested."

72.     In the early afternoon, MPD began handcuffing detainees and placing them into vehicles for transport to detention facilities.

73.     Neither Defendant Officers Doe 91-140 nor Defendant Supervisory Officers Soe 16-20 took any actions to try to ensure that only individuals whom they had probable cause to believe had committed crimes would be handcuffed and transported to detention facilities.

74.     Defendant Officers John Doe 91-140 purposefully proceeded slowly with the arrests to maximize the detainees' discomfort.

75.     The level of coordination in slow-walking the formal arrest of detainees reflects that Defendant Supervisory Officers Soe 16-20 instructed the arresting officers to process the detainees slowly to maximize their discomfort.

*Bystanders and Legal Observers Are Pepper-Sprayed*

76.     Plaintiff Judah Ariel had started working as a legal observer at 6:30 a.m. on January 20 at various demonstrations throughout the District. He was dressed in a brown jacket and blue jeans, and he was wearing the distinctive bright neon green hat commonly worn by legal observers to identify themselves. He was not wearing a hood or mask.

77.     At approximately 1:30 p.m., Mr. Ariel was walking east from McPherson Square on K Street NW.

78.     Because Mr. Ariel had heard from another legal observer about police activity in the area of 12th and L Streets NW, he walked north on 12th Street NW toward that intersection to see if he could be of use as a legal observer there.

79.     Mr. Ariel joined a crowd of people at the southeast corner of 12th and L Streets NW, outside the kettle. The crowd included multiple legal observers along the sidewalk, clearly identifiable by on their bright neon green hats.

80.     The south side of the intersection was cordoned off by yellow police tape and blocked by a row of police motorcycles. In the intersection, and extending west on L Street NW, a row of MPD officers lined up facing south towards the crowd. Additional MPD officers were lined up behind the first police line.

81.     Mr. Ariel observed the kettled group of detainees surrounded by police at the northwest corner of the intersection.

82.     Many members of the crowd outside the kettle shouted at the police to demand the release of the people being detained.

83.     While Mr. Ariel was present, neither he nor the other individuals outside the kettle menaced, threatened, or assaulted the police or their vehicles.

84.     At approximately 1:45 p.m., suddenly and without warning or a dispersal order, Defendant Officers Doe 141-149 began to pepper-spray the people outside the kettle, including Mr. Ariel, on the south side of L Street NW.

85.     When the pepper-spraying began, there was no threat to public or officer safety, and neither Mr. Ariel nor other individuals in the crowd were disobeying police orders.

86.     The coordinated action by multiple officers reflects that Defendant Supervisory Officers Soe 16-20, overseeing the conduct of officers at the kettle, ordered the pepper-spraying of bystanders, despite the absence of a threat to officer or public safety or disobedience of any officer's command.

87.     The crowd began to retreat from the spray.

88.     Officers Doe 141-149 moved forward down 12th Street NW, advancing on the retreating crowd, continuing to deploy pepper spray indiscriminately on people in the crowd.

89.     One MPD officer, Defendant Officer John Doe 141, held his spray gun in front of him, sweeping the spray back and forth across the crowd.

90.     Mr. Ariel coughed and felt his lungs and eyes burn from the spray.

91.     Mr. Ariel covered his mouth with a cloth but a few seconds later, he began to choke.

92.     Fearing for his safety, Mr. Ariel fled. He felt that he was on the verge of passing out.

*The Formal Arrests*

93.     The pace of the formal arrests of the kettled detainees speeded up in the mid- to late afternoon.

94.     When Mr. Horse was formally arrested, Defendant Officer John Doe 101 handcuffed him (using zipties) so excessively tightly that he lost feeling in some of the fingers on both of his hands.

95.     Mr. Horse complained to Defendant Officer John Doe 102 that the zipties were painfully tight, but the officer refused to remove them, explaining that the zipties were not supposed to be comfortable.

96.     Mr. Horse's zipties were not removed for approximately three hours.

97.     When Ms. Lagesse was arrested, Defendant Officer John Doe 103 handcuffed her using zipties so excessively tightly that one of her wrists was cut and began to bleed.

98.     Ms. Lagesse complained to Defendant Officer John Doe 104 that the zipties were painfully tight, but the officer refused to remove them.

99.     Ms. Lagesse's zipties were not removed for approximately two hours.

100.    Mr. Horse was detained in the kettle for approximately 7 hours.

101.    By the time Mr. Horse was formally arrested and transported to a detention facility, he had gone approximately 9-10 hours without access to a toilet.

102.    Mr. Horse was not given food or drink until later in the evening; he was detained an approximate total of 10-11 hours without being provided food or drink.

103.    Ms. Lagesse was detained on the street for approximately 5-6 hours.

104.    By the time Ms. Lagesse was formally arrested, transported to a detention facility, and had her belongings inventoried, she had gone approximately 7-8 hours without access to a toilet.

105.    The toilet to which Ms. Lagesse was finally given access had no toilet paper. Several of the women detained with her asked for toilet paper but none was provided.

106.    Ms. Lagesse was not given access to water until late that night; she was detained an approximate total of 11-12 hours without water.

107.    Ms. Lagesse did not receive food at the detention facility until the early hours of the following morning; she was detained an approximate total of 13-16 hours before she was given food.

108.    Mr. Gonzalez was detained on the street for approximately 7 hours.

109.    By the time Mr. Gonzalez was formally arrested, transported to a detention facility, and given the opportunity to use a toilet, he had gone approximately 9-10 hours without access to a toilet.

110.    By the time he was allowed to urinate, Mr. Gonzalez was in pain from having held his urine for so long.

111.    When Mr. Gonzalez was allowed to use a portable toilet, MPD officers held the door open and watched him urinate. They rushed Mr. Gonzalez out of the toilet before he had finished emptying his bladder.

112.    Mr. Gonzalez was not given food or drink until later in the evening; he was detained an approximate total of 10-11 hours without being provided food or drink.

*The Rectal Searches*

113.    After Plaintiffs Horse and Gonzalez were arrested, they were detained at a facility they believe to have been the Metropolitan Police Academy on Blue Plains Drive SW, off I-295 near the Maryland state line.

114.    MPD officers took them inside the facility to what appeared to be an officer-training area that was set up to look like a mock street. There the officers searched both of them along with several other detainees.

115.    Defendant Officer John Doe 150, who was wearing rubber gloves, ordered Mr. Horse, Mr. Gonzalez, and three other detainees to remove their pants.

116.    Without warning, Defendant Officer John Doe 150 grabbed Mr. Horse's testicles and yanked on them.

117.    He then put his finger into Mr. Horse's rectum, through his underwear.

118.    As Defendant Officer John Doe 150 pushed his finger into Mr. Horse's rectum, he ordered Mr. Horse not to flinch.

119.    Defendant Officer John Doe 150 pushed his finger an inch deep into Mr. Horse's rectum and wiggled it around for several seconds.

120.    Defendant Officer John Doe 150 then reached inside Mr. Gonzalez's underwear and fondled his testicles.

121.    Defendant Officer John Doe 150 reached inside Mr. Gonzalez's underwear and put his finger into Mr. Gonzalez's rectum.

122.    As the Defendant Officer John Doe 150 pushed his finger into Mr. Gonzalez's rectum, he ordered Mr. Gonzalez not to resist.

123.    Defendant Officer John Doe 150 and other officers laughed at Mr. Gonzalez while this degrading search was performed.

124.    Defendant Officer John Doe 150 then moved down the line and subjected the other three detainees there to similar treatment; Mr. Horse heard another detainee yelp.

125.    Defendant Officer John Doe 150 did not change gloves when he moved from one individual to the next.

126.    The manual rectal searches were performed in the presence of several other detainees and approximately five to ten other MPD officers, including at least one or two female officers.

127.     No circumstances provided reasonable suspicion or probable cause to suspect Mr. Horse or Mr. Gonzalez of concealing contraband in any body cavity.

128.     No contraband was found on either Mr. Horse or Mr. Gonzalez.

*Plaintiff Horse's Injuries*

129.     As a result of Defendants' use of pepper spray and tear gas, Plaintiff Horse suffered severe pain as his eyes burned from the pepper spray. Pepper spray remained in his hair throughout his detention, which lasted more than 24 hours; every time his long hair touched his face, it caused a burning sensation and coughing. Mr. Horse had a rash on his scalp for a week after his arrest. Mr. Horse suffered emotional distress from the panic at being trapped and unable to breathe while he was pepper-sprayed during the kettle.

130.     As a result of his arrest without probable cause and in response to his exercise of his First Amendment rights, Mr. Horse was detained for approximately 33 hours.

131.     Because Mr. Horse's arrest and detention led to the confiscation of his photographs and camera for approximately two months, Mr. Horse lost income because he was unable to sell his photographs of the January 20 demonstrations in a timely manner and did not have the equipment he needed to cover other newsworthy protests in the weeks following his arrest.

132.     As a result of the application of excessively tight zipties, Mr. Horse experienced pain in his hands and lost feeling in several fingers on both hands. Several fingers on his left hand remained numb for more than four months after his arrest. Because of the numbness, Mr. Horse has had difficulty with important daily tasks, including typing

on a keyboard and operating his camera. Mr. Horse had scarring on his left wrist from the zipties for more than two months after the arrest.

133.     As a result of the denial of food, water, and access to a toilet, Mr. Horse experienced hunger, thirst, discomfort, and anxiety.

134.     As a result of Defendants' manual rectal probing and grabbing of his testicles, Mr. Horse suffered humiliation, anxiety, and emotional distress. He feels as if he has been raped. Mr. Horse's anus was sore for a day or two after the intrusion. Mr. Horse has felt irritable and withdrawn from other people, and he has found it harder to trust and confide in other people. The emotional distress has negatively affected Mr. Horse's relationships, including impinging on his sex drive and performance. Mr. Horse remains haunted by what he experienced.

135.     As a result of the defendants' conduct described above, particularly the kettling and the rectal probing, Mr. Horse has suffered bouts of anxiety and has had difficulty sleeping since January 20. He suffers from nightmares filled with violent imagery and wakes up approximately every three hours, often in a panicked state. Covering demonstrations—a crucial part of Mr. Horse's job—heightens his anxiety as he remembers what happened to him on January 20.

*Plaintiff Lagesse's Injuries*

136.     As a result of Defendants' use of pepper spray and tear gas, Plaintiff Lagesse coughed, had difficulty breathing, and experienced a burning sensation on her face and in her eyes. Ms. Lagesse also suffered emotional distress from the panic at being trapped and unable to breathe when she was pressed in a crush of people and pepper-sprayed while being detained in the kettle.

137.     As a result of her exposure to pepper spray, the skin on Ms. Lagesse's face was peeling for more than a week after the arrest.

138.     As a result of her arrest without probable cause and in response to her exercise of her First Amendment rights, Ms. Lagesse was detained for approximately 37 hours.

139.     As a result of Defendants' application of excessively tight zipties, Ms. Lagesse's wrist bled and she experienced pain in her wrists and hands. More than four months after her arrest, she still has a quarter-inch-long scar on her right wrist.

140.     As a result of the denial of food, water, and access to a toilet, Ms. Lagesse experienced hunger, thirst, discomfort, and anxiety.

141.     As a result of the defendants' conduct described above, Ms. Lagesse suffered stress, anxiety, and emotional distress both on January 20 and subsequently. For weeks after her arrest, she experienced heightened anxiety whenever she heard helicopters or loud noises such as fireworks. She continues to feel increased anxiety around police officers. Ms. Lagesse participated in many political demonstrations prior to January 20, but is now reluctant to do so because she fears that she may again be subjected to police violence through no fault of her own. Although she has nevertheless attended two demonstrations since January 20, she was nervous while demonstrating, constantly watching for police and worrying about their whereabouts, and she sometimes avoided chanting or carrying a sign because she feared that if she called attention to herself she might be again become a target of police violence.

*Plaintiff Ariel's Injuries*

142.     As a result of Defendants' use of pepper spray and tear gas, Plaintiff Ariel coughed, choked, had difficulty breathing, and experienced a burning sensation in his eyes and lungs. He feared he would pass out and suffer further injury.

143.     As a result of Defendants' unjustified and sudden pepper-spraying, Mr. Ariel suffered emotional distress and anxiety during and after his encounter with the police. He often continues to feel increased anxiety around police officers.

*Plaintiff Gonzalez's Injuries*

144.     As a result of Defendants' use of pepper spray and tear gas, Plaintiff Gonzalez coughed, had difficulty breathing, and experienced a burning sensation in his eyes, on his face, and in his lungs and chest. He experienced extreme panic when he was being pepper-sprayed in the kettle and felt unable to breathe and unable to escape. When Mr. Gonzalez attended a Chinese New Year celebration shortly after his arrest, the fireworks caused Mr. Gonzalez to panic and feel as if concussion grenades were being detonated near him.

145.     As a result of the denial of food, water, and access to a toilet, Mr. Gonzalez experienced hunger, thirst, discomfort, and anxiety. Specifically, Mr. Gonzalez experienced pain and discomfort in his midsection as a result of holding his bladder; the pain persisted for two weeks after his arrest. Additionally, Mr. Gonzalez experienced difficulty urinating for two weeks after his arrest. He sought medical attention for both of these conditions.

146.    As a result of Defendants' manual rectal probing and the grabbing of his testicles, Mr. Gonzalez suffered humiliation, anxiety, and emotional distress. He feels more withdrawn from people and has had difficulty relating to people since the search.

147.    As a result of all the conduct described here, Mr. Gonzalez has had difficulty sleeping since January 20. He has regular nightmares about being chased, attacked, or locked up by the police. He frequently cannot sleep for hours and occasionally goes all night without sleeping. Mr. Gonzalez also feels nervous about attending protests. When he encounters police, he becomes extremely fearful, and begins to shake and sweat. After experiencing these symptoms at several demonstrations after January 20, he has ceased attending demonstrations entirely because of his fear and anxiety.

*The District's Responsibility for Plaintiffs' Injuries*

148.    The actions of the Defendants described above were taken pursuant to a municipal policy, practice and custom of responding to demonstrations at which some law-breaking occurs by using excessive force against participants who have not broken the law.

149.    Chief Newsham has acknowledged that the Defendant Officers' kettling of detainees was not mere happenstance but a coordinated strategy. Indeed, all of the Defendants Officers' actions in pepper-spraying, assaulting with additional noise- and light-emitting weaponry, and detaining demonstrators were carried out in a coordinated manner.

150.    Chief Newsham spent the day on January 20 in an MPD command center, where he was well aware of and (on information and belief) directed the massive and coordinated MPD response to the march down 13th Street NW, in accordance with MPD Standard Operating Procedure 16-01 ("Handling First Amendment Assemblies And Mass

Demonstrations"), which provides (at page 11) that "During periods in which the Department is fully mobilized for mass demonstration operations . . . [t]he Chief of Police, as the commanding official of the MPD, shall oversee all police activities …."

151.    To whatever extent Chief Newsham did not direct the coordinated MPD response himself, he nonetheless was aware of the large-scale MPD actions taken against the individuals who marched down 13th Street NW, and he deliberately failed to supervise and restrain Defendants under his command from violating the rights of Plaintiffs and others repeatedly and continually throughout January 20.

152.    The coordinated MPD response is part of a custom of the District of Columbia of responding with overwhelming and unlawful force to non-violent demonstrators at largely peaceful demonstrations where some law-breaking is occurring. For instance, MPD has:

a.    Used excessive force against and unconstitutionally detained demonstrators during the counter-inaugural demonstrations in Adams Morgan in January 2005; the pepper-spraying and arrest of numerous peaceful demonstrators led to lawsuits resolved by large settlement payments to victims of MPD violence.

b.    Used excessive force against demonstrators during the counter-inaugural demonstrations near the White House in January 2005 after other demonstrators had removed a portion of security fencing; the pepper-spraying of law-abiding demonstrators led to a lawsuit resolved by large settlement payments to victims of MPD violence.

c.      Used excessive force against and unconstitutionally detained demonstrators during the World Bank protests in Pershing Park in September 2002; the mass arrests and hogtying of protestors led to lawsuits resolved by large settlement payments to victims of MPD violence.

d.      Used excessive force against and unconstitutionally detained anti-globalization demonstrators in April 2000, including kettling, use of pepper spray, and denying detainees of access to food and water, all of which led to lawsuits resolved by large settlement payments to victims of MPD violence.

153.     The prior incidents in which MPD used excessive force against and unconstitutionally detained peaceful demonstrators where some law-breaking occurred made clear to the District that its officers required training regarding the constitutional limits of their authority to detain demonstrators and use force against them. To whatever extent the individual Defendants' actions described here did not reflect municipal custom or carry out affirmative instructions from Chief Newsham, these actions were the result of the District's failure to train, or its inadequate training of, MPD officers.

154.     Dozens of individuals detained by MPD on January 20, including individuals who were transported to detention facilities at various times during the afternoon and evening, report that MPD officers subjected them to manual cavity searches and other molestations similar to those experienced by Plaintiffs Horse and Gonzalez.

155.     The widespread and pervasive nature of MPD's abusive cavity searches demonstrates that they were undertaken pursuant to a central policy or pervasive custom of the District to humiliate and degrade individuals arrested for demonstrating.

156.     When asked to comment on the conduct of MPD officers on January 20, Chief Newsham responded by ratifying the officers' conduct in an interview with WTOP radio, in which he stated: "[A]ll the police officers were outstanding in the judgment that they used. They used the least amount of force necessary to bring those folks safely and respectfully into custody. I couldn't be more proud of the way this department responded." Chief Newsham further stated to WTOP that he was "very, very pleased" with the way police responded to the demonstration.

157.     Following a report by the Office of Police Complaints raising concerns about MPD's conduct on Inauguration Day, an official MPD spokesperson reaffirmed that its officers' actions conformed to the District's expectations: "The Metropolitan Police Department stands by its assertion that our officers acted responsibly and professionally during Inauguration Day," MPD spokesperson Rachel Reid said in a statement emailed to the news media.

*Notice of Claim*

158.     Plaintiffs have timely given notice in writing to the Mayor of the District of Columbia of the "approximate time, place, cause, and circumstances" of their injuries, pursuant to D.C. Code § 12-309. The Notice of Claim letter was hand-delivered to the D.C. Office of Risk Management on June 12, 2017.

**CLAIMS FOR RELIEF**

**Claim 1: Fourth Amendment / 42 U.S.C. § 1983 – arrest without probable cause**
**(Plaintiffs Horse and Lagesse against Defendants District of Columbia, Doe 61-140, Soe 11-20, and Newsham)**

159.     The actions of Defendants Doe 61-140, namely the warrantless arrests of Plaintiffs Horse and Lagesse without probable cause, and the actions of Defendants Soe

11-20 and Newsham in ordering or approving such arrests, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

160.     Defendants Doe 61-140, Soe 11-20, and Newsham are jointly and severally liable to Plaintiffs Horse and Lagesse pursuant to 42 U.S.C. § 1983 for this violation of their rights.

161.     Defendant District of Columbia is liable to Plaintiffs Horse and Lagesse pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

### Claim 2: First Amendment / 42 U.S.C. § 1983 – arrest for protected speech
### (Plaintiffs Horse and Lagesse against Defendants District of Columbia, Doe 61-140, Soe 11-20, and Newsham)

162.     The actions of Defendants Doe 61-140, namely the arrest of Plaintiffs Horse and Lagesse for exercising their First Amendment freedoms to report the news or to express their views, respectively, and the actions of Defendants Soe 11-20 and Newsham in ordering or approving such arrests, violated the rights of Plaintiffs Horse and Lagesse under the First Amendment to the United States Constitution, which provides for the freedoms of speech and press.

163.     Defendants Doe 61-140, Soe 11-20, and Newsham are jointly and severally liable to Plaintiffs Horse and Lagesse pursuant to 42 U.S.C. § 1983 for this violation of their rights.

164.     Defendant District of Columbia is liable to Plaintiffs Horse and Lagesse pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

**Claim 3: False arrest / false imprisonment**
**(Plaintiffs Horse and Lagesse against Defendants District of Columbia, Doe 61-140,**
**Soe 11-20, and Newsham)**

165.     The actions of Defendants Doe 61-140, namely the warrantless arrest of
Plaintiffs Horse and Lagesse without probable cause, and the actions of Defendants Soe
11-20 and Newsham in ordering or approving such arrests, constituted false arrest and false
imprisonment under the laws of the District of Columbia.

166.     Defendants Doe 61-140, Soe 11-20, and Newsham are jointly and severally
liable to Plaintiffs Horse and Lagesse for these tortious acts.

167.     Defendant District of Columbia is liable under the doctrine of *respondeat
superior* for the damages inflicted by its agents while acting within the scope of their
employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 4: Negligence per se / First Amendment Assemblies Act – kettling**
**(Plaintiffs Horse and Lagesse against Defendants District of Columbia, Soe 11-20,**
**and Newsham)**

168.     The actions of Defendants Soe 11-20 and Newsham, namely ordering the
kettling or encircling of Plaintiffs, violated the rights of Plaintiffs Horse and Lagesse under
the First Amendment Assemblies Act because Defendants lacked "probable cause to
believe that a *significant* number or percentage of the persons located in the area or zone
have committed unlawful acts" and because the police did not "have the ability to identify
those individuals." D.C. Code § 5-331.08 (emphasis added).

169.     Defendants Soe 11-20 and Newsham are jointly and severally liable to
Plaintiffs Horse and Lagesse for this violation of their rights, because Defendants' violation
of the First Amendment Assemblies Act constitutes negligence per se and/or is redressable
under the First Amendment Assemblies Act.

170.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 5: Negligence per se / First Amendment Assemblies Act – failure to give dispersal order
### (Plaintiffs Horse, Lagesse, and Ariel against Defendants District of Columbia, Doe 1-149, Soe 1-20, and Newsham)

171.     The actions of Defendants Doe 1-149, namely the failure to give Plaintiffs "at least one clearly audible and understandable order to disperse using an amplification system or device" and to "provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal" violated the rights of Plaintiffs Horse, Lagesse, and Ariel under the First Amendment Assemblies Act. D.C. Code § 5-331.07(e)(1).

172.     Defendants Soe 1-20 and Newsham are liable for these actions of Doe 1-149 because Soe 1-20 and Newsham ordered the police to assault the plaintiffs without a dispersal order or knew about, condoned, and failed to correct this conduct.

173.     Defendants Doe 1-149, Soe 1-20 and Newsham are jointly and severally liable to Plaintiffs Horse, Lagesse, and Ariel for this violation of their rights, because Defendants' violation of the First Amendment Assemblies Act constitutes negligence per se and/or is redressable under the First Amendment Assemblies Act.

174.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 6: Fourth Amendment / 42 U.S.C. § 1983 –**
**excessive force (use of chemical irritants)**
**(Plaintiffs Horse, Lagesse, Ariel and Gonzalez against Defendants District of**
**Columbia, Doe 1-60 & 91-149, Soe 1-10 & 16-20, and Newsham)**

175.     The actions of Defendants Doe 1-60 & 91-149, namely the use of pepper spray and tear gas against nonviolent and non-resisting demonstrators, detainees, and bystanders, and the actions of Defendants Soe 1-10 & 16-20 and Newsham in ordering or approving such use of pepper spray and tear gas, violated the rights of Plaintiffs Horse, Lagesse, Ariel, and Gonzalez under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

176.     Defendants Doe 1-60 & 91-149, Soe 1-10 & 16-20, and Newsham are jointly and severally liable to Plaintiffs Horse, Lagesse, Ariel, and Gonzalez pursuant to 42 U.S.C. § 1983 for this violation of their rights.

177.     Defendant District of Columbia is liable to Plaintiffs Horse, Lagesse, Ariel, and Gonzalez pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

**Claim 7: Assault and battery – use of chemical irritants**
**(Plaintiffs Horse, Lagesse, Ariel, and Gonzalez against Defendants District of**
**Columbia, Doe 1-60 & 91-149, Soe 1-10 & 16-20, and Newsham)**

178.     The actions of Defendants Doe 1-60 & 91-149, namely the use of pepper spray and tear gas against nonviolent and non-resisting demonstrators, detainees, and bystanders, and the actions of Defendants Soe 1-10 & 16-20 and Newsham in ordering or approving such use of pepper spray and tear gas, constituted the torts of assault and battery against Plaintiffs Horse, Lagesse, Ariel, and Gonzalez.

179.     Defendants Doe 1-60 & 91-149, Soe 1-10 & 16-20, and Newsham are jointly and severally liable to Plaintiffs for these tortious acts.

180.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 8: Negligence per se / First Amendment Assemblies Act –
unlawful use of chemical irritants
(Plaintiffs Horse, Lagesse, Ariel, and Gonzalez against Defendants District of
Columbia, Doe 1-60 & 91-149, Soe 1-10 & 16-20, and Newsham)**

181.     The actions of Defendants Doe 1-60 & 91-149, namely the use of pepper spray and tear gas against nonviolent and non-resisting demonstrators, detainees, and bystanders, and the actions of Defendants Soe 1-10 & 16-20 and Newsham in ordering or approving such use of pepper spray and tear gas, violated the rights of Plaintiffs Horse, Lagesse, Ariel, and Gonzalez under the First Amendment Assemblies Act because Defendants used "[l]arge scale canisters of chemical irritant" when not "reasonable and necessary to protect officers or others from physical harm or to arrest actively resisting subjects" and because they used "[c]hemical irritant … to disperse a First Amendment assembly" absent a circumstance where "assembly participants or others are committing acts of public disobedience endangering public safety and security." D.C. Code § 5-331.16(b).

182.     Defendants Doe 1-60 & 91-149, Soe 1-10 & 16-20, and Newsham are jointly and severally liable to Plaintiffs Horse, Lagesse, Ariel, and Gonzalez for this violation of their rights, because Defendants' violation of the First Amendment Assemblies Act constitutes negligence per se and/or is redressable under the First Amendment Assemblies Act.

183.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 9: Fourth Amendment / 42 U.S.C. § 1983 –
### excessive force (zipties)
### (Plaintiffs Horse and Lagesse against Defendants Doe 101-04)

184.     The actions of Defendants Doe 101-04, namely the excessively and painfully tight handcuffing of Plaintiffs Horse and Lagesse and the refusal to remove the restraints despite knowing that they were too tight, violated their rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

185.     Defendants Doe 101-04 are jointly and severally liable to Plaintiffs Horse and Lagesse pursuant to 42 U.S.C. § 1983 for this violation of their rights.

### Claim 10: Fourth and Fifth Amendments / 42 U.S.C. § 1983 –
### unconstitutional conditions of pre-trial confinement
### (Plaintiffs Horse, Lagesse, and Gonzalez against Defendants District of Columbia,
### Doe 91-140, Soe 16-20, and Newsham)

186.     The actions of Defendants Doe 91-140, namely the detention of Plaintiffs Horse, Lagesse, and Gonzalez for a prolonged period without access to food, water or toilets, and the decision of Defendants Soe 16-20 and Newsham to order or approve such prolonged detention under these conditions, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures and under the Fifth Amendment to the United States Constitution to due process of law.

187.    Defendants Doe 91-140, Soe 16-20, and Newsham are jointly and severally liable to Plaintiffs Horse, Lagesse, and Gonzalez pursuant to 42 U.S.C. § 1983 for this violation of their rights.

188.    Defendant District of Columbia is liable to Plaintiffs Horse, Lagesse, and Gonzalez pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

**Claim 11: Negligence per se / First Amendment Assemblies Act –**
**unreasonable delay in providing food to arrestees**
**(Plaintiffs Horse, Lagesse, and Gonzalez against Defendants District of Columbia,**
**Doe 91-140, Soe 16-20, and Newsham)**

189.    The actions of Defendants Doe 91-140, namely the failure to provide food to detainees "not released within a reasonable time of arrest," and the decision of Defendants Soe 16-20 and Newsham to order or approve such prolonged detention under these conditions, violated the rights of Plaintiffs Horse, Lagesse, and Gonzalez under the First Amendment Assemblies Act. D.C. Code § 5-331.12(b)(2).

190.    Defendants Doe 91-140, Soe 16-20, and Newsham are jointly and severally liable to Plaintiffs Horse, Lagesse, and Gonzalez for this violation of their rights, because Defendants' violation of the First Amendment Assemblies Act constitutes negligence per se and/or is redressable under the First Amendment Assemblies Act.

191.    Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 12: Negligence per se / First Amendment Assemblies Act –
### failing to process arrestees promptly
### (Plaintiffs Horse, Lagesse, and Gonzalez against Defendants District of Columbia, Doe 91-140, Soe 16-20, and Newsham)

192.     The actions of Defendants Doe 91-140, namely the failure to "promptly process any person arrested in connection with a First Amendment assembly to determine whether the person is eligible for immediate release pursuant to a lawful release option," and the decision of Defendants Soe 16-20 and Newsham to order or approve delays in processing, violated the rights of Plaintiffs Horse, Lagesse, and Gonzalez under the First Amendment Assemblies Act. D.C. Code § 5-331.12(a)(1).

193.     Defendants Doe 91-140, Soe 16-20, and Newsham are jointly and severally liable to Plaintiffs Horse, Lagesse, and Gonzalez for this violation of their rights, because Defendants' violation of the First Amendment Assemblies Act constitutes negligence per se and/or is redressable under the First Amendment Assemblies Act.

194.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 13: Intentional infliction of emotional distress – denial of access to toilets
### (Plaintiff Gonzalez against Defendants District of Columbia, Doe 91-140, Soe 16-20, and Newsham)

195.     The actions of Defendants Doe 91-140, namely the detention of Plaintiff Gonzalez for a prolonged period without access to toilets, and the decision of Defendants Soe 16-20 and Newsham to order or approve such prolonged detention under these conditions, constituted extreme and outrageous conduct that intentionally or recklessly caused Plaintiff Gonzalez severe emotional distress.

196.     Defendants Doe 91-149, Soe 16-20, and Newsham are jointly and severally liable to Plaintiff Gonzalez for these tortious acts.

197.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 14: Fourth Amendment / 42 U.S.C. § 1983 – unreasonable search
### (Plaintiffs Horse and Gonzalez against Defendants District of Columbia and John Doe 150)

198.     The actions of Defendant John Doe 150, namely the manual rectal probing of Plaintiffs Horse and Gonzalez and the grabbing of their testicles without reasonable suspicion or probable cause, violated the rights of Plaintiffs Horse and Gonzalez under the Fourth Amendment to the United States Constitution to be free from unreasonable searches.

199.     Defendant John Doe 150 is liable to Plaintiffs Horse and Gonzalez pursuant to 42 U.S.C. § 1983 for this violation of their rights.

200.     Defendant District of Columbia is liable to Plaintiffs Horse and Gonzalez pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

### Claim 15: Assault and battery – bodily invasion
### (Plaintiffs Horse and Gonzalez against Defendants District of Columbia and John Doe 150)

201.     The actions of Defendant John Doe 150, namely the manual rectal probing of Plaintiffs Horse and Gonzalez and the grabbing of their testicles, constituted the torts of assault and battery against Plaintiffs Horse and Gonzalez.

202.     Defendant Doe 150 is liable to Plaintiffs Horse and Gonzalez for these tortious acts.

203.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agent while acting within the scope of his employment as an MPD officer and on behalf of and in the interest of his employer.

### Claim 16: Intentional infliction of emotional distress – bodily invasion
### (Plaintiffs Horse and Gonzalez against Defendants District of Columbia and John Doe 150)

204.     The actions of Defendant John Doe 150, namely the manual rectal probing of Plaintiffs Horse and Gonzalez and the grabbing of their testicles, constituted extreme and outrageous conduct that intentionally or recklessly caused Plaintiffs severe emotional distress.

205.     Defendant Doe 150 is liable to Plaintiffs Horse and Gonzalez for these tortious acts.

206.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agent while acting within the scope of his employment as an MPD officer and on behalf of and in the interest of his employer.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(a)     RULE that Defendants' actions violated Plaintiffs' rights under the First, Fourth and Fifth Amendments to the United States Constitution, the First Amendment Assemblies Act, and the law of the District of Columbia;

(b)     ENTER JUDGMENT awarding Plaintiffs compensatory damages against all Defendants in an amount appropriate to the evidence adduced at trial;

(c)      ENTER JUDGMENT awarding Plaintiffs punitive damages against Defendants John/Jane Doe 1-150, John/Jane Soe 1-20, and Newsham in an amount appropriate to the evidence adduced at trial;

(d)      ENTER JUDGMENT awarding Plaintiffs their costs and reasonable attorneys' fees in this action as provided in 42 U.S.C. § 1988(b); and

(e)      GRANT Plaintiffs such further relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiffs request a trial by jury.

Respectfully submitted,

*/s/ Scott Michelman*
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Shana Knizhnik[†]
American Civil Liberties Union Foundation
   of the District of Columbia
4301 Connecticut Avenue NW, Suite 434
Washington, D.C. 20008
Tel. 202-457-0800
Fax 202-457-0805
smichelman@acludc.org

June 21, 2017                              Counsel for Plaintiffs

---

[†] Admitted in New York. Practicing in D.C. under supervision of a D.C. Bar member while D.C. Bar application pending, pursuant to D.C. Ct. App. R. 49(c)(8).

Exhibit A

