UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHAY HORSE
  [Address redacted pursuant to court order]
JUDAH ARIEL
  [Address redacted pursuant to court order]
ELIZABETH LAGESSE
  [Address redacted pursuant to court order]
MILO GONZALEZ
  [Address redacted pursuant to court order]
GWEN FRISBIE-FULTON
  [Address redacted pursuant to court order]
A.S., a minor, through his mother
  Gwen Frisbie-Fulton
  [Address redacted pursuant to court order],

                              Plaintiffs,

        v.

DISTRICT OF COLUMBIA; PETER NEWSHAM; KEITH DEVILLE; LAMAR GREENE; ROBERT ALDER; JEFFERY CARROLL; PAUL NIEPLING; MICHAEL WHITESIDE; SEAN HILL; ANTHONY ALIOTO; MICHAEL MURPHY; MICHAEL HOWDEN; GREGORY ROCK; DANIEL THAU; MELVIN WASHINGTON; DENNIS BALDWIN;    COURTNEY    FLASH; TIMOTHY    STEFFES;    LEONARD ROCCATO;    BRUCE    BASKERVILLE; DIANE BROOKS; PHOKHAM VONGKEO; FERNEY DENNIS; KENNETH PARKER; SEQUITA WILLIAMS; JOSEPH MASCI; AULIO ANGULO; DONALD BOGARDUS; HARVY HINOSTROZA; JOHN DOE MPD OFFICER,
  c/o Office of the Attorney General
  441 4th Street NW
  Washington, D.C. 20001,

                              Defendants.

No. 1:17-cv-01216 (ABJ)

**JURY TRIAL DEMANDED**

**FIRST AMENDED COMPLAINT FOR DAMAGES**
(Violation of constitutional and D.C.-law rights of Inauguration Day demonstrators)

**INTRODUCTION**

On January 20, 2017, Donald J. Trump was sworn in as President of the United States. Exercising their constitutional right to freedom of speech and assembly, people from all over the country took to the streets of the nation's capital to express their disapproval of his policies. Journalists came to report on the demonstrations. Legal observers came to document any violations of the demonstrators' legal rights.

During the course of demonstrations in the District of Columbia that day, several acts of vandalism occurred. In response, the District's Metropolitan Police Department (MPD) rounded up and arrested hundreds of people, including people who engaged in no illegal activity, by chasing them and blocking streets so as to force them into a confined area (a "kettle") on a D.C. street corner. During the chase and then while detaining demonstrators for hours, police fired pepper spray, stingballs, and flash-bang grenades at crowds of demonstrators, journalists, and legal observers, frequently without warning or justification. In the course of the roundup and subsequent processing of demonstrators, police held detainees for hours without food, water, or access to toilets; handcuffed detainees so tightly as to cause injury or loss of feeling; and subjected some detainees to manual rectal jabbing. Much of MPD's misconduct has been independently documented by the District of Columbia's Office of Police Complaints.

Plaintiffs are individuals who came to the District to express their views concerning the inauguration, a photojournalist who covered the demonstrations, and a legal observer who was present at the scene. Each of them suffered one or more of the constitutional, statutory, and common law violations described here.

Among the violations committed by MPD and its officers were the following: Plaintiff Horse, a photojournalist, was pepper-sprayed while he was taking a photograph of demonstrators and neither posing a threat nor breaking the law; he was subsequently arrested even though he was not participating in any unlawful activity. Plaintiff Lagesse was arrested even though she did not participate in any acts of vandalism and was not even close enough to witness any; she was marching to express her views when she was caught up in the stampede created by MPD's pursuit of the demonstrators and its use of chemical irritants. At one point, multiple MPD officers pepper-sprayed into a large and peaceful crowd of individuals without warning and for no apparent reason other than they were standing near the corner where MPD was detaining demonstrators; among the victims of this attack were Plaintiff Ariel, a clearly identified legal observer, and Plaintiffs Frisbie-Fulton and her ten-year-old son A.S., who were peaceful demonstrators. Pepper spray and other chemical irritants were used against all plaintiffs without justification and without warning. While Plaintiffs Lagesse, Horse, and Gonzalez were detained on a D.C. street corner and later in police transport vehicles, they were unreasonably denied food, water, and access to a toilet for periods ranging from 7 to 16 hours; arresting officers unnecessarily prolonged the arrest process in order to keep detainees in a state of anxiety, hunger, thirst, and other discomfort. Plaintiffs Lagesse and Horse were handcuffed so tightly that one of Plaintiff Lagesse's wrists bled and Plaintiff Horse lost feeling in several fingers, some of which were numb for months afterward. During processing, Plaintiffs Horse and Gonzalez were subjected to intrusive, humiliating, and unjustified manual rectal jabbing.

To obtain compensation for their injuries and to vindicate their rights under the First, Fourth, and Fifth Amendments to the Constitution, the D.C. First Amendment Assemblies Act, and the common law, plaintiffs now seek relief in this Court.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because the plaintiffs' claims arise under the First, Fourth and Fifth Amendments to the United States Constitution and are asserted here pursuant to 42 U.S.C. § 1983. Plaintiffs' claims under the statutory and common law of the District of Columbia arise from the same events as the constitutional claims and are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because the events giving rise to all claims occurred in the District of Columbia.

## PARTIES

3. Plaintiff Shay Horse is an adult resident of New York and a freelance photojournalist whose work has been purchased by Getty Images and Associated Press and published in a variety of outlets including Rolling Stone, Al Jazeera America, and The Intercept. On January 20, 2017, he was in Washington, D.C. to photograph the Inauguration Day demonstrations.

4. Plaintiff Judah Ariel is an adult resident of the District of Columbia and a licensed attorney. On January 20, he was serving as a legal observer to document any violations of the rights of counter-inaugural demonstrators.

5.        Plaintiff Elizabeth Lagesse is an adult resident of the District of Columbia. On January 20, she traveled to Washington, D.C. from Baltimore, where she then lived, for the purpose of expressing her opposition to the policy positions of the new President.

6.        Plaintiff Milo Gonzalez is an adult resident of New York. On January 20, he was in Washington, D.C. for the purpose of expressing his opposition to the policy positions of the new President and assisting journalists covering the demonstrations.

7.        Plaintiff Gwen Frisbie-Fulton is an adult resident of North Carolina. On January 20, she was in Washington, D.C. for the purpose of expressing her opposition to the policy positions of the new President.

8.        Plaintiff A.S. is the minor son of Plaintiff Gwen Frisbie-Fulton and a resident of North Carolina. On January 20, A.S. was ten years old and was in Washington, D.C. for the purpose of expressing his opposition to the policy positions of the new President.

9.        Defendant District of Columbia is a municipal corporation, the local government of Washington, D.C. It operates and governs the MPD pursuant to the laws of the District of Columbia. In this case, the District of Columbia acted through its agents, employees, and servants, including all of the individual Defendants.

10.        Defendant Peter Newsham is the Chief of the D.C. Metropolitan Police Department. At the time of the events at issue, he was the Interim Chief of Police and was acting within the scope of his employment and under color of law of the District of Columbia. He supervised, directed, or ordered the conduct of other MPD officers as described below. He is sued in his individual capacity.

11.      Defendants Cmdr. Keith Deville (Badge No. DC40), Asst. Chief Lamar Greene, Asst. Chief Robert Alder, Cmdr. Jeffery Carroll (Badge No. DC36), Lt. Paul Niepling (Badge No. L178), Lt. Michael Whiteside (Badge No. L323), Sgt. Sean Hill (Badge No. S723) and Sgt. Anthony Alioto (Badge No. S473), are sworn officers of the MPD who supervised, directed, or ordered the conduct of other MPD officers as described below. At the time of the events at issue, Defendants Deville, Greene, Alder, Carroll, Niepling, Whiteside, Hill, and Alioto were acting within the scope of their employment and under color of law of the District of Columbia. They are sued in their individual capacities.

12.      Defendants Ofcr. Michael Murphy (Badge No. 1473), Ofcr. Michael Howden (Badge No. 3344), Ofcr. Gregory Rock (Badge No. 3547), Ofcr. Daniel Thau (Badge No. SOS80), Ofcr. Melvin Washington (Badge No. 4123), Ofcr. Dennis Baldwin (Badge No. 5101), Ofcr. Courtney Flash (Badge No. 4167), Ofcr. Timothy Steffes (Badge No. S521), Ofcr. Leonard Roccato (Badge No. 2084), Ofcr. Bruce Baskerville (Badge No. 3872), Ofcr. Diane Brooks (Badge No. 3328), Ofcr. Phokham Vongkeo (Badge No. 5348), Ofcr. Ferney Dennis (Badge No. 5107), Ofcr. Kenneth Parker (Badge No. 2064), Ofcr. Sequita Williams (Badge No. 4703), Ofcr. Joseph Masci (Badge No. 2904), Ofcr. Aulio Angulo (Badge No. 2841), Ofcr. Donald Bogardus (Badge No. 3807), and Ofcr. Harvy Hinostroza (Badge No. 2388) are sworn officers of the MPD. At the time of the events at issue, these defendants were acting within the scope of their employment and under color of law of the District of Columbia. They are sued in their individual capacities.

13.      Defendant John Doe MPD Officer is a sworn officer who is employed by the MPD and whose real name is unknown at this time. At the time of the events at issue,

he was acting within the scope of his employment and under color of law of the District of Columbia. He is sued in his individual capacity.

## FACTS

*Police Weapons*

14.    On Inauguration Day 2017, MPD officers who interacted with demonstrators were equipped with several types of chemical or other weapons, including:

a.    Oleoresin Capsicum spray dispensers, which resemble small fire extinguishers containing 14-48 ounces of solution, with a typical range of 25-30 feet. The solution, commonly known as pepper spray, produces a burning sensation on a person's skin and in a person's eyes and lungs, vision problems, and breathing problems including coughing and choking.

b.    "Stingballs," which are explosive devices that release smoke, rubber pellets, and a chemical irritant within a radius of approximately 50 feet.

c.    Smoke flares, which are explosive devices that release smoke.

d.    Concussion grenades, which are devices that produce loud explosive noises.

e.    Flash-bang grenades, which are devices that produce loud explosive noises and bright flashes of light.

f.    Long range acoustic devices, or LRADs, which are devices that emit an excruciatingly loud tone.

*Demonstrators March Down 13th Street NW*

15.    On January 20, 2017, thousands of people demonstrated in the District of Columbia to express their opposition to the new President.

7

16.     The overwhelming majority of the demonstrators were peaceful and law-abiding.

17.     Between 10 and 11 a.m. on January 20, hundreds of demonstrators walked south on 13th Street NW from Logan Circle toward the National Mall.

18.     The number of demonstrators walking down 13th Street NW was sufficiently large that they took up two or three blocks.

19.     Plaintiff Shay Horse was walking alongside the demonstrators in order to photograph the demonstration for journalistic purposes. He intended to sell his photographs commercially, and he had a well-founded expectation that he would be able to do so.

20.     Mr. Horse was wearing dark jeans, a hooded sweatshirt with the hood down, a leather jacket, and a camera around his neck. He carried a bag onto which he had affixed silver duct tape to make the bag more identifiable.

21.     Between 10 and 11 a.m. on January 20, some demonstrators engaged in acts of vandalism on or near 13th Street NW between Logan Circle and Franklin Square.

22.     The individuals who engaged in vandalism were dressed in all-black clothing with hoods over their heads and masks over their faces.

23.     Mr. Horse was not wearing a hood or a mask.

*The Police Assault*

24.     When demonstrators began to march down 13th Street NW from Logan Circle, MPD had approximately 100 officers present, including Defendant Cmdr. Keith Deville, along with approximately 10 police vans and five or six additional police vehicles.

25.     Cmdr. Deville was the on-scene commander who directed the MPD officers on the ground as they responded to the march.

26.     Cmdr. Deville, in turn, received orders from top MPD officials in MPD's command center.

27.     Among the officials directing Cmdr. Deville from the command center was Defendant Asst. Chief Lamar Greene.

28.     Defendant Chief Peter Newsham has acknowledged that he was stationed in the command center on January 20.

29.     On information and belief, Chief Newsham himself was overseeing and directing the actions of Asst. Chief Green, Cmdr. Deville, and other top MPD officials as they, in turn, directed MPD's actions regarding the demonstrators who marched down 13th Street NW between 10 a.m. and 11 a.m. on January 20.

30.     MPD officers witnessed acts of vandalism on and around 13th Street NW and made Cmdr. Deville, Asst. Chief Greene and (on information and belief) Chief Newsham aware of these acts.

31.     Cmdr. Deville, under the direction of Defendants Chief Newsham and Asst. Chief Greene, did not order MPD officers to identify or apprehend individuals committing acts of vandalism.

32.     Instead, approximately 15 minutes after demonstrators began to march south down 13th Street NW, and after a few acts of vandalism had been committed by a few people, Cmdr. Deville declared to MPD officers that the march was a "riot" and ordered MPD officers to stop the marchers from continuing further south.

33.     Cmdr. Deville received the order to stop the march from Asst. Chief Greene at the command center, where (on information and belief) he received direction from Chief Newsham.

34.     Cmdr. Deville knew that not all of the individuals who were marching were committing acts of vandalism when he declared the march a "riot." He was also aware that some of the individuals walking down 13th Street NW were journalists photographing the march or otherwise documenting the march.

35.     Throughout the time when demonstrators were moving south on 13th Street NW, both before and after acts of vandalism occurred, some individuals joined the march and others left it. Not all individuals who were part of the march were aware of the acts of vandalism that occurred.

36.     Neither when Cmdr. Deville declared a "riot" nor at any time for the rest of the day, did Cmdr. Deville or his supervisors — from Chief Newsham and Asst. Chief Greene to the officers on the ground — distinguish or attempt to distinguish between individuals who were peacefully exercising their First Amendment rights and individuals who were committing unlawful acts.

37.     A number of MPD officers had ready access to bullhorns and to loudspeakers on their vehicles.

38.     Nonetheless, at no time did Chief Newsham, Asst. Chief Greene, Cmdr. Deville, or any other MPD official order that demonstrators be given a dispersal order, be given an opportunity to disperse, or be given a safe route to disperse. No order to disperse, opportunity to disperse, or safe route to disperse was ever provided.

39.     Instead, Cmdr. Deville, under the direction of Defendants Chief Newsham and Asst. Chief Greene, ordered that MPD officers use pepper spray against the demonstrators.

40.     Among MPD officers' weapons for discharging pepper spray on January 20 were large canisters that fire a steady stream of pepper spray as if from a small hose. Officers refer to these weapons as "supersoakers."

41.     Cmdr. Deville told his officers: "any time you need pepper [spray], use it."

42.     A few minutes later, Cmdr. Deville, under the direction of Defendants Chief Newsham and Asst. Chief Greene, authorized the use of stingballs, which shoot out rubber pellets and chemical irritants at people.

43.     At their commanders' orders, MPD officers used stingballs, "supersoakers" of pepper spray, and noise-emitting crowd-control devices against the demonstrators.

44.     At least some of the time, officers fired chemical irritants at people without regard for whether these weapons were necessary to prevent unlawful conduct or subdue a person who was resisting officers.

*Plaintiff Horse Is Unjustifiably Pepper-Sprayed*

45.     As MPD officers confronted demonstrators at Franklin Square, many demonstrators and Mr. Horse moved away from the police down streets to the east and south of Franklin Square.

46.     Plaintiff Horse continued to take photographs of the events, including photographs of a few demonstrators in hoods and masks breaking a storefront window and a photograph of Defendant Ofcr. Michael Murphy as he pepper-sprayed demonstrators.

47.     Although Ofcr. Murphy had observed Mr. Horse with a large, professional-quality camera around his neck taking photographs, Ofcr. Murphy pepper-sprayed Mr. Horse without warning.

48.     At the time Ofcr. Murphy pepper-sprayed Mr. Horse, Mr. Horse was not engaged in any unlawful or dangerous activity. He was not disobeying any orders by any police officer.

49.     As a result of the pepper spray, Mr. Horse choked and gasped for breath. As the pepper spray flooded his eyes, they began to burn.

50.     As Mr. Horse and a number of demonstrators ran away from the police assault, MPD officers confronted them on the streets immediately east and/or south of Franklin Square and discharged pepper spray, flash-bang grenades, concussion grenades, stingballs, smoke flares, and LRADs at demonstrators and other individuals in the vicinity, including Plaintiff Horse.

51.     Using pepper spray, flash-bang grenades, concussion grenades, stingballs, smoke flares, and LRADs, MPD officers chased Mr. Horse and many of the demonstrators back toward Franklin Square.

*Plaintiff Lagesse Marches Down 13th Street NW*

52.     Throughout demonstrators' chaotic flight from the police, some demonstrators left the Franklin Square area, while other individuals were still arriving to demonstrate.

53.     Plaintiff Elizabeth Lagesse began marching later than most of the demonstrators. She walked south down 13th Street NW toward Franklin Square approximately thirty minutes after most of the demonstrators had begun marching.

54.     Ms. Lagesse was wearing a black and white T-shirt, a bright-colored inner jacket, and a long grey rain jacket that she removed as she marched, and she was carrying a multi-colored bag. She did not wear a hood or mask. Having encountered overzealous

police officers using pepper spray at prior demonstrations, Ms. Lagesse brought a bandana and a pair of lab safety goggles she owned. They were not on her face as she walked south down 13th Street NW.

55.     Ms. Lagesse did not engage in or witness any acts of vandalism.

*Continued Police Assault and Mass Detentions*

56.     On or near 13th Street NW, MPD officers deployed pepper spray and/or stingballs against individuals, including Mr. Horse and Ms. Lagesse, without warning or a dispersal order, often in circumstances where the officers faced no threat to themselves or to public safety or disobedience of any commands they had given.

57.     The pepper spray caused Mr. Horse's and Ms. Lagesse's eyes to burn.

58.     Ms. Lagesse put on her safety goggles and pulled her bandana from around her neck to cover her mouth in an attempt to protect herself from the pepper spray that MPD officers were discharging.

59.     Although neither Ms. Lagesse nor Mr. Horse had committed any unlawful act, the police conduct put each of them in fear for their safety, causing them to run away from the police, ultimately heading north on 14th Street NW.

60.     Cmdr. Deville, under the direction of Chief Newsham and Asst. Chief Greene, ordered MPD officers to block numerous alternative egress routes in order to force Mr. Horse, Ms. Lagesse, and many other demonstrators to flee north up 14th Street NW and then east on L Street NW to the corner of 12th and L Streets NW. Defendants Newsham, Greene, and Deville thus caused MPD officers to act in a coordinated manner to funnel individuals to that location.

61.     Cmdr. Deville, under the direction of Chief Newsham and Asst. Chief Greene, ordered MPD officers to establish a blockade at the corner of 12th and L Streets NW to trap individuals proceeding east on L Street NW.

62.     Defendant Ofcrs. Michael Howden, Gregory Rock, Daniel Thau, and Melvin Washington were among the MPD officers who established the blockade.

63.     Sgt. Anthony Alioto was among the MPD officers who supervised the establishment of the blockade.

64.     Although some individuals on L Street NW managed to escape by evading the MPD blockade before it closed in, Ms. Lagesse, Mr. Horse, and most of the other individuals on L Street NW were detained by police at the northwest corner of 12th and L Streets NW and on L Street NW itself.

65.     MPD officers detained more than 200 individuals in the cordoned area (the "kettle") they had created at 12th and L Streets NW.

66.     Neither the MPD officials who ordered the creation of the kettle — including Defendants Newsham, Greene and Deville — nor the MPD officers who established the kettle — including Ofcrs. Howden, Rock, Thau, Alioto, and Washington — took any actions to try to ensure that only individuals whom they had probable cause to believe had committed crimes would be detained in the kettle.

67.     Chief Newsham (on information and belief), Asst. Chief Greene, and Cmdr. Deville were aware that the size of the march had fluctuated dramatically since demonstrators left Logan Circle, and they were aware that numerous demonstrators had joined or left the march throughout its disorganized progress until the point at which a number of demonstrators were forced into the kettle and prevented from leaving. Chief

Newsham, Asst. Chief Greene, Cmdr. Deville, and the officers involved in forming the kettle had no ability to identify which, if any, of the kettled individuals had committed crimes. Chief Newsham, Asst. Chief Greene, and Cmdr. Deville knew that neither they nor their officers had the ability to identify which, if any, of the kettled individuals had committed crimes.

68.     As Cmdr. Deville subsequently testified regarding the decision to detain demonstrators, "I wasn't differentiating who was demonstrating and who was rioting."

69.     Chief Newsham later acknowledged to the Washington Post that his officers strategically maneuvered the demonstrators to trap them in the kettle. The MPD official in charge at the scene, Cmdr. Deville, was in constant contact with the MPD command center, where Defendant Newsham was stationed throughout the day. On information and belief, Defendant Newsham ordered or approved trapping demonstrators in the kettle at the time this action took place, and/or approved the continued detention and arrest of the kettled demonstrators despite his awareness that the police had no ability to identify which, if any, of these individuals had committed crimes.

70.     Because of Defendants' intentional and coordinated action in chasing individuals north on 14th Street NW, then east on L Street NW, while driving them on by using pepper spray, flash-bang grenades, concussion grenades, and stingballs, and blocking their egress via alternate routes, the individuals who were trapped in the kettle at 12th and L Streets NW were not there by virtue of having acted unlawfully but merely because they were present on particular downtown D.C. streets on the morning of January 20 and then tried to flee when police chased and assaulted them.

71.     Mr. Horse did not engage in any vandalism or other unlawful activity on the streets of Washington, D.C. on January 20, 2017. He did not encourage anyone to do so or cheer for anyone who did so. He was not dressed the same as anyone who did so.

72.     Mr. Horse was detained in the kettle without probable cause and merely because he was exercising his First Amendment right to document the demonstrations as a photojournalist, was present on particular downtown D.C. streets on the morning of January 20, and tried to run away when police officers chased and assaulted him.

73.     Ms. Lagesse did not engage in any vandalism or other unlawful activity on the streets of Washington, D.C. on January 20, 2017. She did not encourage anyone to do so or cheer for anyone who did so. She was not dressed the same as anyone who did so.

74.     Ms. Lagesse was detained in the kettle without probable cause and merely because she wished to exercise her First Amendment right to demonstrate peacefully in opposition to the Inauguration, was present on particular downtown D.C. streets on the morning of January 20, and tried to run away when police officers chased and assaulted her.

*In the Kettle*

75.     The kettle of detainees at 12th and L Streets NW was formed at about 10:45 a.m.

76.     Plaintiffs Horse and Lagesse were detained there along with approximately 200 other individuals, one of whom was Plaintiff Milo Gonzalez.

77.     Plaintiffs Horse, Lagesse, and Gonzalez were detained in the kettle for hours.

16

78.     Defendant Cmdr. Deville, under the direction of Defendants Chief Newsham and Asst. Chief Greene, declared that all the detainees were under arrest and ordered that no one was to leave the kettle. Defendants Ofcr. Howden and Sgt. Alioto were among those primarily responsible for ensuring that the detainees could not leave.

79.     While individuals were detained in the kettle, MPD officers repeatedly deployed pepper spray and stingballs containing chemical irritants against individuals or groups of individuals in the kettle, including Plaintiffs Horse, Lagesse, and Gonzalez.

80.     Many of these deployments came without warning or dispersal order— indeed, the individuals in the kettle were physically prevented from dispersing—and were carried out when there was no threat to officer or public safety or any disobedience of police orders on the part of the detainees. For instance:

a.   Defendant Ofcr. Washington discharged pepper spray into the crowd of individuals, including Plaintiffs Horse, Lagesse, and Gonzalez, being herded into the kettle, even though the detainees were not disobeying orders or posing a threat.

b.   Defendant Ofcr. Thau discharged pepper spray into the crowd of kettled individuals, including Plaintiffs Horse, Lagesse, and Gonzalez, as detainees retreated from the line of officers on the east side of the kettle and at a time when detainees were not disobeying orders or posing a threat.

c.   Defendant Ofcr. Thau discharged a stingball into the crowd of kettled individuals, including Plaintiffs Horse, Lagesse, and Gonzalez, as detainees retreated from the line of officers on the east side of the kettle and at a time when detainees were not disobeying orders or posing a threat.

d.  Defendant Ofcr. Rock discharged a stingball into the crowd of kettled individuals, including Plaintiffs Horse, Lagesse, and Gonzalez, as detainees retreated from the line of officers on the east side of the kettle and at a time when detainees were not disobeying orders or posing a threat.

81.     Defendant Ofcr. Howden remarked to his supervisor that the police had been "extremely wild" with their use of pepper spray.

82.     Although Plaintiffs Horse, Lagesse, and Gonzalez are unsure whether they were targeted personally by any of the officers' uses of pepper spray or stingballs, the tight packing of the detainees into a small space ensured that everyone in the kettle would feel the effects of spray directed at the crowd of detainees.

83.     The pepper spray and other chemical irritants were so thick that at times they created a haze over the kettle and all the individuals detained there.

84.     The repeated deployment of chemical irritants caused panic among the kettled detainees, including Plaintiffs Horse, Lagesse, and Gonzalez, because they were having difficulty breathing, were tightly pressed together with other detainees, and could not escape the kettle.

85.     Each time Plaintiffs Horse and Gonzalez were hit with pepper spray or other chemical irritants, their eyes began to burn painfully, and they began to cough and to gasp for breath.

86.     Because Plaintiff Lagesse had goggles on by this time, her eyes were protected, but the pepper spray caused her to cough, to have difficulty breathing, and to experience a burning sensation on the uncovered part of her face.

87.     Defendants Asst. Chief Robert Alder, Cmdr. Jeffery Carroll, and Lt. Paul Niepling supervised the continued maintenance of the kettle. These officials continued to communicate with and receive orders from the MPD command center, where Defendant Chief Newsham was overseeing the operation.

88.     During the many hours that Plaintiffs Horse, Lagesse, and Gonzalez were detained in the kettle, MPD officers, under the supervision and direction of Chief Newsham, Asst. Chief Alder, Cmdr. Carroll, and Lt. Niepling, failed to provide them with food, water, or access to a toilet.

89.     Many demonstrators, including Ms. Lagesse and Mr. Gonzalez, specifically requested food, water, and/or access to a toilet.

90.     While the detainees were kettled, several MPD officers threw edible food in a garbage can in view of the detainees, including Plaintiffs Horse and Gonzalez, to taunt them. Mr. Gonzalez specifically asked the officers for the food that they were throwing away, and they refused to provide it. The officers laughed at Mr. Gonzalez as they threw their food away.

91.     Hungry, Mr. Horse and Mr. Gonzalez both resorted to rummaging in a city trashcan for the food the officers had discarded.

92.     One MPD officer made clear to the detainees that no toilets would be made available by stating in response to one detainee's request that she should "shit [her] pants" to prove she needed a toilet.

93.     Having no other place to urinate, some of the demonstrators urinated on the street or against the side of buildings. Some demonstrators rummaged in the trash for empty

bottles in which to urinate. One demonstrator crouched against the side of a building and defecated into a paper bag.

94.     Mr. Gonzalez badly needed to use a toilet, but, fearing that he could be charged with public urination, did not dare to urinate on the street.

95.     Holding his bladder was painful for Mr. Gonzalez.

96.     One officer taunted Mr. Gonzalez, saying "If you wanted to go to the bathroom, you shouldn't have gotten arrested."

97.     Within 30 to 45 minutes of the formation of the kettle, by 11:30 a.m., MPD had prisoner vans and processing officers at the scene and was ready for the processing of detainees.

98.     Nonetheless, the handcuffing of detainees and placing them into vehicles for transport to detention facilities stretched on for hours, with some of the detainees, including Plaintiff Lagesse, remaining at the corner of 12th and L Streets NW until the late afternoon and others, including Plaintiffs Horse and Gonzalez, remaining until after sunset.

99.     The gap in time between the point at which MPD was prepared to take detainees into formal custody and the point at which the detainees were actually processed reflects that MPD officers, under the supervision and direction of Chief Newsham, Asst. Chief Alder, Cmdr. Carroll, and Lt. Niepling, purposefully conducted the arrest process unnecessarily slowly in order to maximize the detainees' discomfort.

*Bystanders and Legal Observers Are Pepper-Sprayed*

100.    Plaintiffs Gwen Frisbie-Fulton and her ten-year-old son A.S. were also present at the intersection of 12th and L Streets NW in the early afternoon of January 20.

101.    Plaintiffs Frisbie-Fulton and A.S. have engaged together in a variety of demonstrations over the years. Ms. Frisbie-Fulton, a single mother, has a strong sense of social responsibility, having worked for over two decades with non-profit organizations that help poor and marginalized communities. She currently works at a food bank; she has previously served as co-director of a homeless shelter and before that was employed at an organization supporting survivors of domestic violence. She has been active in public demonstrations for approximately twenty years in order to speak out against social injustice. After A.S. became old enough, Ms. Frisbie-Fulton began bringing A.S. to peaceful demonstrations in order to expose him to important issues of public concern, to illustrate the power of peaceful political protest, and to educate him about his First Amendment rights.

102.    Over the years, A.S. has attended a few dozen protests with his mother and has come to feel strongly about expressing his political opinions. Among the causes for which Ms. Frisbie-Fulton and A.S. have demonstrated together are racial justice, economic justice, and environmental protection. Ms. Frisbie-Fulton takes care to be keenly aware of her surroundings when she is with her son at a demonstration so that she can avoid exposing him to any risk of harm.

103.    A.S. followed the 2016 election closely, asking his mother to be allowed to stay up past his bedtime to watch the presidential debates and to follow the election returns. A.S. was strongly opposed to candidate Donald Trump because of his hostile views toward a variety of groups, especially immigrants, and because A.S. thinks that Trump said terrible things during the campaign. A.S. was deeply disappointed and concerned for the future of the country when Donald Trump was elected.

104.    As Inauguration Day approached, Ms. Frisbie-Fulton wanted to come to Washington, D.C. to protest, in particular by attending the Women's March on the day after the inauguration. Ms. Frisbie-Fulton also wanted to show A.S. how citizens of a democracy can respond peacefully and constructively to an election result they disagree with: by exercising their First Amendment right to protest.  Because of his own strong feelings of opposition to Donald Trump, A.S. decided, together with his mother, that he would join her in protesting the inauguration.

105.    Ms. Frisbie-Fulton and A.S. traveled to D.C. with a number of their friends from their tight-knit community in North Carolina.

106.    On January 20, Ms. Frisbie-Fulton and A.S. had spent about three hours participating in various peaceful demonstrations around Washington, D.C. when Ms. Frisbie-Fulton learned via text message in the early afternoon that a friend from their hometown had been detained by police at the corner of 12th and L Streets NW. Ms. Frisbie-Fulton and A.S. were three blocks away and decided to walk to the intersection to check on their friend.

107.    Ms. Frisbie-Fulton was wearing a black windbreaker and jeans. A.S. was wearing a gray sweater, jeans, a red bandana, and a gray Star Wars hat. Both Ms. Frisbie-Fulton's and A.S.'s faces were uncovered, and neither was wearing a hood or mask.

108.    Ms. Frisbie-Fulton and A.S. arrived at the southeast corner of 12th and L Streets NW at approximately 1:00 p.m. They saw the group of detainees kettled on the northwest corner of the intersection. A large group of bystanders, protestors, and legal observers had gathered outside the kettle on the south side of the intersection of 12th and L Streets NW.

109.    The south side of the intersection was cordoned off by yellow police tape and blocked by a row of police motorcycles and bicycles. In the intersection, and extending west on L Street NW, a row of MPD officers lined up facing south towards the crowd. Additional MPD officers were lined up behind the first police line.

110.    After about five minutes, Ms. Frisbie-Fulton and A.S. moved to the southwest corner of the intersection. From there, A.S. saw their friend in the kettle and boosted himself up by holding onto a streetsign in order to wave at their friend.

111.    Ms. Frisbie-Fulton and A.S. were present at the intersection of 12th and L Streets NW for approximately 45 minutes.

112.    Plaintiff Judah Ariel was also present at the intersection of 12th and L Streets NW.

113.    He had started working as a legal observer at 6:30 a.m. on January 20 at various demonstrations throughout the District. He was dressed in a dark green jacket and blue jeans with a blue and red backpack, and he was wearing the distinctive bright neon green baseball cap commonly worn by some legal observers to identify themselves. He was not wearing a hood or mask.

114.    At approximately 1:30 p.m., Mr. Ariel was walking east from McPherson Square on K Street NW.

115.    Because Mr. Ariel had heard from another legal observer about police activity in the area of 12th and L Streets NW, he walked north on 12th Street NW toward that intersection to see if he could be of use as a legal observer there.

116.     Mr. Ariel joined a crowd of people at the southeast corner of 12th and L Streets NW, outside the kettle. The crowd included multiple legal observers along the sidewalk, clearly identifiable by their bright neon green hats.

117.     Mr. Ariel observed the kettled group of detainees surrounded by police at the northwest corner of the intersection.

118.     Many members of the crowd outside the kettle shouted at the police to demand the release of the people being detained.

119.     While Mr. Ariel, Ms. Frisbie-Fulton, and A.S. were present, neither they nor any of the other individuals outside the kettle menaced, threatened, or assaulted the police or their vehicles.

120.     At approximately 1:45 p.m., suddenly and without warning or a dispersal order, Defendants Lt. Michael Whiteside, Ofcr. Dennis Baldwin, Ofcr. Courtney Flash, Ofcr. Timothy Steffes, Ofcr. Leonard Roccato, Ofcr. Bruce Baskerville, Ofcr. Diane Brooks, Ofcr. Phokham Vongkeo, Ofcr. Ferney Dennis, Ofcr. Kenneth Parker, and Ofcr. Sequita Williams began to pepper-spray the people outside the kettle, including Mr. Ariel on the south side of L Street NW.

121.     When the pepper-spraying began, there was no threat to public or officer safety, and none of the individuals in the crowd outside the kettle — including Mr. Ariel, Ms. Frisbie-Fulton, and A.S. — was disobeying police orders.

122.     Defendants Lt. Michael Whiteside and Sgt. Sean Hill walked behind the line of officers speaking to them moments before the spraying began. This conduct, in combination with the coordinated action by multiple officers, reflects that Defendants Lt.

Whiteside and Sgt. Hill ordered the pepper-spraying of bystanders, despite the absence of a threat to officer or public safety or disobedience of any officer's command.

123.     Defendants Ofcrs. Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams moved forward down 12th Street NW, advancing on the retreating crowd, continuing to deploy pepper spray indiscriminately on people in the crowd.

124.     One of these officers held his spray gun in front of him, sweeping the spray back and forth across the crowd.

125.     Mr. Ariel coughed and felt his lungs and eyes burn from the spray.

126.     Mr. Ariel covered his mouth with a cloth but a few seconds later, he began to choke.

127.     Fearing for his safety, Mr. Ariel fled. He felt that he was on the verge of passing out.

128.     As soon as Ms. Frisbie-Fulton saw the pepper-spraying begin, she feared for A.S.'s safety and her own and so told to A.S. that it was time to go. A.S. hopped down from the streetsign he had been holding onto and began to hurry ahead of his mother west on L Street NW away from the intersection where the officers were pepper-spraying the crowd.

129.     Without warning or provocation, a line of police officers, including Ofcr. Joseph Masci and Ofcr. Aulio Angulo, rushed forward. Ofcrs. Masci and Angulo collided with A.S., knocking him to the ground.

130.     Defendants Lt. Michael Whiteside and Sgt. Sean Hill walked behind the line of officers speaking to them moments before the charge. This conduct, in combination

with the coordinated action by multiple officers, reflects that Defendants Lt. Whiteside and Sgt. Hill ordered the charge into nonviolent protestors, despite the absence of a threat to officer or public safety or disobedience of any officer's command.

131.     A.S. felt his ribs scrape against the curb of the sidewalk as he hit the ground.

132.     Ms. Frisbie-Fulton instinctively threw her body on top of her son, and she felt herself pushed from behind as police and demonstrators collided and became tangled.

133.     Scared and confused why he had been assaulted while trying to flee, A.S. began to cry. From his mother's arms at the bottom of the pile of people, he hoped the officers would hear him and permit them to leave.

134.     As she tried to round her back to create space to protect A.S. from being crushed under her, Ms. Frisbie-Fulton felt terror at the possibility that her son could be injured or that she could be injured and unable to see him to safety.

135.     After approximately half a minute, people began to stand up from the crush of bodies, and Ms. Frisbie-Fulton managed to stand up. She picked up A.S., who was sobbing, and looked for an escape route.

136.     L Street NW was clear to the west except for a group of police officers. Ms. Frisbie-Fulton asked the officers whether she and A.S. could leave in that direction, but an officer responded that she could not and chastised Ms. Frisbie-Fulton, "You shouldn't have come here with your child."

137.     From behind her, an MPD officer tapped Ms. Frisbie-Fulton and told her to follow him. Carrying A.S., she complied. The officer led Ms. Frisbie-Fulton back toward the intersection of 12th and L Streets NW, moving through the line of officers, whom he asked to let the pair pass.

138.     Soon, however, Ms. Frisbie-Fulton and A.S. became separated from the officer who had tried to help them. Other officers, including Lt. Whiteside and Ofcrs. Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams, continued to pepper-spray the retreating crowd. Ms. Frisbie-Fulton and A.S. attempted to flee south on 12th Street NW with the rest of the crowd.

139.     The street was clouded with pepper spray.

140.     As they ran, Ms. Frisbie-Fulton inhaled pepper spray from the officers' barrage and began to cough and choke. She felt unable to carry A.S. any further.

141.     Another demonstrator indicated his willingness to help, so Ms. Frisbie-Fulton handed A.S., terrified and crying, to the demonstrator, who carried him further down 12th Street NW away from the officers as Ms. Frisbie-Fulton struggled to keep up.

142.     Pepper spray landed on A.S.'s Star Wars winter hat. A.S. felt his throat clogged from either his own crying or the effects of the pepper spray, and he began to cough uncontrollably.

143.     Both Ms. Frisbie-Fulton and A.S. feared losing each other in the crowd. At one point, A.S. lost sight of his mother and became terrified.

144.     Ms. Frisbie-Fulton and A.S. were able to reunite at the end of the block. They hurried away from the area as A.S. continued to cough.

*The Formal Arrests*

145.     Defendant Asst. Chief Greene ordered the formal arrests of Plaintiffs Horse, Lagesse, and Gonzalez, which took place after they had been detained for several hours. Defendant Ofcr. Harvy Hinostroza took Plaintiffs Horse and Gonzalez into formal custody. Defendant Ofcr. Borgardus took Plaintiff Lagesse into formal custody.

146.     When Mr. Horse was formally arrested, Defendant Ofcr. Hinostroza handcuffed him using zipties so excessively tightly that he lost feeling in some of the fingers on both of his hands.

147.     Mr. Horse complained to Ofcr. Hinostroza that the zipties were painfully tight, but Ofcr. Hinostroza refused to remove them, explaining that the zipties were not supposed to be comfortable.

148.     Mr. Horse's zipties were not removed for approximately three hours.

149.     When Ms. Lagesse was arrested, Defendant Ofcr. Borgardus handcuffed her using zipties so excessively tightly that one of her wrists was cut and began to bleed.

150.     Ms. Lagesse complained to Ofcr. Borgardus that the zipties were painfully tight, but he refused to remove them.

151.     Ms. Lagesse's zipties were not removed for approximately two hours.

152.     Mr. Horse was detained in the kettle for approximately 7 hours.

153.     By the time Mr. Horse was formally arrested and transported to a detention facility, he had gone approximately 9-10 hours without access to a toilet.

154.     Mr. Horse was not given food or drink until later in the evening; he was detained an approximate total of 10-11 hours without being provided food or drink.

155.     Ms. Lagesse was detained on the street for approximately 5-6 hours.

156.     By the time Ms. Lagesse was formally arrested, transported to a detention facility, and had her belongings inventoried, she had gone approximately 7-8 hours without access to a toilet.

157.     The toilet to which Ms. Lagesse was finally given access had no toilet paper. Several of the women detained with her asked for toilet paper but none was provided.

158.    Ms. Lagesse was not given access to water until late that night; she was detained an approximate total of 11-12 hours without water.

159.    Ms. Lagesse did not receive food at the detention facility until the early hours of the following morning; she was detained an approximate total of 13-16 hours before she was given food.

160.    Mr. Gonzalez was detained on the street for approximately 7 hours.

161.    By the time Mr. Gonzalez was formally arrested, transported to a detention facility, and given the opportunity to use a toilet, he had gone approximately 9-10 hours without access to a toilet.

162.    By the time he was allowed to urinate, Mr. Gonzalez was in pain from having held his urine for so long.

163.    When Mr. Gonzalez was allowed to use a portable toilet, MPD officers held the door open and watched him urinate. They rushed Mr. Gonzalez out of the toilet before he had finished emptying his bladder.

164.    Mr. Gonzalez was not given food or drink until later in the evening; he was detained an approximate total of 10-11 hours without being provided food or drink.

165.    Neither the officials in charge of the kettle and/or the arrests — Defendants Chief Newsham, Asst. Chief Greene, Asst. Chief Alder, Cmdr. Carroll, Cmdr. Deville, and Lt. Niepling — nor arresting officers Defendants Hinostroza and Borgardus took any actions to ensure that only individuals whom they had probable cause to believe had committed crimes would be handcuffed and transported to detention facilities.

*The Rectal Searches*

166.     After Plaintiffs Horse and Gonzalez were arrested, they were detained at the Metropolitan Police Academy on Blue Plains Drive SW, off I-295 near the Maryland state line.

167.     MPD officers took them inside the facility to what appeared to be an officer-training area that was set up to look like a mock street. There each of them was subjected to a search.

168.     Defendant Officer John Doe patted Mr. Horse down and then jabbed into Mr. Horse's rectum, through his pants.

169.     As Defendant Officer John Doe pushed his finger into Mr. Horse's rectum, he ordered Mr. Horse not to flinch.

170.     Several minutes later, Defendant Officer John Doe patted Mr. Gonzalez down and ordered him to spread his legs, then to spread them again, wider.

171.     Defendant Officer John Doe then reached inside Mr. Gonzalez's underwear and fondled his testicles.

172.     Defendant Officer John Doe reached inside Mr. Gonzalez's underwear and put his finger into Mr. Gonzalez's rectum.

173.     As the Defendant Officer John Doe jabbed into Mr. Gonzalez's rectum, he ordered Mr. Gonzalez not to resist.

174.     No officer had reason to believe that Mr. Horse or Mr. Gonzalez possessed contraband. No contraband was found on either Mr. Horse or Mr. Gonzalez.

*Plaintiff Horse's Injuries*

175.     As a result of Defendants' unjustified use of pepper spray and other chemical irritants, Plaintiff Horse suffered severe pain as his eyes burned from the pepper spray. Pepper spray remained in his hair throughout his detention, which lasted more than 24 hours; every time his long hair touched his face, it caused a burning sensation and coughing. Mr. Horse had a rash on his scalp for a week after his arrest. Mr. Horse suffered emotional distress from the panic at being trapped and unable to breathe while he was pepper-sprayed during the kettle.

176.     As a result of his arrest without probable cause and in response to his exercise of his First Amendment rights, Mr. Horse was detained for approximately 33 hours.

177.     Because Mr. Horse's arrest and detention led to the confiscation of his photographs and camera for approximately two months, Mr. Horse lost income because he was unable to sell his photographs of the January 20 demonstrations in a timely manner and did not have the equipment he needed to cover other newsworthy protests in the weeks following his arrest.

178.     As a result of the application of excessively tight zipties, Mr. Horse experienced pain in his hands and lost feeling in several fingers on both hands. Several fingers on his left hand remained numb for more than four months after his arrest. Because of the numbness, Mr. Horse has had difficulty with important daily tasks, including typing on a keyboard and operating his camera.  Mr. Horse had scarring on his left wrist from the zipties for more than two months after the arrest.

179.    As a result of the denial of food, water, and access to a toilet, Mr. Horse experienced hunger, thirst, discomfort, and anxiety.

180.    As a result of Defendants' manual rectal jabbing, Mr. Horse suffered humiliation, anxiety, and emotional distress. He feels as if he has been raped. Mr. Horse's anus was sore for a day or two after the intrusion. Mr. Horse has felt irritable and withdrawn from other people, and he has found it harder to trust and confide in other people. The emotional distress has negatively affected Mr. Horse's relationships, including impinging on his sex drive and performance. Mr. Horse remains haunted by what he experienced.

181.    As a result of the defendants' conduct described above, particularly the kettling and the rectal jabbing, Mr. Horse has suffered bouts of anxiety and has had difficulty sleeping since January 20. He suffers from nightmares filled with violent imagery and wakes up approximately every three hours, often in a panicked state. Covering demonstrations—a crucial part of Mr. Horse's job—heightens his anxiety as he remembers what happened to him on January 20.

*Plaintiff Lagesse's Injuries*

182.    As a result of Defendants' unjustified use of pepper spray and other chemical irritants, Plaintiff Lagesse coughed, had difficulty breathing, and experienced a burning sensation on her face and in her eyes. Ms. Lagesse also suffered emotional distress from the panic at being trapped and unable to breathe when she was pressed in a crush of people and pepper-sprayed while being detained in the kettle.

183.    As a result of her exposure to pepper spray, the skin on Ms. Lagesse's face was peeling for more than a week after the arrest.

184.     As a result of her arrest without probable cause and in response to her exercise of her First Amendment rights, Ms. Lagesse was detained for approximately 37 hours.

185.     As a result of Defendants' application of excessively tight zipties, Ms. Lagesse's wrist bled and she experienced pain in her wrists and hands. More than four months after her arrest, she still has a quarter-inch-long scar on her right wrist.

186.     As a result of the denial of food, water, and access to a toilet, Ms. Lagesse experienced hunger, thirst, discomfort, and anxiety.

187.     As a result of the defendants' conduct described above, Ms. Lagesse suffered stress, anxiety, and emotional distress both on January 20 and subsequently. For weeks after her arrest, she experienced heightened anxiety whenever she heard helicopters or loud noises such as fireworks. She continues to feel increased anxiety around police officers. Ms. Lagesse participated in many political demonstrations prior to January 20, but is now reluctant to do so because she fears that she may again be subjected to police violence through no fault of her own. Although she has nevertheless attended demonstrations since January 20, she has sometimes been nervous while demonstrating, watching for police and worrying about their whereabouts, and she has sometimes avoided chanting or carrying a sign because she feared that if she called attention to herself she might be again become a target of police violence.

*Plaintiff Ariel's Injuries*

188.     As a result of Defendants' unjustified use of pepper spray and other chemical irritants, Plaintiff Ariel coughed, choked, had difficulty breathing, and

experienced a burning sensation in his eyes and lungs. He feared he would pass out and suffer further injury.

189.    As a result of Defendants' unjustified and sudden pepper-spraying, Mr. Ariel suffered emotional distress and anxiety during and after his encounter with the police. He often continues to feel increased anxiety around police officers and whenever he passes by the intersection of 12th and L Streets NW. Mr. Ariel regularly participated in political demonstrations prior to January 20, but he has since been hesitant to attend potentially contentious protests, whether as a legal observer or a participant. Although Mr. Ariel fulfilled his prior commitment to serve as a legal observer at the Women's March on January 21, he made sure to keep his distance from the police and has avoided attending other protests — such as the August 12, 2017 counter-demonstration against white supremacists in Charlottesville — due to fear of police violence.

*Plaintiff Gonzalez's Injuries*

190.    As a result of Defendants' unjustified use of pepper spray and other chemical irritants, Plaintiff Gonzalez coughed, had difficulty breathing, and experienced a burning sensation in his eyes, on his face, and in his lungs and chest. He experienced extreme panic when he was being pepper-sprayed in the kettle and felt unable to breathe and unable to escape. When Mr. Gonzalez attended a Chinese New Year celebration shortly after his arrest, the fireworks caused Mr. Gonzalez to panic and feel as if concussion grenades were being detonated near him.

191.    As a result of the denial of food, water, and access to a toilet, Mr. Gonzalez experienced hunger, thirst, discomfort, and anxiety. Specifically, Mr. Gonzalez experienced pain and discomfort in his midsection as a result of holding his bladder; the

34

pain persisted for two weeks after his arrest. Additionally, Mr. Gonzalez experienced difficulty urinating for two weeks after his arrest. He sought medical attention for both of these conditions.

192.     As a result of Defendants' manual rectal jabbing and the grabbing of his testicles, Mr. Gonzalez suffered humiliation, anxiety, and emotional distress. He feels more withdrawn from people and has had difficulty relating to people since the search.

193.     As a result of all the conduct described here, Mr. Gonzalez has had difficulty sleeping since January 20. He has regular nightmares about being chased, attacked, or locked up by the police. He frequently cannot sleep for hours and occasionally goes all night without sleeping. Mr. Gonzalez also feels nervous about attending protests. When he encounters police, he becomes extremely fearful, and begins to shake and sweat. After experiencing these symptoms at several demonstrations after January 20, he ceased attending demonstrations entirely because of his fear and anxiety.

*Injuries to Plaintiffs Frisbie-Fulton and A.S.*

194.     As a result of Defendants' conduct toward nonthreatening demonstrators outside the kettle at 12th and L Streets — including Defendants' unjustified use of pepper spray and other chemical irritants and Defendants' charge into a nonthreatening crowd on the south side of L Street NW — Plaintiffs Frisbie-Fulton and A.S. coughed and choked for several minutes, and A.S. scraped his ribs. They both continued to cough intermittently throughout the rest of the day.

195.     As a result of Defendants' conduct, Ms. Frisbie-Fulton and A.S. suffered significant anxiety, fear, and other emotional distress as they became entangled beneath a crush of people, feared for their own and each other's safety, and feared becoming

separated from each other. Ms. Frisbie-Fulton experienced particular anxiety and fear at the thought that she might be unable to protect her son. Although ten years old, A.S. found that he needed to sleep with his mother on the night of January 20 after what they had experienced. For approximately a month after January 20, A.S. had difficulty recalling their experience at 12th and L Streets NW without becoming emotional. A.S. continues to remember that experience when he sees police officers.

196.     As a result of Defendants' conduct on January 20, Ms. Frisbie-Fulton and A.S. have become wary at political demonstrations. As they had planned to do, Ms. Frisbie-Fulton and A.S. attended the Women's March in Washington, D.C. on January 21, 2017, but they decided to leave early when A.S. became frightened at the sight of a police officer. Both of them have become more nervous at demonstrations, and Ms. Frisbie-Fulton no longer takes A.S. to certain types of demonstrations where she expects the police presence will be too concentrated to feel safe.

*The District's Responsibility for Plaintiffs' Injuries*

197.      The actions of the Defendants described above were taken pursuant to a municipal policy, practice, and custom of responding to demonstrations at which some law-breaking occurs by using excessive force against participants who have not broken the law.

198.     Chief Newsham has acknowledged that the Defendant Officers' kettling of detainees was not mere happenstance but a coordinated strategy. All the Defendant officers' actions in pepper-spraying, assaulting with additional noise- and light-emitting weaponry, and detaining demonstrators were carried out in a coordinated manner.

199.     Chief Newsham spent the day on January 20 in an MPD command center, where he was well aware of and (on information and belief) directed the massive and

36

coordinated MPD response to the march down 13th Street NW, pursuant to MPD Standard Operating Procedure 16-01 ("Handling First Amendment Assemblies And Mass Demonstrations"), which provides (at page 11) that "During periods in which the Department is fully mobilized for mass demonstration operations . . . [t]he Chief of Police, as the commanding official of the MPD, shall oversee all police activities …."

200.    Cmdr. Keith Deville, the officer in command on the scene of the demonstration and subsequent kettling, was in constant communication with the MPD command center, where he received orders from Asst. Chief Lamar Greene and other top-ranking members of MPD. On information and belief, Asst. Chief Greene and the other officials who instructed Cmdr. Deville acted on the orders or with the approval of Chief Newsham, who was with them in the command center.

201.    To whatever extent Chief Newsham did not direct the coordinated MPD response himself, he nonetheless was aware of the large-scale MPD actions taken against the individuals who marched down 13th Street NW, and he deliberately failed to supervise and restrain Defendants Greene and Deville, and other officers under his command, from violating the rights of Plaintiffs and others repeatedly and continually throughout January 20.

202.    The coordinated MPD response is part of a custom of the District of Columbia of responding with overwhelming and unlawful force to non-violent demonstrators at largely peaceful demonstrations where some law-breaking is occurring. For instance, MPD has:

   a.    Used excessive force against and unconstitutionally detained
         demonstrators during the counter-inaugural demonstrations in Adams Morgan

in January 2005; the pepper-spraying and arrest of numerous peaceful demonstrators led to lawsuits resolved by large settlement payments to victims of MPD violence.

b.      Used excessive force against demonstrators during the counter-inaugural demonstrations near the White House in January 2005 after other demonstrators had removed a portion of security fencing; the pepper-spraying of law-abiding demonstrators led to a lawsuit resolved by large settlement payments to victims of MPD violence.

c.      Used excessive force against and unconstitutionally detained demonstrators during the World Bank protests in Pershing Park in September 2002; the mass arrests and hogtying of protestors led to lawsuits resolved by large settlement payments to victims of MPD violence.

d.      Used excessive force against and unconstitutionally detained anti-globalization demonstrators in April 2000; the kettling, use of pepper spray, and denial food and water to detainees led to lawsuits resolved by large settlement payments to victims of MPD violence.

203.    The prior incidents in which MPD used excessive force against and unconstitutionally detained peaceful demonstrators where some law-breaking occurred made clear to the District that its officers required training regarding the constitutional limits of their authority to detain demonstrators and use force against them. The widespread use of chemical irritants on January 20 in violation of both D.C. law and the Fourth Amendment reflects a deliberately indifferent failure to train MPD officers on the appropriate circumstances in which to deploy chemical irritants. To whatever extent the

individual Defendants' actions described here did not reflect municipal custom or carry out affirmative instructions from Chief Newsham, these actions were the result of the District's failure to train MPD officers.

204.    When asked to comment on MPD officers' January 20 conduct, Chief Newsham responded by ratifying the officers' conduct in a WTOP radio interview, in which he stated: "[A]ll the police officers were outstanding in the judgment that they used. They used the least amount of force necessary to bring those folks safely and respectfully into custody. I couldn't be more proud of the way this department responded." Chief Newsham further stated to WTOP that he was "very, very pleased" with the way police responded to the demonstration.

205.    Following a report by the Office of Police Complaints raising concerns about MPD's conduct on Inauguration Day, an official MPD spokesperson reaffirmed that its officers' actions conformed to the District's expectations: "The Metropolitan Police Department stands by its assertion that our officers acted responsibly and professionally during Inauguration Day," MPD spokesperson Rachel Reid said in a statement emailed to the news media.

*Notices of Claims*

206.    Plaintiffs have timely given notice in writing to the Mayor of the District of Columbia of the "approximate time, place, cause, and circumstances" of their injuries, pursuant to D.C. Code § 12-309. The Notice of Claim letter for Plaintiffs Horse, Lagesse, Ariel, and Gonzalez was hand-delivered to the D.C. Office of Risk Management on June 12, 2017. The Notice of Claim letter for Plaintiffs Frisbie-Fulton and A.S. was mailed to

the D.C. Office of Risk Management on July 18, 2017, and Ms. Frisbie-Fulton subsequently received a letter from the District acknowledging receipt.

## CLAIMS FOR RELIEF

**Claim 1: Fourth Amendment / 42 U.S.C. § 1983 – arrest without probable cause
(Plaintiffs Horse and Lagesse against Defendants District of Columbia, Newsham,
Deville, Greene, Howden, Rock, Thau, Alioto, Washington, Bogardus, and
Hinostroza)**

207.     The actions of Defendants Howden, Rock, Thau, Alioto, Washington, Bogardus, and Hinostroza, namely the warrantless arrests of Plaintiffs Horse and Lagesse without probable cause, and the actions of Defendants Newsham, Deville, and Greene in ordering or approving such arrests, violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

208.     Defendants Newsham, Deville, Greene, Howden, Rock, Thau, Alioto, Washington, Bogardus, and Hinostroza are jointly and severally liable to Plaintiffs Horse and Lagesse pursuant to 42 U.S.C. § 1983 for this violation of their rights.

209.     Defendant District of Columbia is liable to Plaintiffs Horse and Lagesse pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

**Claim 2: First Amendment / 42 U.S.C. § 1983 – arrest for protected speech
(Plaintiffs Horse and Lagesse against Defendants District of Columbia, Newsham,
Deville, Greene, Howden, Rock, Thau, Alioto, Washington, Bogardus, and
Hinostroza)**

210.     The actions of Defendants Howden, Rock, Thau, Alioto, Washington, Bogardus, and Hinostroza, namely the arrest of Plaintiffs Horse and Lagesse for exercising their First Amendment freedoms to report the news or to express their views, respectively, and the actions of Defendants Newsham, Deville, and Greene in ordering or approving

40

such arrests, violated the rights of Plaintiffs Horse and Lagesse under the First Amendment to the United States Constitution, which guarantees the freedoms of speech, assembly, and press.

211.     Defendants Newsham, Deville, Greene, Howden, Rock, Thau, Alioto, Washington, Bogardus, and Hinostroza are jointly and severally liable to Plaintiffs Horse and Lagesse pursuant to 42 U.S.C. § 1983 for this violation of their rights.

212.     Defendant District of Columbia is liable to Plaintiffs Horse and Lagesse pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

## Claim 3: False arrest / false imprisonment
### (Plaintiffs Horse and Lagesse against Defendants District of Columbia, Newsham, Deville, Greene, Howden, Rock, Thau, Alioto, Washington, Bogardus, and Hinostroza)

213.     The actions of Defendants Howden, Rock, Thau, Alioto, Washington, Bogardus, and Hinostroza, namely the warrantless arrest of Plaintiffs Horse and Lagesse without probable cause, and the actions of Defendants Newsham, Deville, and Greene in ordering or approving such arrests, constituted false arrest and false imprisonment under the law of the District of Columbia.

214.     Defendants Newsham, Deville, Greene, Howden, Rock, Thau, Alioto, Washington, Bogardus, and Hinostroza are jointly and severally liable to Plaintiffs Horse and Lagesse for these tortious acts.

215.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 4: Negligence per se / First Amendment Assemblies Act – kettling**
**(Plaintiffs Horse and Lagesse against Defendants District of Columbia, Newsham, Deville, and Greene)**

216.     The actions of Defendants Newsham, Deville, and Greene, namely ordering the kettling or encircling of Plaintiffs Horse and Lagesse and detaining them in the kettle for several hours, violated the rights of Plaintiffs under the First Amendment Assemblies Act because Defendants lacked "probable cause to believe that a significant number or percentage of the persons located in the area or zone have committed unlawful acts" and because the police did not "have the ability to identify those individuals." D.C. Code § 5-331.08.

217.     Defendants Newsham, Deville, and Greene are jointly and severally liable to Plaintiffs Horse and Lagesse for this violation of their rights, because Defendants' violation of the First Amendment Assemblies Act constitutes negligence per se and/or is redressable under the First Amendment Assemblies Act.

218.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 5: Negligence per se / First Amendment Assemblies Act –**
**failure to give dispersal order**
**(Plaintiffs Horse, Lagesse, Ariel, Frisbie-Fulton and A.S. against Defendants District of Columbia, Newsham, Deville, Greene, Howden, Rock, Thau, Alioto, Washington, Murphy, Whiteside, Hill, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, Williams, Masci, and Angulo)**

219.     The actions of Defendants Howden, Rock, Thau, Alioto, Washington, Murphy, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, Williams, Masci, and Angulo, namely the failure to give Plaintiffs Horse, Lagesse, Ariel, Frisbie-Fulton and A.S. "at least one clearly audible and understandable order to disperse

42

using an amplification system or device" and to "provide the participants a reasonable and adequate time to disperse and a clear and safe route for dispersal" violated the rights of Plaintiffs under the First Amendment Assemblies Act. D.C. Code § 5-331.07(e)(1).

220.     Defendants Newsham, Deville, Greene, Whiteside, and Hill are liable for these actions because each of them ordered their officers to assault one or more of the plaintiffs without a dispersal order or because they knew about, condoned, and/or failed to correct this conduct.

221.     Defendants Newsham, Deville, Greene, Howden, Rock, Thau, Alioto, Washington, Murphy, Whiteside, Hill, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, Williams, Masci, and Angulo are jointly and severally liable to Plaintiffs Horse, Lagesse, Ariel, Frisbie-Fulton and A.S. for this violation of their rights, because Defendants' violation of the First Amendment Assemblies Act constitutes negligence per se and/or is redressable under the First Amendment Assemblies Act.

222.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 6: Fourth Amendment / 42 U.S.C. § 1983 –
excessive force (use of chemical irritants)
(Plaintiffs Horse, Lagesse, Ariel, Gonzalez, Frisbie-Fulton and A.S. against
Defendants District of Columbia, Rock, Thau, Washington, Murphy, Whiteside,
Hill, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis,
Parker, and Williams)**

223.     The actions of Defendants Rock, Thau, Washington, Murphy, Whiteside, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams, namely the use of pepper spray and stingballs against nonviolent and non-resisting demonstrators, detainees, and bystanders, including Plaintiffs Horse, Lagesse,

Ariel, Gonzalez, Frisbie-Fulton and A.S., and the actions of Defendants Whiteside and Hill in ordering or approving such use of pepper spray and stingballs, violated the rights of Plaintiffs under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

224.     Defendants Rock, Thau, Washington, Murphy, Whiteside, Hill, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams are jointly and severally liable to Plaintiffs Horse, Lagesse, Ariel, Gonzalez, Frisbie-Fulton and A.S. pursuant to 42 U.S.C. § 1983 for this violation of their rights.

225.     Defendant District of Columbia is liable to Plaintiffs pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

**Claim 7: Assault and battery – use of chemical irritants**
**(Plaintiffs Horse, Lagesse, Ariel, Gonzalez, Frisbie-Fulton and A.S. against Defendants District of Columbia, Newsham, Deville, Greene, Rock, Thau, Washington, Murphy, Whiteside, Hill, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams)**

226.     The actions of Defendants Rock, Thau, Washington, Murphy, Whiteside, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams, namely the use of pepper spray and stingballs against nonviolent and non-resisting demonstrators, detainees, and bystanders, including Plaintiffs Horse, Lagesse, Ariel, Gonzalez, Frisbie-Fulton and A.S., constituted the torts of assault and battery.

227.     Defendants Newsham, Deville, Greene, Whiteside, and Hill are liable for these actions because they ordered their officers to use pepper spray and stingballs against nonviolent and non-resisting demonstrators, detainees, and bystanders or knew about, condoned, and/or failed to correct this conduct.

228.     Defendants Newsham, Deville, Greene, Rock, Thau, Washington, Murphy, Whiteside, Hill, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams are jointly and severally liable to Plaintiffs for these tortious acts.

229.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 8: Negligence per se / First Amendment Assemblies Act –
unlawful use of chemical irritants
(Plaintiffs Horse, Lagesse, Ariel, Gonzalez, Frisbie-Fulton and A.S. against
Defendants District of Columbia, Newsham, Deville, Greene, Rock, Thau,
Washington, Murphy, Whiteside, Hill, Baldwin, Flash, Steffes, Roccato, Baskerville,
Brooks, Vongkeo, Dennis, Parker, and Williams)**

230.     The actions of Defendants Rock, Thau, Washington, Murphy, Whiteside, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams, namely the use of pepper spray and stingballs against nonviolent and non-resisting demonstrators, detainees, and bystanders, including Plaintiffs Horse, Lagesse, Ariel, Gonzalez, Frisbie-Fulton and A.S., violated the rights of Plaintiffs under the First Amendment Assemblies Act because Defendants used "[l]arge scale canisters of chemical irritant" when not "reasonable and necessary to protect officers or others from physical harm or to arrest actively resisting subjects" and because they used "[c]hemical irritant … to disperse a First Amendment assembly" other than at a time when "assembly participants or others are committing acts of public disobedience endangering public safety and security." D.C. Code § 5-331.16(b).

231.     Defendants Newsham, Deville, Greene, Whiteside, and Hill are liable for these actions because they ordered their officers to use pepper spray and stingballs against demonstrators, detainees, and bystanders in circumstances prohibited by the First

Amendment Assemblies Act or knew about, condoned, and/or failed to correct this conduct.

232.     Defendants Newsham, Deville, Greene, Rock, Thau, Washington, Murphy, Whiteside, Hill, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams are jointly and severally liable to Plaintiffs for this violation of their rights, because Defendants' violation of the First Amendment Assemblies Act constitutes negligence per se and/or is redressable under the First Amendment Assemblies Act.

233.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

### Claim 9: Fourth Amendment / 42 U.S.C. § 1983 – excessive force (knocking down ten-year-old) (Plaintiff A.S. against Defendants Whiteside, Hill, Masci, and Angulo)

234.     The actions of Defendants Masci and Angulo, namely charging into A.S. unprovoked and knocking him to the ground, and the actions of Defendants Whiteside and Hill in ordering Defendants Masci and Angulo to charge at nonviolent demonstrators including A.S., violated the right of Plaintiff A.S. under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

235.     Defendants Masci, Angulo, Whiteside, and Hill are jointly and severally liable to Plaintiff A.S. pursuant to 42 U.S.C. § 1983 for this violation.

**Claim 10: Assault and battery – knocking down ten-year-old**
**(Plaintiff A.S. against Defendants District of Columbia, Whiteside, Hill, Masci, and Angulo)**

236.     The actions of Defendants Masci and Angulo, namely charging into A.S. unprovoked and knocking him to the ground, constituted the torts of assault and battery against Plaintiff A.S.

237.     Defendants Whiteside and Hill are liable for these actions because they ordered their officers to charge at nonviolent demonstrators including A.S. or knew about, condoned, and/or failed to correct this conduct.

238.     Defendants Masci, Angulo, Whiteside, and Hill are jointly and severally liable to Plaintiff A.S. for this tortious act.

239.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 11: Fourth Amendment / 42 U.S.C. § 1983 –**
**excessive force (zipties)**
**(Plaintiffs Horse and Lagesse against Defendants Hinostroza and Borgardus)**

240.     The actions of Defendants Hinostroza and Borgardus, namely the excessively and painfully tight handcuffing of Plaintiffs Horse and Lagesse and the refusal to remove the restraints despite knowing that they were too tight, violated their rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures.

241.     Defendants Hinostroza and Borgardus are liable to Plaintiffs Horse and Lagesse pursuant to 42 U.S.C. § 1983 for these violations of their rights.

**Claim 12: Fourth and Fifth Amendments / 42 U.S.C. § 1983 –
unconstitutional conditions of pre-trial confinement
(Plaintiffs Horse, Lagesse, and Gonzalez against Defendants District of Columbia,
Newsham, Alder, Carroll, and Niepling)**

242.     The actions of Defendants Newsham, Alder, Carroll, and Niepling in ordering or approving the detention of Plaintiffs Horse, Lagesse, and Gonzalez for a prolonged period without access to food, water or toilets violated Plaintiffs' rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures and under the Fifth Amendment to the United States Constitution to due process of law.

243.     Defendants Newsham, Alder, Carroll, and Niepling are jointly and severally liable to Plaintiffs Horse, Lagesse, and Gonzalez pursuant to 42 U.S.C. § 1983 for this violation of their rights.

244.     Defendant District of Columbia is liable to Plaintiffs Horse, Lagesse, and Gonzalez pursuant to 42 U.S.C. § 1983 for this violation of their rights, because the violation was caused by a policy, practice, or custom of the District of Columbia.

**Claim 13: Negligence per se / First Amendment Assemblies Act –
unreasonable delay in providing food to arrestees
(Plaintiffs Horse, Lagesse, and Gonzalez against Defendants District of Columbia,
Newsham, Alder, Carroll, and Niepling)**

245.     The actions of Defendants Newsham, Alder, Carroll, and Niepling, namely the failure to provide food to detainees "not released within a reasonable time of arrest," violated the rights of Plaintiffs Horse, Lagesse, and Gonzalez under the First Amendment Assemblies Act. D.C. Code § 5-331.12(b)(2).

246.     Defendants Newsham, Alder, Carroll, and Niepling are jointly and severally liable to Plaintiffs Horse, Lagesse, and Gonzalez for this violation of their rights, because

Defendants' violation of the First Amendment Assemblies Act constitutes negligence per se and/or is redressable under the First Amendment Assemblies Act.

247.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 14: Negligence per se / First Amendment Assemblies Act –
failing to process arrestees promptly
(Plaintiffs Horse, Lagesse, and Gonzalez against Defendants District of Columbia,
Newsham, Alder, Carroll, and Niepling)**

248.     The actions of Defendants Newsham, Alder, Carroll, and Niepling, namely ordering or approving their officers' failure to "promptly process any person arrested in connection with a First Amendment assembly to determine whether the person is eligible for immediate release pursuant to a lawful release option," and/or failing to take steps necessary to ensure such prompt processing, violated the rights of Plaintiffs Horse, Lagesse, and Gonzalez under the First Amendment Assemblies Act. D.C. Code § 5-331.12(a)(1).

249.     Defendants Newsham, Alder, Carroll, and Niepling are jointly and severally liable to Plaintiffs Horse, Lagesse, and Gonzalez for this violation of their rights, because Defendants' violation of the First Amendment Assemblies Act constitutes negligence per se and/or is redressable under the First Amendment Assemblies Act.

250.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 15: Intentional infliction of emotional distress – denial of access to toilets**
**(Plaintiff Gonzalez against Defendants District of Columbia, Newsham, Alder,**
**Carroll, and Niepling)**

251.     The actions of Defendants Newsham, Alder, Carroll, and Niepling, namely ordering or approving the detention of Plaintiff Gonzalez for a prolonged period without access to a toilet, constituted extreme and outrageous conduct that intentionally or recklessly caused Plaintiff Gonzalez severe emotional distress.

252.     Defendants Newsham, Alder, Carroll, and Niepling are jointly and severally liable to Plaintiff Gonzalez for this tortious act.

253.     Defendant District of Columbia is liable under the doctrine of *respondeat superior* for the damages inflicted by its agents while acting within the scope of their employment as MPD officers and on behalf of and in the interests of their employer.

**Claim 16: Fourth Amendment / 42 U.S.C. § 1983 – unreasonable search**
**(Plaintiffs Horse and Gonzalez against Defendant John Doe)**

254.     The actions of Defendant John Doe, namely the manual rectal jabbing of Plaintiffs Horse and Gonzalez and the grabbing of Plaintiff Gonzalez's testicles without reasonable suspicion or probable cause, violated the rights of Plaintiffs Horse and Gonzalez under the Fourth Amendment to the United States Constitution to be free from unreasonable searches.

255.     Defendant John Doe is liable to Plaintiffs Horse and Gonzalez pursuant to 42 U.S.C. § 1983 for this violation of their rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

(a)      RULE that Defendants' actions violated Plaintiffs' rights under the First, Fourth and Fifth Amendments to the United States Constitution, the First Amendment Assemblies Act, and the law of the District of Columbia;

(b)      ENTER JUDGMENT awarding Plaintiffs compensatory damages against all Defendants in an amount appropriate to the evidence adduced at trial;

(c)      ENTER JUDGMENT awarding Plaintiffs punitive damages against all individual Defendants in an amount appropriate to the evidence adduced at trial;

(d)      ENTER JUDGMENT awarding Plaintiffs their costs and reasonable attorneys' fees in this action as provided in 42 U.S.C. § 1988(b); and

(e)      GRANT Plaintiffs such further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs request a trial by jury.

Respectfully submitted,

*/s/ Scott Michelman*
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Shana Knizhnik (D.C. Bar No. 1020840)
American Civil Liberties Union Foundation
   of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel. 202-457-0800
Fax 202-457-0805
smichelman@acludc.org

January 2, 2018                Counsel for Plaintiffs