**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HORSE, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>     Defendants. | Civil Action No. 17-1216 (ABJ) |

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' FIRST AMENDED COMPLAINT

   Defendants the District of Columbia (the District), Peter Newsham, Keith Deville, Lamar Greene, Robert Alder, Jeffery Carroll, Paul Niepling, Michael Whiteside, Sean Hill, Anthony Alioto, Michael Murphy, Michael Howden, Gregory Rock, Daniel Thau, Melvin Washington, Dennis Baldwin, Courtney Flash, Timothy Steffes, Leonard Roccato, Bruce Baskerville, Diane Brooks, Phokham Vongkeo, Ferney Dennis, Kenneth Parker, Sequita Williams, Joseph Masci, Aulio Angulo, Donald Bogardus, and Harvy Hinostroza (collectively, defendants), respectfully move under Fed. R. Civ. P. 12(b)(6) to dismiss plaintiffs' First Amended Complaint [29] on the following grounds:

   1.  Defendants are entitled to qualified immunity against plaintiffs' constitutional claims brought under 42 U.S.C. § 1983 because plaintiffs fail to allege violations of their clearly established constitutional rights.

   2.  There was probable cause to arrest plaintiffs Horse and Lagesse.

3.      Plaintiffs Horse, Lagesse, Gonzalez, Frisbie-Fulton, A.S., and Ariel fail to state a claim for assault or battery because they fail to allege intentional acts by defendants.

4.      Plaintiffs fail to allege a basis to hold the District liable under 42 U.S.C. § 1983 for plaintiffs' constitutional claims.

5.      Plaintiffs fail to state viable claims of negligence *per se* because, among other defects, the cited statutes do not impose specific duties on specific actors and the Amended Complaint does not allege that violations of these statutes caused plaintiffs' injuries.

6.      Plaintiff Gonzalez fails to state a claim for intentional infliction of emotional distress because he fails to allege outrageous conduct by defendants or that he suffered severe emotional distress.

These grounds are discussed in greater detail in the accompanying memorandum of points and authorities. A proposed order is attached.

Dated: March 30, 2018.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Acting Chief, Equity Section

*/s/ Amanda J. Montee*
AMANDA J. MONTEE [1018326]

MATTHEW R. BLECHER [1012957]
ERIC U. JOHNSON [1030661]
Assistant Attorneys General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C.  20001
(202) 724-5691
(202) 741-8934 (fax)
amanda.montee@dc.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HORSE, *et al.*,<br><br>               Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>               Defendants. | Civil Action No. 17-1216 (ABJ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS'**
**FIRST AMENDED COMPLAINT**

## INTRODUCTION

On January 20, 2017, thousands of people took to the streets of Washington, D.C., for demonstrations relating to the presidential inauguration. Although most of these demonstrations proceeded peacefully, one group of self-described anarchists and anti-fascists rioted across Northwest D.C., breaking storefront windows, tossing newspaper stands and trashcans into the street, and spray-painting and destroying vehicles. The District of Columbia Metropolitan Police Department (MPD) was tasked with controlling the violence and arresting the rioters, who responded by attacking and violently charging at MPD officers in a bid to escape arrest. Plaintiffs—some of whom were arrested for rioting that day, and two of whom are still actively being prosecuted by the United States Attorney's Office—have filed this action against the District of Columbia (the District) and many of the

responding MPD officers, alleging a total of sixteen constitutional and common law claims. But as set forth below, these claims lack merit and should be dismissed.

## FACTS

On Inauguration Day 2017, while thousands protested peacefully in the District, some demonstrators wearing hoods, masks, and all black clothing destroyed property and engaged in other acts of vandalism. *See* Am. Compl. [29] ¶¶ 15–16, 21–22, 46. These individuals were in a group of hundreds that met at Logan Circle at approximately 10 a.m. and walked south, towards the National Mall. *Id.* ¶ 17. Plaintiffs Shay Horse and Milo Gonzalez were among them. *Id.* ¶¶ 19, 76.

Fifteen minutes after the group left Logan Circle, members began destroying property, including breaking storefront windows. *Id.* ¶¶ 32, 46. Chief Newsham and Assistant Chief Greene were monitoring the violence from the MPD Command Center. *Id.* ¶¶ 199–200. Shortly after the violence began, the on-scene commander, Keith Deville, declared that the demonstration had turned into a riot and ordered officers to stop the group. *Id.* ¶ 32. Commander Deville received this order from Assistant Chief Greene, who "received direction from" Chief Newsham. *Id.* ¶ 33. Commander Deville, also "under the direction of Defendant Chief Newsham and Asst. Chief Greene," authorized the officers on the scene to use pepper spray and stingballs, as needed. *Id.* ¶¶ 39, 41, 42. Around this time, plaintiff Horse alleges he was pepper sprayed by Officer Murphy while photographing individuals wearing "hoods and masks" breaking windows. *Id.* ¶ 46–47.

Approximately fifteen minutes after Commander Deville declared the event a riot—and thirty minutes after the demonstration began—plaintiff Elizabeth Lagesse joined the group. *Id.* ¶ 53. At some point after she began marching, but before she was arrested, Lagesse put on lab safety goggles and covered her mouth with a bandana to protect herself from the possible effects of pepper spray. *Id.* ¶¶ 54, 58.

Plaintiffs Horse and Lagesse both fled, "run[ning] away from the police, heading north up 14th Street NW, then east on L Street NW," changing course as they encountered MPD officers. *Id.* ¶¶ 56, 59–60. The group continued to move until "Cmdr. Deville, under the direction of Chief Newsham and Asst. Chief Greene, ordered MPD officers to establish a blockade at the corner of 12th and L Streets NW." *Id.* ¶ 61. Around 10:45 a.m., *id.* ¶ 75, officers detained approximately 200 individuals in a cordoned area—the "kettle"—at 12th and L Streets, N.W., *id.* ¶ 65. Officers Howden, Rock, Thau and Washington were "among the MPD officers who established the blockade," *id.* ¶ 62; Sergeant Alioto was "among the MPD officers who supervised the establishment of the blockade," *id.* ¶ 63.

Plaintiffs Horse, Gonzalez, and Lagesse were detained in the kettle. *Id.* ¶ 76. They allege that while they were detained, Officers Washington, Rock, and Thau deployed pepper spray into the group of detainees. *Id.* ¶ 80. "Although Plaintiffs Horse, Lagesse, and Gonzalez are unsure whether they were targeted personally by any of the officers' uses of pepper spray or stingballs," they allege "the tight packing

of the detainees into a small space ensured that everyone in the kettle would feel the effects of spray directed at the crowd of detainees." *Id.* ¶ 82.

"Within 30 or 45 minutes of the formation of the kettle, by 11:30 a.m., MPD had prisoner vans and processing officers at the scene and was ready for processing of detainees." *Id.* ¶ 97. "Nonetheless, the handcuffing of detainees and placing them into vehicles for transport to detention facilities stretched on for hours, with some of the detainees, including Plaintiff Lagesse, remaining on the corner of 12th and L Streets NW until the late afternoon and others, including Plaintiffs Horse and Gonzalez, remaining until after sunset." *Id.* ¶ 98. Plaintiffs allege that Assistant Chief Alder, Commander Carroll, and Lieutenant Niepling supervised this process. *Id.* ¶ 87. While detained in the kettle, Horse, Lagesse, and Gonzalez were without food, water, and toilets. *Id.* ¶ 88.

At approximately 1:00 p.m., while some arrestees were still awaiting transport, plaintiff Gwen Frisbie-Fulton went to the scene with her ten-year old son, plaintiff A.S. *Id.* ¶ 108. They stayed for approximately 45 minutes. *Id.* ¶ 111. At 1:30 p.m., plaintiff Judah Ariel also went to the scene. *Id.* ¶ 114.

Ariel alleges that fifteen minutes after he arrived, 11 officers "suddenly and without warning" pepper sprayed people outside the kettle, including him; he alleges those officers were Lieutenant Whiteside and Officers Dennis, Baldwin, Flash, Steffes, Rocatto, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams. *Id.* ¶ 120. Ariel alleges the pepper spray was ordered by Lieutenant

Whiteside and Sergeant Hill, who "walked behind the line of officers speaking to them moments before the spraying began." *Id.* ¶ 122.

Plaintiffs Frisbie-Fulton and A.S. do not allege they were directly sprayed with any chemical irritant. *See id.* ¶¶ 140, 142. However, plaintiff Frisbie-Fulton alleges she inhaled pepper spray, *id.* ¶ 140, and plaintiff A.S. alleges pepper spray "landed" on his winter hat, *id.* ¶ 142. A.S. also alleges Officers Masci and Angulo "collided with [him], knocking him to the ground." *Id.* ¶ 129. He deduces that Lieutenant Whiteside and Sergeant Hill ordered the "charge" that resulted in this collision based on observing them walk behind the line of officers and seeing them speak to those officers moments before. *Id.* ¶ 130. Plaintiffs Frisbie-Fulton and A.S. further recount that an unnamed MPD officer attempted to help them flee, but the group became separated. *Id.* ¶ 138.

After Horse, Gonzalez, and Lagesse had been detained in the kettle for several hours, they were formally arrested and handcuffed with zipties. *Id.* ¶ 145. Officer Hinostroza arrested Horse and Gonzalez, and Officer Bogardus arrested Lagesse. *Id.* ¶ 145. Horse and Lagesse allege that their zipties were too tight and left scarring on their wrists. *Id.* ¶¶ 147, 150, 178, 185.

## LEGAL STANDARD

Dismissal of a claim or complaint is appropriate when a party fails to set forth "a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although the factual allegations in the complaint must be taken as true, a plaintiff must offer "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557)).

## ARGUMENT

## I.    CLAIM 1:  Horse's and Lagesse's Fourth Amendment Unlawful Arrest Claims Should be Dismissed.

### A.    Claim 1 Should Be Dismissed Because Plaintiffs Were Arrested Based on Probable Cause.

Horse and Lagesse allege they were arrested in violation of their Fourth Amendment rights and bring a § 1983 claim against the District and ten individual defendants:  Newsham, Greene, Deville, Alioto, Howden, Rock, Thau, Washington, Bogardus, and Hinostroza. Am. Compl., ¶¶ 207–09. Because Horse and Lagesse do not sufficiently allege a violation of their Fourth Amendment rights, their unlawful arrest claim should be dismissed.

"The Fourth Amended protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 587 (2018) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)). A seizure is reasonable if it is supported by probable cause, which "exists 'when known facts and circumstances

are sufficient to warrant [an officer] of reasonable prudence in the belief that an offense has been or is being committed.'" *Dukore v. District of Columbia*, 799 F.3d 1137, 1142 (D.C. Cir. 2015) (quoting *United States v. Davis*, 458 F.2d 819, 821 (D.C. Cir. 1972)). "To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'" *Wesby*, 138 S. Ct. at 586 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "[P]robable cause is evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Ronkin v. Vihn*, 71 F. Supp. 3d 124 (D.D.C. 2014) (internal quotation marks omitted). It "depends on the totality of the circumstances" and is "a flued concept." *Wesby*, 138 S. Ct. at 586 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* (quoting *Gates*, 462 U.S. at 243–44 n.13).

Taking the facts alleged in the Complaint as true, there was probable cause to arrest Horse and Lagesse. Under District law, it is a crime to engage in a riot or willfully incite or urge other persons to riot. D.C. Code § 22-1322(b)–(c). A riot is "a public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons." D.C. Code § 22-1322(a).

Horse and Lagesse admit they were travelling within a group that "engaged in acts of vandalism." Am. Compl. ¶ 22. They also allege that some members of the

group left when violence began, *id.* ¶ 67, but that they were both with the group at least 15 minutes after the violence started. *See id.* ¶ 32 (vandalism occurred within fifteen minutes of the group leaving Logan Circle); ¶ 53 (Lagesse joined the group thirty minutes after they left Logan Circle); ¶ 46 (Horse was with the group when members broke storefront windows).

Additionally, Horse knew that the group was engaged in vandalism. *See id.* ¶ 46. And although Lagesse does not allege whether or not she was aware of the vandalism when she joined and continued with the group, the probable cause determination is made from the perspective of an officer. *Wesby*, 138 S. Ct. at 587. A reasonable officer would have had probable cause to believe Lagesse was engaging in criminal activity with the group because she remained with them at least 15 minutes after the vandalism began, and was equipped with gear to hide portions of her face and protect herself from the effects of pepper spray. *See Am. Compl.* ¶ 58. She alleges she donned lab safety goggles and covered part of her face with a bandana prior to her arrest. *Id.* Individuals who were engaged in vandalism also covered their faces. *Id.* ¶ 22.

Additionally, Horse and Lagesse admit to fleeing from the police when officers attempted to stop the movement of the group. *Id.* ¶¶ 50, 59–60. Under Supreme Court precedent, flight from law enforcement can be treated as suspicious behavior that factors into the probable cause determination. *Wesby*, 138 S. Ct. at 587; *see also Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000).

Even if each of these facts in isolation would not establish probable cause, under the totality of the circumstances it would have appeared to an objectively reasonable officer that there was a probability or substantial chance that Horse and Lagesse were rioting—sufficient to meet the probable cause threshold the Supreme Court has characterized as "not a high bar." *Wesby*, 138 S. Ct. at 586.

Finally, Horse and Lagesse were indicted by a grand jury following their arrests. *See United States v. Lagesse*, 2017 CF2 1355 (D.C. Sup. Ct);[1] *United States v. Horse*, 2017 CF2 1219 (D.C. Sup. Ct). "In evaluating the presence or lack of probable cause, the court may consider a grand jury indictment as *prima facie* evidence of probable cause." *Moore v. Hartman*, 102 F. Supp. 3d 35, 115 (D.D.C. 2015) (citing *Moore v. Hartman*, 571 F.3d 62, 63, 67, 69 (D.C. Cir. 2009) (*Moore IV*)). "[T]he plaintiff may rebut the presumption in this case by showing 'that the indictment was produced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith.'" *Id.* (citing *Moore IV*, 571 F.3d at 69). The Amended Complaint makes no allegations questioning the grand jury proceedings.

---

[1]     Lagesse is still being prosecuted; her trial is scheduled for July 23, 2018. If this Court does not dismiss the claims related to Lagesse's arrest, "it is within the power of the district court, and in accord with common practice, to stay the civil action until the criminal case or the likelihood of a criminal case is ended. If the plaintiff is ultimately convicted, and if the stayed civil suit would impugn that conviction, *Heck* will require dismissal; otherwise, the civil action will proceed, absent some other bar to suit." *Wallace v. Kato*, 548 U.S. 384, 393–94 (2007) (citing *Heck v. Humphrey*, 512 U.S. 477, 487–88 n.8 (1994)) (internal citations omitted).

**B.    Defendants Are Entitled to Qualified Immunity On Horse's and Lagesse's Fourth Amendment Unlawful Arrest Claims.**

      **1.    To Hold Individual Defendants Liable Under Section 1983, Plaintiffs Must Allege Facts Sufficient to Show the Defendant Is *Not* Entitled to Qualified Immunity.**

Qualified immunity "is an *immunity from suit* rather than a mere defense to liability," so entitlement to immunity should be resolved "at the earliest possible stage of litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (emphasis in original). "At the motion to dismiss stage, a plaintiff must allege sufficient facts to establish that the defendants are *not* entitled to qualified immunity." *Patterson v. United States*, 999 F. Supp. 2d 300, 311 (D.D.C. 2013) (emphasis in original). "As laid out by the Supreme Court, the two pertinent questions in determining whether qualified immunity applies are (1) 'whether a constitutional right would have been violated on the facts alleged,' and (2) 'whether the right was clearly established at the time of the violation.'" *Shaw v. District of Columbia*, 944 F. Supp. 2d 43, 54 (D.D.C. 2013) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

"'Clearly established' means that at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand what he or she is doing' is unlawful." *Wesby*, 138 S. Ct. at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). It requires the legal principle to be "settled law," "which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Id.* at 589–90 (quoting *al-Kidd*, 563 U.S. at 741–42). It "also requires that the legal principle clearly prohibit the officer's conduct in the

particular circumstances before him." *Id.* "This requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015)).

"In order to find a supervisor personally liable in damages for the unconstitutional acts of his subordinate, it must be shown that he was responsible for supervising the wrongdoer; that a duty to instruct the subordinate to prevent constitutional harm arose from the surrounding circumstances; and that, as a result of the official's failure to instruct, the plaintiff was harmed in the manner threatened." *Haynesworth v. Miller*, 820 F.2d 1245, 1262 (D.C. Cir. 1987) (overruled in part by *Hartman v. Moore*, 547 U.S. 250 (2006)). "The supervisor[ ] must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they may see." *Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004). "In the absence of any such 'affirmative links,' the supervisors cannot be shown to have the requisite 'direct responsibility' or to have given 'their authorization or approval to such misconduct,' and the effort to hold them personally liable fades into *respondeat superior* or vicarious liability, clearly barred by § 1983." *Id.* at 27 (quoting *Rizzo*, 423 U.S. at 371, 376)) (internal quotations omitted).

### 2. Defendants Are Entitled to Qualified Immunity Because It Was Not Clearly Established That Horse's and Lagesse's Arrests Lacked Probable Cause.

This "clearly established" component of qualified immunity is "especially important in the Fourth Amendment context" because "[g]iven its imprecise nature, officers will often find it difficult to know how the general standard of probable

11

cause applies in 'the precise situation encountered.'" *Wesby*, 138 S. Ct. at 590. (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017)). Thus, the Supreme Court has "stressed the need to 'identify a case where an officer under similar circumstances ... was held to have violated the Fourth Amendment.'" *Id.* (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam)). If there is no case on point, existing precedent must place the lawfulness of the particular arrest "beyond debate," except in the "rare 'obvious case,' where the lawlessness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id.* (citing *Brosseau v. Haugen*, 543 U.S. 149, 199 (2004) (per curiam)).

Because this is not one of those rare obvious cases, plaintiffs must demonstrate that legal precedent of this Circuit placed it beyond debate that there was no probable cause to arrest them on Inauguration Day. Plaintiffs cannot meet this standard. To the contrary, the case law of this Circuit provides a legal basis for defendants' reasonable belief that there was probable cause to arrest Horse and Lagesse. *See Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009). And at minimum, *Carr* demonstrates that it was not "clearly established" that Horse's and Lagesse's arrests were unlawful.

*Carr* was brought by five individuals who were arrested on January 20, 2005, during counter-inaugural demonstrations that turned violent. *Id.* at 403–05. Around 11:00 p.m. on January 20, 2005, approximately 250 to 300 individuals marched westbound on Columbia Road from its intersection with 16th Street, N.W. *Id.* at

12

403. As they marched, members of the group committed the following acts of vandalism: dragged newspaper vending machines into the street; broke windows or glass doors of businesses; spray painted buildings and cars; and threw objects at police cars. *Id.* at 404. Officers "witnessed the group cheering with members raising their arms in response to the destruction." *Id.* The commander ordered the protesters to be arrested, but many of them ran away first. *Id.* Ultimately, 65 to 75 were arrested. *Id.*

The *Carr* plaintiffs challenged their arrests under the Fourth Amendment. *Id.* at 402. Reversing the district court's grant of summary judgment for the plaintiffs, the D.C. Circuit recognized that under this Circuit's precedent, "officers may be able to establish they had probable cause to arrest an entire group of individuals if the group is observed violating the law even if specific unlawful acts cannot be ascribed to specific individuals." *Id.* at 406. And although probable cause must be particularized, "that showing is satisfied if the officers have grounds to believe all arrested persons were part of a unit observed violating the law." *Id.* at 407. Meaning, "[p]olice witnesses must only be able to form a reasonable belief that the entire crowd is acting as a unit and therefore all members of the crowd violated the law." *Id.* at 408 ("[I]t is possible that an entirely innocent person would be mistaken for a rioter. But it should be borne in mind that the legal issue is probable cause, not ultimate conviction. Probable cause only requires a reasonable belief of guilt, not a certitude.").

In light of *Carr*, plaintiffs cannot demonstrate it was clearly established that their arrests were unlawful. Like in *Carr*, plaintiffs allege they were with a large group, Am. Compl. ¶ 17, that members of the group engaged in acts of vandalism, *id.* ¶ 22, and that they remained with the group at least 15 minutes after the vandalism began, as the group continued to travel together through the District, *id.* ¶¶ 31, 32, 46, 53. Under the totality of the circumstances and from the perspective of a reasonable officer on the scene, it was not clearly established under *Carr* or any other precedent that defendants lacked probable cause to arrest Horse and Lagesse.

### C.   Plaintiffs Horse and Lagesse Fail to State a Claim for Unlawful Arrest in Violation of the Fourth Amendment Against Officers Howden, Rock, Thau, Washington and Sergeant Alioto Because They Fail to Allege These Defendants Arrested Them.

Horse's and Lagesse's Fourth Amendment unlawful arrest claims against Officers Howden, Rock, Thau, Washington, and Sergeant Alioto should also be dismissed because plaintiffs fail to allege adequately that these defendants arrested them. For Officers Howden, Rock, Thau, and Washington, plaintiffs allege: (1) that these officers "were among the MPD officers who established the blockade" at the corner of 12th and L Streets, N.W., *id.* ¶ 62, and (2) that they did not take "any actions to try to ensure that only individuals whom they had probable cause to believe had committed crimes would be in the kettle," *id.* ¶ 66. The allegations against Sergeant Alioto are the same, except plaintiffs also allege he "was among the MPD officers who supervised establishment of the blockade." *Id.* ¶¶ 62, 66, 63.

Plaintiffs do not allege these defendants arrested them. And as for the allegation that defendants failed to ensure there was probable cause for detaining

every person in the kettle, there is no such obligation, *see Carr*, 587 F.3d at 407–08, particularly where the arrest decision was made by these defendants' supervisors, Am. Compl. ¶ 61. Plaintiffs have not stated a Fourth Amendment unlawful arrest claim against Officers Howden, Rock, Thau, Washington, and Sergeant Alioto.

## II.   CLAIM 3:  Horse and Lagesse Fail to State a Claim for False Arrest.

### A.   Horse and Lagesse Fail to State a Claim for False Arrest Because They Were Arrested Based on Probable Cause.

"In actions for false arrest and false imprisonment, the central issue is whether the arresting officer was justified in ordering the arrest of the plaintiff; if so, the conduct of the arresting officer is privileged and the action fails." *Scott v. District of Columbia*, 493 A.2d 319, 321 (D.C. 1985). To prevail on their common law false arrest claim, plaintiffs "must demonstrate 'that the police acted without probable cause, in an objective constitutional sense, to effectuate his arrest.'" *Barnhardt v. District of Columbia*, 723 F. Supp. 2d 197, 214 (D.D.C. 2010) (quoting *Taylor v. District of Columbia*, 691 A.2d 121, 125 (D.C. 1997)). "Constitutional and common law false arrest claims are generally analyzed as though they comprise a single cause of action. The elements of both claims are substantially identical." *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 989 (D.C. Cir. 2014) (internal citations omitted).

Horse and Lagesse bring a common law false arrest claim against the same defendants as their Fourth Amendment claim for arrest without probable cause. Am. Compl. ¶¶ 213–15. For the reasons explained above in Section I, plaintiffs fail

to allege their arrests lacked probable cause. Thus, their common law false arrest claim should be dismissed against all defendants.

**B.      Horse and Lagesse Fail to State a Claim for False Arrest Against Officers Howden, Rock, Thau, Washington, Bogardus, Hinostroza, and Sergeant Alioto Because Defendants Acted In Good Faith Based on Reasonably Trustworthy Information.**

For the defendants who were ordered to arrest plaintiffs—Officers Howden, Rock, Thau, Washington, Bogardus, Hinostroza and Sergeant Alioto, *id.* ¶ 61—there is an additional basis for defendants' dismissal from plaintiffs' common law false arrest claim. "'[T]he law of this jurisdiction … also allows a lesser, partially subjective test to support a police officer's defense to a false arrest claim. Under the 'partially subjective test it,' 'it will suffice if the officer can demonstrate that (1) he or she believed, in good faith, that his [or her] conduct was lawful, and (2) this belief was reasonable.'" *Scales v. District of Columbia*, 973 A.2d 722,729 (D.C. 2009) (quoting *District of Columbia v. Murphy*, 635 A.2d 929, 932 (D.C. 1993)). The officer may form his or her "good faith" belief based on "reasonably trustworthy information." *Funchess v. United States*, 677 A.2d 1019, 1020–21 (D.C. 1996).

Under the facts plaintiffs allege, Officers Howden, Rock, Thau, Washington, Bogardus, Hinostroza, and Sergeant Alioto relied on the probable cause determinations made by superiors. Am. Compl. ¶ 61. Plaintiffs do not make any factual allegations that would support a finding that these officers lacked good faith in their reliance on the probable cause determination of their superiors, or that the determination was not reasonably trustworthy information under the

circumstances. As a result, the partially subjective test warrants the dismissal of Claim 3 against these defendants.

III.   <u>CLAIM 2:  Horse's and Lagesse's Claims Alleging Arrest for Protected Speech in Violation of the First Amendment Should be Dismissed.</u>

A.   <u>Plaintiffs Fail to State A Claim For Violation of Their First Amendment Rights Because They Do Not Allege a Causal Link Between Their Arrests and Exercise of Their First Amendment Rights.</u>

Horse and Lagesse allege they were arrested for engaging in protected speech, in violation of the First Amendment. *Id.* ¶¶ 210–12. As defendants, they name the District and the same ten individuals in Horse's and Lagesse's Fourth Amendment unlawful arrest claim (Claim 1) and false arrest claim (Claim 3). To establish a First Amendment retaliation violation, plaintiffs must allege "(1) that [they] engaged in protected conduct, (2) that the government 'took some retaliatory action, sufficient to deter a person of ordinary firmness in plaintiff[s'] position from speaking again, and (3) that there exists 'a causal link between the exercise of a constitutional right and the adverse action taken against [them].'" *Daugherty v. Sheer*, 248 F. Supp. 3d 272, 283 (D.D.C. 2017) (quoting *Doe v. District of Columbia*, 796 F.3d 96, 106 (D.C. Cir. 2015)). Horse and Lagesse fail to state a claim for First Amendment retaliation because they do not allege a causal link between the exercise of their First Amendment rights and their arrests.

First, at the time of the arrests, the demonstration was no longer protected speech under the First Amendment. Although Horse and Lagesse allege they engaged in protected speech activity when they joined a group of "hundreds" walking from Logan Circle towards the National Mall, Am. Compl. ¶¶ 17, 19, 53,

17

they admit that the demonstration did not remain peaceful. *Id.* ¶ 21. In fact, by the time Lagesse arrived, members of the group had been engaging in vandalism for at least fifteen minutes. *See id.* ¶¶ 32, 53. As a result, when plaintiffs were arrested, the demonstration had already turned violent and had lost its protection as expression under the First Amendment. *See Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972) ("Of course, where demonstrations turn violent, they lose their protected quality as expression under the First Amendment.").

Second, plaintiffs do not sufficiently allege they were arrested because of their speech rather than because of the vandalism. Plaintiffs each have one conclusory statement alleging the causation between their arrests and First Amendment activity:  Horse alleges he was arrested "merely because he was exercising his First Amendment right to document the demonstrations as a photojournalist," Am. Compl. ¶ 72; and Lagesse alleges she was arrested "merely because she wished to exercise her First Amendment right to demonstrate peacefully in opposition to the Inauguration," *id.* ¶ 74. These allegations do not satisfy the pleading standards of Rule 12(b)(6), because they are legal conclusions and naked assertions, devoid of "further factual enhancement." *See Iqbal*, 556 U.S. at 678. Plaintiffs have not sufficiently alleged a factual basis to find causation between their First Amendment protected expression and their arrests; in contrast, they have presented facts that provide an alternative explanation for their arrests— the unlawful activity of the group, *see* Am Compl. ¶ 21. Their First Amendment retaliation claims should be dismissed.

**B.** **Defendants Are Entitled to Qualified Immunity Because There Was No Clearly Established Right for Plaintiffs to be Free From Arrest When There Was Probable Cause to Arrest Them.**

There is a "First Amendment right not to be arrested in retaliation for one's speech where there is otherwise no probable cause for the arrest." *Patterson v. United States*, 999 F. Supp. 2d 300, 310 (D.D.C. 2013) (citing *Dellums v. Powell*, 566 F.2d 167, 195–96 (D.C. Cir. 1977)). However, there is no *clearly established* right to be free from a retaliatory arrest that is otherwise supported by probable cause. *Reichle v. Howards*, 132 S. Ct. 2088, 2094 (2012) ("Here, the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause. This Court has never held that there is such a right."); *Dukore*, 799 F.3d at 1145 (finding no clearly established right to be free from First Amendment retaliatory arrest where there is probable cause); *Ronkin v. Vihn*, 71 F. Supp. 3d 124, 137 (D.D.C. 2014) (same). In other words, even if plaintiffs had sufficiently pled that they were arrested because they were engaged in protected speech, as long as their arrests were also supported by probable cause, defendants are entitled to qualified immunity.

As a result, Horse's and Lagesse's First Amendment retaliation claims depend—like plaintiffs' Fourth Amendment unlawful arrest claim—on whether under the totality of the circumstances a reasonable officer in their position would have believed there was probable cause to arrest Horse and Lagesse. As explained above in Section I:  (1) there was probable cause to arrest Horse and Lagesse; and

(2) under the totality of the circumstances it was not clearly established that that the officers lacked probable cause to execute the arrests. Defendants are entitled to qualified immunity.

## IV.  CLAIM 6:  Plaintiffs' Fourth Amendment Excessive Force Claims Regarding the Use of Pepper Spray Should be Dismissed.

### A.  Gwen Frisbie-Fulton, A.S., and Judah Ariel Fail to State a Claim for Violation of Their Fourth Amendment Rights Because They Were Not Seized.

"The Fourth Amendment's prohibition on unreasonable search and seizures also 'encompasses the right to be free from the use of excessive force during an arrest, investigatory stop, or any other seizure.'" *Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 193 (D.D.C. 2015) (quoting *Armbruster v. Frost*, 962 F. Supp. 2d 105, 111 (D.D.C. 2013)). "An excessive-force claim shares with an unreasonable-seizure claim the requirement that a Fourth Amendment seizure occurred." *Id.*

A seizure requires significant, intentional governmental termination of freedom of movement. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (stating that a seizure "does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even when there is a governmentally caused and governmentally desired termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*.") (emphasis in original). Frisbie-Fulton, A.S., and Ariel were not seized.

Frisbie-Fulton alleges her Fourth Amendment rights were violated because she "inhaled" residual pepper spray that was in the air at the scene of the arrests. Am. Compl. ¶ 139–40. She does not allege she was seized; neither does A.S. Instead, he alleges his Fourth Amendment rights were violated because pepper spray "landed" on his hat. *Id.* ¶ 142. Finally, Ariel alleges that he was across the street from the kettle when he was pepper sprayed. *Id.* ¶ 120. He does not allege he was ever seized or even that his freedom of movement was restricted.

Because Frisbie-Fulton, A.S., and Ariel fail to state a claim under the Fourth Amendment, Claim 6 should also be dismissed against Whiteside, Hill, Baldwin, Flash, Steffes, Rocatto, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams, because Frisbie-Fulton, A.S., and Ariel are the only plaintiffs who allege these defendants pepper sprayed them; Horse, Lagesse, and Gonzalez do not allege they were sprayed by these 12 defendants. *See id.* ¶¶ 47, 80.

### B. Horse Fails to State a Fourth Amendment Violation Against Officer Murphy Because He Was Not Seized By Officer Murphy.

Horse's claim against Officer Murphy should be dismissed because Horse also does not allege he was being seized when Officer Murphy allegedly used force against him. *See Robinson*, 130 F. Supp. 3d at 180 (noting a plaintiff must allege a seizure to state a claim for excessive force in violation of the Fourth Amendment). Horse alleges Officer Murphy's use of force against him before he was seized and before MPD officers attempted to seize him. *See* Am. Compl. ¶ 47. Consistent with this understanding of Horse's alleged timeline of events, Horse never alleges Officer

Murphy's use of force was related to his seizure. *See id.* ¶ 46–48. Horse has not stated a Fourth Amendment violation against Officer Murphy.

### C. Horse's, Lagesse's, and Gonzalez's Claims Against Officers Washington Rock, and Thau Should Be Dismissed Because They Fail To Sufficiently Allege Defendants' Use of Force Was Unreasonable.

Horse, Lagesse, Gonzalez have not stated a Fourth Amendment excessive force claim against Officers Washington, Rock, and Thau because they do not allege defendants' use of force was unreasonable under the circumstances. For a Fourth Amendment claim in the excessive-force context, the plaintiff must prove the force used to carry out the seizure was objectively unreasonable. *Robinson*, 130 F. Supp. 3d at 193; *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 22 (D.D.C. 2011). However, "the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Graham v. Connor*, 490 U.S. 386, 396 (1989). As a result, reasonableness depends on the totality of the particular situation, including the severity of the crime, whether the plaintiff was actively resisting or attempting to evade arrest, whether the plaintiff posed an immediate threat to the officers' or others' safety, and the severity of the plaintiff's injury. *Id.*

This reasonableness assessment must be "judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* Under that standard, "an officer has the authority to use 'some degree of physical coercion or threat thereof' during the course of the arrest, and 'not every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers,'

violates the Fourth Amendment." *Rogala v. District of Columbia*, 161 F.3d 44, 55 (D.C. Cir. 1998) (quoting *Graham*, 490 U.S. at 395–97)).

Plaintiffs allege Officers Washington, Rock, and Thau violated their Fourth Amendment rights by deploying pepper spray into the kettle. Am. Compl. ¶ 80. But they fail to sufficiently allege this use of force was unreasonable under the totality of the circumstances. First, plaintiffs admit that individuals in the kettle had committed criminal acts. *Id.* ¶ 22. Second, they admit members of the group attempted to flee, meaning at least some members of the group were not cooperative. *Id.* ¶ 64. Third, plaintiffs allege that they do not know who the target of the use of force was—they do not allege that they were personally the targets. *Id.* ¶ 82. Under these facts, plaintiffs do not sufficiently allege the use of force by Officers Washington, Rock, and Thau—against unknown targets—was unreasonable.

Additionally, the occurrence of a constitutional violation is just the first step to allege a claim against individual defendants—qualified immunity confers upon officers an extra layer of protection from § 1983 liability. "[E]ven if the degree of force used might, objectively speaking, exceed that allowed by the Fourth Amendment, immunity should be granted where the officer was reasonably mistaken (in light of the then-existing state of the law) about 'whether a particular amount of force [was] legal' under the circumstances." *Qutb v. Ramsey*, 285 F. Supp. 2d 33, 48 (D.D.C. 2003) (quoting *Saucier*, 533 U.S. at 205). Even if Officers Washington, Rock, and Thau were mistaken regarding the necessity of the force,

under the totality of the chaotic and violent circumstances, defendants should be affarded qualified immunity.

## V.   CLAIM 7:  Plaintiffs' Assault and Battery Clams Should Be Dismissed.

### A.   A.S. and Frisbie-Fulton Do Not Allege Assault or Battery Because They Fail to Allege an Intentional Act by Defendants.

An individual injured by a District police officer may recover for assault by proving "'intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff,' and for battery by proving 'an intentional act that causes harmful or offensive bodily contact.'" *District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003) (quoting *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997)).

Frisbie-Fulton's and A.S.'s assault and battery claims should be dismissed because they fail to allege defendants intentionally attempted to do them physical harm, threatened to do them physical harm, or intentionally caused them physical harm. Frisbie-Fulton does not allege she was intentionally targeted by any pepper spray or that she was pepper sprayed at all. *See* Am. Compl. ¶ 140. She alleges merely that she inhaled residual pepper spray from the air. *Id.* ¶ 140. A.S.'s allegations are even more tenuous—he alleges that pepper spray "landed" on his hat. *Id.* ¶142. Plaintiffs' claims also fail because they do not allege offensive bodily contact. Neither plaintiff has stated a claim for assault or battery.

**B.** **Horse, Lagesse, and Gonzalez Have Not Stated an Assault or Battery Claim against Defendants Newsham, Alder, Greene, Deville, Whiteside, Hill, Washington, Rock, and Thau Because They Fail to Allege Defendants Committed an Intentional Act Against Them.**

Horse, Lagesse, and Gonzalez also allege that they do not know if they were the targets of the intentional acts they allege were committed by Officers Washington, Rock, and Thau. Am. Compl. ¶ 82. Because they do not allege Officers Washington, Rock, or Thau *intentionally* threatened them or *intentionally* caused them physical harm, plaintiffs' claims against Washington, Rock, and Thau should be dismissed. *See Chinn*, 839 A.2d at 705 (assault and battery are intentional torts).

Similarly, they allege only that Chief Newsham, Assistant Chiefs Alder and Greene, Commander Deville, Lieutenant Whiteside, and Sergeant Hill authorized officers to use pepper spray and stingballs. *See* Am. Compl. ¶ 227. Plaintiffs do not allege personal involvement of defendants. *See Smith v. D.C.*, 149 F. Supp. 3d 128, 135 (D.D.C. 2015); *King v. Kidd*, 640 A.2d 656, 666 (D.C. 1993).

**C.** **Defendants Washington, Rock, Thau, Murphy, Whiteside, Hill, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams are Entitled to Qualified Privilege.**

If the elements of an assault and battery claim are satisfied, the "outcome of the claim turns on the defense of privilege." *Chinn*, 839 A.2d at 706. "Under District of Columbia law, a police officer is privileged to use force so long as the 'means employed are not in excess of those which [he] reasonably believes [are] necessary.'" *Dormu*, 795 F. Supp. 2d at 27 (quoting *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993)). "Just as qualified immunity is a shield against liability in § 1983 excessive force claims, qualified privilege protects officers in common law

25

claims of assault and battery." *Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124, 148 (D.D.C. 2017) (citing *Chinn*, 839 A.2d at 705–06). "A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary." *Scales*, 973 A.2d at 730 . "[T]he test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Id.*

Under the totality of the circumstances alleged, defendants are entitled to qualified privilege. Plaintiffs allege that defendants Washington, Rock, Thau, Murphy, Whiteside, Hill, Baldwin, Flash, Steffes, Roccato, Baskerville, Brooks, Vongkeo, Dennis, Parker, and Williams had all been authorized to use pepper spray where appropriate, and that the authorization came from superiors who had a more complete perspective of the events. Am. Compl. ¶ 39. With this knowledge, defendants faced a group of hundreds of individuals, at least some of whom were violent and committing criminal acts. *Id.* ¶ 21. Because the qualified privilege reasonableness analysis must be made "with allowance for the officer's need to make quick decision under potentially dangerous situations," *Dormu*, 795 F. Supp. 2d at 28, it was objectively and subjectively reasonable for defendants to deploy pepper spray under the circumstances; they are entitled to qualified privilege.

## VI.   CLAIM 8:   Plaintiffs' Assault and Battery Claims (Claim 7) and Negligence Claims (Claim 8) Are Incompatible; Plaintiffs Cannot Proceed on Both.

"Intent and negligence are regarded as mutually exclusive grounds of liability. As the saying goes, there is no such thing as a negligent battery." *Chinn*, 839 A.2d at 706. "Under District of Columbia law, a plaintiff who simultaneously asserts claims for negligence and assault and battery based on excessive force must ensure that the negligence claim is:  (1) 'distinctly pled;' (2) 'based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself;' and (3) 'violative of a distinct standard of care.' These requirements stem from the different states of mind each theory of liability requires. Battery and assault are intentional torts. Negligence is not." *Dormu*, 795 F. Supp. 2d at 30 (quoting *Chinn*, 839 A.2d at 706, 711)).

Plaintiffs have not distinctly pled their claims for negligence and assault and battery because the factual allegations plaintiffs allege to support the claims are the same. As a result, plaintiffs have pled inconsistent theories of liability. In the event the claims survive the motion to dismiss stage, plaintiffs should not be permitted to proceed on both theories of liability, as alleged in Claims 7 and 8.

## VII.   CLAIMS 9 AND 10:  A.S. Fails to State a Claim for a Violation of his Fourth Amendment Rights or an Assault or Battery.

Ten-year old A.S. alleges that he arrived with his mother at 12th and L Street, N.W., where hundreds of individuals had been arrested for rioting, at approximately 1:00 p.m. on January 20, 2018. Am. Compl. ¶ 108. They were still there 45 minutes later, when A.S. alleges "[w]ithout warning or provocation, a line

27

of police officers, including Ofcr. Joseph Masci and Ofcr., Auilo Angulo, rushed forward" and "Ofcrs. Masci and Angulo collided with A.S., knocking him to the ground." *Id.* ¶ 129. He also alleges "Lt. Michael Whiteside and Sgt. Sean Hill walked behind the line of police officers speaking to them moments before the charge," and that "this conduct, in combination with the coordinated action by multiple officers, reflects that Defendants Lt. Whiteside and Sgt. Hill ordered the charge into nonviolent protestors." *Id.* ¶ 130. Based on these allegations, A.S. claims a violation of his Fourth Amendment rights (Claim 9) and assault and battery (Claim 10). Both claims should be dismissed because the facts alleged are insufficient to constitute a constitutional violation or an intentional tort.

First—as with A.S.'s Fourth Amendment excessive force claim regarding the pepper spray that "landed" on his hat—A.S. has not stated a claim for a Fourth Amendment excessive force violation because he does not allege he was seized. *See Robinson*, 130 F. Supp. 3d at 193; *see also* Section IV, above. A.S. cannot state a claim to be free from unreasonable searches and seizures when he does not allege he was searched or seized.

Second, A.S. also fails to allege any of the defendants intentionally knocked him down or threatened him, caused him actual physical harm, or that defendant Whiteside and Hill actually ordered the other defendants to knock him down. He alleges merely that the officers "collided" with him; this is insufficient to form the basis for assault or battery. A.S.'s claim should be dismissed against all defendants.

## VIII.   CLAIM 11:   Horse's and Lagesse's Allegations That Their Zipties Were Excessively Tight Fail to State a Claim Under the Fourth Amendment.

There is a clearly established right to be free from injury-inflicting handcuffing when an individual complains about the tightness of the cuffs. *Dormu*, 795 F. Supp. 2d at 24. However, the injury to the plaintiff must be more than *de minimus*. *Id.* Plaintiffs Horse's and Lagesse's claims should be dismissed because they fail to allege more than minor injuries. Both plaintiffs allege minor scarring and Horse alleges he experienced numbness in his fingers, Am. Compl. ¶¶ 178, 185; these injuries are *de minimus*. *Compare id.* at 22 (plaintiff alleged more than a *de minimus* injury where the injury he sustained from the excessively tight handcuffs required surgery) *with Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (plaintiff failed to show more than *de minimus* injury where the excessively tight handcuffs resulted in swelling).

## IX.   CLAIM 12:   Plaintiffs Fail to Allege Violations of Clearly Established Constitutional Rights Regarding the Conditions of Their Confinement.

### A.   Plaintiffs Do Not Sufficiently Allege Newsham, Alder, Carroll, or Niepling Deprived Them of Food, Water, or Toilets.

Horse, Lagesse, and Gonzalez allege they went a "prolonged period" without food, water, and toilets and that these deprivations amount to a violation of their Fifth Amendment due process rights and Fourth Amendment right to be free from unreasonable searches and seizures. To support this claim, plaintiffs Horse and Gonzalez allege they were without a toilet for 9 to 10 and 10 to 11 hours, respectively, and were both without food or water for 10 to 11 hours while they were in the kettle. Am. Compl. ¶¶ 153, 154, 161, 164. Lagesse alleges she was without a

29

toilet for 7 to 8 hours, without water for 11 to 12 hours, and without food for 13 to 16 hours while she was in the kettle. *Id.* ¶¶ 158–59. Plaintiffs name Newsham, Alder, Carroll and Niepling as defendants. *Id.* ¶ 242–43.

But plaintiffs' factual allegations against each defendant are insufficient to allege that the defendant violated plaintiffs' constitutional rights. The basis for plaintiffs' claim against Chief Newsham is that he authorized the kettle and supervised the officers who maintained the kettle from the command center at MPD. *Id.* ¶ 87. They do not allege he was present at the kettle or that he was even aware that plaintiffs were without food, water, and toilets. *See id.* ¶ 88. Chief Newsham's position of authority and remote supervision of officers who maintained the kettle is an insufficient basis to find him liable, personally or through supervisory liability. *See Rizzo v. Goode*, 423 U.S. 362, 376 (1976).

For defendants Alder, Carroll, and Niepling, plaintiffs allege merely that they "failed to provide them with food, water, or access to a toilet." Am. Compl. ¶ 88. But plaintiffs do not allege that Alder, Carroll, and Niepling were at the kettle during the entire duration or knew that plaintiffs were without food, water, and toilets for the full duration. *Id.* ¶ 88. Additionally, although plaintiffs Lagesse and Gonzalez allege they requested food, water, or bathrooms, they do not allege that they made this request to any of the defendants, or that any of the defendants were aware of their requests. *Id.* ¶ 89. Based on their allegations in the Amended Complaint, these defendants cannot be responsible for the alleged constitutional violation of plaintiffs' rights. *See Rizzo*, 423 U.S. at 376.

## B.   Plaintiffs Do Not Allege a Violation of a Clearly Established Fifth Amendment Right.

Plaintiffs have not sufficiently alleged a constitutional violation under the Fifth Amendment. "[P]retrial detainees have an independent due-process right under the Fifth and Fourteenth Amendments to humane conditions while incarcerated." *Estate of Gaither v. District of Columbia*, 655 F. Supp. 2d 69, 86 (D.D.C. 2009). A detainee's due-process rights are violated if the conditions of the pretrial confinement amount to punishment of the detainee. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963)). The factors in *Mendoza-Martinez* provide "useful guideposts in determine whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of the word." *Id.* at 538. They are:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry and may often point in differing directions.

*Mendoza-Martinez*, 372 U.S. at 168–69. "A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 538.

Plaintiffs do not allege that Newsham, Alder, Carroll or Niepling imposed pretrial conditions akin to punishment, and have not alleged facts to find the conditions of their confinement amounted to punishment under the *Mendoza-*

31

*Martinez* guideposts. First, plaintiffs do not allege that defendants intentionally deprived them of food, water, or toilets; instead they allege defendants "failed to provide them" with food, water, and toilets. Am. Compl. ¶ 88. Second, there is a clearly a non-penal explanation for the deprivations. Plaintiffs were detained on a public street, not in a location with bathrooms or where the police would have ready access to food and water. *Id.* ¶ 75. Plaintiffs also admit that there were nearly 200 individuals in the kettle, which is a significant number of individuals for the officers to manage. *Id.* ¶ 76. Complicating the situation further, it was Inauguration Day, when there were road closures and thousands of pedestrians. Under these circumstances and applying plaintiffs' allegations to the guideposts outlined in *Mendoza-Martinez*, plaintiffs have not alleged a deprivation that amounts to punishment or rises to the level of a due process violation.

Further, it was not clearly established that under these circumstances, Newsham, Alder, Carroll, and Niepling would violate plaintiffs' Fifth Amendment rights if they did not ensure plaintiffs received food, water, or bathrooms more promptly. *See Wesby*, 138 S. Ct. at 589. There is no precedent in this jurisdiction that holds that due process requires arrestees to receive food, water, or access to toilets within a certain amount of time. There also are no similar cases in this jurisdiction which would establish the boundaries of a Fifth Amendment violation in this context; the right was not clearly established.

Other jurisdictions have found that comparable allegations do not reach the threshold of a due process deprivation. *See, e.g., Williams v. Dellorco*, No. 05-4129,

2007 U.S. Dist. LEXIS 85721, at *33 (D.N.J. Nov. 20, 2007) ("Even accepting, as Plaintiffs allege, that Defendants withheld food as a means of 'playing hardball' with them for declining to make statements to police, ten hours without food does not meet the threshold of constitutional concern. Effectively, Plaintiffs missed breakfast on one occasion, which does not amount to a deprivation under the Fourteenth Amendment."); *Dzwonczyk v. Syracuse City Police Dep't*, 710 F. Supp. 2d 248 (N.D.N.Y. 2008) (dismissing plaintiff's constitutional claim where plaintiff was incarcerated at 5:35 p.m. and not given food or drink until the following morning); *Villari v. Township of Wall*, No. 06-0004, 2009 U.S. Dist. LEXIS (D. N.J. Sept. 15, 2009) (finding nine hours without food while plaintiff was in custody was insufficient to amount to a constitutional deprivation). But there are no clearly established rules for when deprivations of food, water, and toilets constitute a due process violation. Because plaintiffs do not allege a violation of a clearly established right, defendants are entitled to qualified immunity.

C.   <u>**Plaintiffs Do Not Allege a Violation of a Clearly Established Fourth Amendment Right.**</u>

Plaintiffs also have not stated a violation of an established right under the Fourth Amendment. Although some jurisdictions have held the Fourth Amendment governs conditions of confinement when an individual is post-arrest but pre-probable cause hearing, this jurisdiction has not. *See, e.g., Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir. 2006); *Chambers v. Pennycook*, 641 F.3d 898, 905 (8th Cir. 2011). Instead, in a case involving a plaintiff's condition of detention immediately post-arrest while he was in an MPD holding cell, this Court applied

the Fifth Amendment due process standard. *See Robinson v. District of Columbia*, No. 03-1455, 2005 WL 491467, at \*3 (D.D.C. March 2, 2005). Plaintiffs cannot allege a violation of a clearly established right under the Fourth Amendment where there is no guidance in this jurisdiction establishing the right.

## X.   Plaintiffs Fail To Plead A Plausible Basis For Municipal Liability Under § 1983.

Plaintiffs contend that the District is responsible for the alleged constitutional violations in Claims 1 ("arrest without probable cause"), 2 ("arrest for protected speech"), 6 ("excessive force" with "chemical irritants"), and 12 ("conditions of pre-trial confinement"), but they have not pled sufficient facts to support municipal liability under 42 U.S.C. § 1983. Municipal liability cannot be predicated on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 690–91 (1978). Rather, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 691).

The Circuit has identified four ways official municipal policy can be demonstrated:   (1) express municipal policy; (2) actions of a final municipal "policymaker"; (3) persistent conduct by non-policymakers (*i.e.* "custom" with force of law); and (4) "deliberate indifference" to a risk of constitutional injury. *See Baker v. District of Columbia*, 326 F.3d 1302, 1306–07 (D.C. Cir. 2003) (citations omitted). Each theory has its own "elements," which a § 1983 plaintiff bears the burden of pleading in accordance with *Iqbal*. *Blue v. District of Columbia*, 811 F.3d 14, 20

34

(D.C. Cir. 2015). Additionally, under any theory, a municipal liability claim separately requires proof of causation—specifically, an "affirmative link" between the alleged municipal policy and the alleged constitutional violation, "such that [the former] was the moving force behind the [latter]." *Baker*, 326 F.3d at 1306.

Plaintiffs do not articulate the "type of municipal policy at issue" in any of the four claims for which they seek to hold the District liable under § 1983. *Cf. Blue*, 811 F.3d at 20 ("If the plaintiff fails to identify the type of municipal policy at issue, the court would be unable to determine … whether the plaintiff had provided plausible support for her claim. Although the court could try to surmise which theory of municipal liability has the strongest support in the complaint, this is not our role."). Rather, Claims 1, 2, 6, and 12 each contain the same formulaic statement of the District's alleged fault: "Defendant District of Columbia is liable to Plaintiffs … pursuant to 42 U.S.C. § 1983 for this violation of [plaintiffs'] rights, because the violation was caused by a policy, practice, or custom of the District of Columbia." Am. Compl. ¶¶ 209, 212, 225, 244. To substantiate this conclusory assertion, plaintiffs include nine individually-numbered paragraphs under the heading, "The District's Responsibility for Plaintiffs' Injuries." *Id.* at ¶¶ 197–205. These allegations do not state a valid claim for municipal liability under any of the Circuit's theories for demonstrating a municipal policy.

## A.    Plaintiffs Fail to Allege an Express Municipal Policy.

Plaintiffs never state or even imply that the District had any *express* policy that facilitated the allegedly unlawful conduct at issue in Claims 1, 2, 6, and 12.

Nor could they:  the District's written municipal policy governing police conduct relating to First Amendment assemblies is set forth in D.C. Code § 5-331.01, *et seq.*, and specifically provides for "reasonable" policing of peaceful demonstrations on public space, *id.* §§ 5-331.03, 5-331.04(a), 5-331.07, explicitly prohibiting restrictions based on viewpoint discrimination, *id.* § 5-331.04(c), and instructing on the use of chemical irritants, *id.* § 5-331.16. In fact, plaintiffs' attempted reliance on these provisions to establish the District's duty of care in handling First Amendment assemblies (*i.e.*, as an element of negligence *per se*) effectively concedes that "[their] true grievance is not with a policy or custom of the District, but rather with [ ] specific [individual] decision[s]." *Coppet v. District of Columbia*, 75 F. Supp. 3d 144, 148 (D.D.C. 2014) (Berman Jackson, J.) (plaintiff's statement that municipal policy was "fair [o]n paper" undermined *Monell* claim absent allegation that a final policymaker's decision caused alleged departure from policy).

## B.   <u>Plaintiffs Fail to Allege a Custom.</u>

Plaintiffs fail to plead sufficient facts to show municipal liability based on "custom." To establish municipal policy arising from custom, a § 1983 plaintiff bears the burden of putting forth "evidence that the municipality's employees engaged in a persistent or regular pattern of conduct that gave rise to the alleged constitutional violations." *Egudu v. District of Columbia*, 72 F. Supp. 3d 34, 41 (D.D.C. 2014) (Berman Jackson, J.) (citing *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)). Here, plaintiffs contend that "[t]he coordinated MPD response [on January 20, 2017, was] part of a custom of … responding with overwhelming and

unlawful force to non-violent demonstrators at largely peaceful demonstrations where some law-breaking occurs." Am. Compl. ¶ 202. Plaintiffs allege four events that involved MPD's response to large-scale protests—the latest of which occurred in January 2005—prove a broad custom of constitutional violations in January 2017. *Id.* at ¶ 202. Plaintiffs' assertion fails for three main reasons.

First, it is well-settled that the "persistent" and "pervasive" pattern necessary to show municipal custom cannot be inferred from events with no temporal proximity to the conduct allegedly giving rise to a § 1983 plaintiff's constitutional injury. For example, in *Page v. Mancuso*, 999 F. Supp. 2d 269, 285 (D.D.C. 2013), the court rejected as evidence of a pattern rising to the level of municipal policy the plaintiff's reference to "[two] cases from this district [that] previously recognized … a [District] policy of authorizing [the same type of conduct allegedly causing the plaintiff's injury]." As grounds, the court in *Page* noted that the "policy being addressed [in the earlier cases] was one that existed at least seven years prior," and the plaintiff supplied no facts suggesting "the District persisted in its unconstitutional actions." *Id.* at 285-86. This Court reached substantially the same result in *Egudu v. District of Columbia*, 72 F. Supp. 3d 34 (D.D.C. 2014), declining to credit as evidence of municipal custom a report, a compilation of statistics, and a district court opinion that predated the plaintiff's alleged injury by six, nine, and four years, respectively. *Id.* at 43. The same rationale is dispositive of plaintiffs' municipal custom claim:  events occurring between *twelve and seventeen years*

prior to the incident that resulted in plaintiffs' alleged constitutional injuries are simply too far removed to plausibly infer an underlying municipal custom.

Second, to prove the existence of municipal custom, a § 1983 plaintiff is required to identify past events involving government actions that are *prima facie* identical to the alleged wrongdoing underlying her claim. *Egudu*, 72 F. Supp. 3d at 41 (report "analyz[ing] data related to disorderly conduct arrests [but] tailored toward exposing racial disparities" could not show policy or custom of "violat[ing] an individual's free speech right or the right to be free from an unlawful seizure"); *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 133-34 (D.D.C. 2011) (report could not evidence municipal custom where "plaintiff was not arrested for the offense examined in the report"). Plaintiffs, however, describe MPD's "response" to demonstrations in 2000, 2002, and 2005 using only legal conclusions ("excessive force," "unconstitutional" detention), buttressed by generic and over-generalized assertions of presumptively unlawful police activity ("pepper-spraying of law-abiding demonstrators," "hogtying of protestors," "denial of food and water"). Am. Compl. ¶ 202. "[W]ithout some further factual enhancement," *Iqbal*, 556 U.S. at 678, there is simply no way to determine whether any of the events to which plaintiffs refer are relevant to their claim of municipal liability based on custom. *Cf. Blue*, 811 F.3d at 20 (requiring § 1983 plaintiff to plead "elements" of municipal

liability with "adequate factual support to 'state a claim to relief that is plausible on its face,'" as required by *Iqbal*).[2]

Finally, even if plaintiffs had pled sufficient facts to establish the municipal custom they allege in the Amended Complaint—"a custom of … responding with overwhelming and unlawful force to non-violent demonstrators at largely peaceful demonstrations where some law-breaking is occurring," Am. Compl. ¶ 202—they would have only arguably provided a basis for municipal liability as to one of their § 1983 claims:  Claim 6 ("excessive force" with "chemical irritants"). The remainder— Claims 1 ("arrest without probable cause"), 2 ("arrest for protected speech"), and 12 ("conditions of pre-trial confinement")—have nothing to do with an alleged custom that promotes the use of "unlawful force [against] non-violent demonstrators." As explained, causation is an independent element of a municipal liability claim under § 1983, *Baker*, 326 F.3d at 1306, which plaintiffs' municipal "custom" allegations fail to plausibly demonstrate for all but their constitutional excessive force claim.

---

[2]    Even if the Court looks beyond the pleadings, the 2000, 2002, and 2005 events plaintiffs cite involved markedly different circumstances. For example, MPD's response to "counter-inaugural demonstrations in Adams Morgan in January 2005," presumably a reference to an incident subsequently challenged as *Carr v. District of Columbia*, involved the arrest of 65 to 75 people for parading without a permit. 587 F.3d 401, 404 (D.C. Cir. 2009). Not only were plaintiffs "not arrested for [that] offense," *Hunter*, 824 F. Supp. 2d at 133, there was also no finding in that case that MPD lacked probable cause to arrest the plaintiffs for rioting, the charge plaintiffs Horse and Lagesse seek to challenge here, in Claim 1, *Egudu*, 72 F. Supp. at 43 ("Plaintiff takes no steps to demonstrate how many of [the 5,338 arrests for disorderly conduct in 2009] raised constitutional concern," and the arrests, "without more," do "not demonstrate a custom of constitutional violations").

**C.**   **Plaintiffs Fail to Allege Deliberate Indifference.**

Plaintiffs also fail to plausibly demonstrate municipal liability on a "deliberate indifference" theory, and in particular, based on the assertion that the allegedly unlawful actions underlying Claims 1, 2, 6, and 12 "were the result of the District's failure to train MPD officers." Am. Compl. ¶ 203. As the Supreme Court has cautioned, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–23 (1985)). Only if a failure to train amounts to "'deliberate indifference' to the rights of [the municipality's] inhabitants," such that it can "be properly thought of as a city 'policy or custom,'" is it "actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). Deliberate indifference in this context is an objective but "stringent standard of fault," *Bd. Of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997), requiring that city policymakers both:  (1) had "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights," *Connick*, 563 U.S. at 61; and (2) made a "deliberate choice" not to act, *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by [the relevant] officials"); *accord Harvey v. District of Columbia*, 798 F.3d 1042, 1053 (D.C. Cir. 2015). Here, the Amended Complaint does not establish a plausible basis for either element.

### 1.   Plaintiffs Do Not Allege Notice.

To establish the notice element of their deliberate indifference failure-to-train claim, plaintiffs rely upon the same "prior incidents" that underlie their assertion of a municipal custom, Am. Compl. ¶ 203, which also fail here for similar reasons.[3] The notice element of a deliberate indifference municipal liability claim "ordinarily" requires proof of "[a] pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 61. Whatever evidence is presented by plaintiffs, "the need for more or different training [must be] obvious," and the inadequacy in the training program must be "likely to result in the violation of constitutional rights." *City of Canton*, 489 U.S. at 390.

As in the municipal custom context, temporal proximity is crucial to establishing government notice for deliberate indifference claims. For example, in *Dormu v. District of Columbia*, the court refused to assume "that the District continued to be on notice [of a practice of improper conduct] four years [after first receiving notice that the conduct was occurring]." 795 F. Supp. 2d at 26. Likewise, in *Robinson v. District of Columbia*, the court rejected the plaintiff's deliberate indifference notice evidence, despite finding that it "reflect[ed] an awareness by the District of serious allegations relating to [the conduct at issue]," explaining that "a mere awareness of a problem in January 1999 and a need for improvement is not, as a matter of law, sufficient to impose municipal liability for an incident that

---

[3]   If plaintiffs are permitted to proceed on their deliberate indifference theory at all, the District should still be dismissed from Counts 1, 2, and 12, on the same causation-related grounds discussed above in connection with plaintiffs' municipal custom claim.

occurred in October 2000." 403 F. Supp. 2d 39, 55 (D.D.C. 2005); *accord Moore v. District of Columbia*, 79 F. Supp. 3d 121, 140 (D.D.C. 2015) (approximately eight-year-old study showing pattern of challenged conduct "too remote" to support plaintiff's deliberate indifference notice claim); *Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 140 (D.D.C. 2003) (notice of problem in 1999 insufficient to impose municipal liability for an incident in 2001). As noted above, the latest of plaintiffs' prior incidents occurred in 2005, twelve years before the events underlying Counts 1, 2, 6, and 12, Am. Compl. ¶ 202, with countless demonstrations occurring on public streets during that time; it is plainly not plausible, without more, that those prior events put the District on notice of a risk that plaintiffs were "likely" to suffer constitutional injury absent some further training, *City of Canton*, 489 U.S. at 390 (notice requires that constitutional injury is "likely to result").

Moreover, plaintiffs nowhere allege anything regarding "particular omission[s]," *Connick*, 563 U.S. at 61, in the District's training regarding police handling of violent criminal activity arising out of demonstrations. In fact, the Amended Complaint states nothing about the training (neither subject matter nor frequency) that MPD officers receive; nor does it mention any particular deficiencies in any such training program or how it could have been improved. As this Court has observed, a § 1983 plaintiff who "includes no specific details about police training in the District or how it might be deficient," fails to "supply [necessary] facts from which a court could draw the inference that the District ignored a known risk [of constitutional injury]." *Miango v. Democratic Republic of the Congo*, 243 F. Supp.

3d 113, 128 (D.D.C. 2017) (Berman Jackson, J.) (citing *Bell v. District of Columbia*, 82 F. Supp. 3d 151, 158 (D.D.C. 2015) for the proposition that "[t]he complete absence of any factual allegations concerning a specific shortcoming in training forecloses any plausible inference of 'actual or constructive knowledge' by District policymakers that its officers will 'probably violate constitutional right'"). Plaintiffs' deliberate indifference theory of municipal liability fails for precisely the same reason: "Since the [C]omplaint contains no factual allegations detailing any deficiencies in MPD training on how officers should respond to violence committed [at public demonstrations], plaintiffs' § 1983 allegations amount to nothing more than simpl[e] formulaic recitation of the elements of a deliberate indifference claim, and dismissal is warranted." *Miango*, 243 F. Supp. 3d at 128–29 (internal quotations omitted) (citing *Martin v. District of Columbia*, 720 F. Supp. 2d 19, 23–24 (D.D.C. 2010)).

### 2.   Plaintiffs Fail to Allege Deliberate Indifference.

Even if plaintiffs could establish notice, other evidence reasonably inferred from plaintiffs' pleadings undermines their contention that the District made a "deliberate choice" not to act, *Pembaur*, 475 U.S. at 483, in response to the 2000, 2002, and 2005 incidents featured in the Amended Complaint, Am. Compl. ¶¶ 202–203. Most notably, plaintiffs make numerous references to the First Amendment Assemblies Act (FAAA). That legislation, which explicitly requires, among other things, "regular and periodic training" for MPD personnel "on the handling of, and response to, First Amendment assemblies," was passed by the Council after, and as

the legislative history confirms, D.C. Comm. Rep., B. 15-968 (2004), *in response to*, the incidents cited by plaintiffs. D.C. Code § 5-331.15. It is simply not plausible to conclude that the District remained deliberately indifferent to the risk of constitutional violations at First Amendment assemblies, having passed comprehensive legislation to reform municipal policy relating to that subject matter. Plaintiffs do not challenge that legislation, or the training program it required, as inadequate, further evidencing that the District responded appropriately, not with deliberate indifference. *Egudu*, 72 F. Supp. at 45 (finding District's change in training and procedures following events serving as notice of potential constitutional violations, in conjunction with plaintiff's failure to challenge changes as inadequate, "tend[ed] to support the conclusion that the District did not remain deliberately indifferent").

**D.    Plaintiffs Fail to Allege Actions of a Final Policymaker.**

Finally, plaintiffs have not alleged sufficient facts to establish that their alleged constitutional injuries were caused by the actions of a final municipal policymaker. Although the Amended Complaint is not clear on the point, *Blue*, 811 F.3d at 20, plaintiffs appear to contend that three MPD officials—Chief Newsham, Assistant Chief Greene, and Commander Deville—either ordered or condoned ("acknowledged") the actions of the individual officers who, in turn, directly caused plaintiffs' alleged constitutional injuries underlying Claims 1, 2, 6, and 12. Am.

Compl. ¶¶ 198–201.[4] Even if these officials' actions proximately caused plaintiffs' injuries, they are not attributable to the District because Chief Newsham, Assistant Chief Greene, and Commander Deville are not final municipal policymakers.

"The Supreme Court narrowly interprets [the term municipal] 'policymaker' for the purposes of § 1983 liability, and discretion in a job function is not enough." *Allen-Brown v. District of Columbia*, 54 F. Supp. 3d 35, 42 (D.D.C. 2014) (Berman Jackson, J.) (citing *St. Louis v. Praprotnik*, 485 U.S. 112, 126 (1988) (O'Connor, J., plurality op.)); *accord Singletary v. District of Columbia*, 766 F.3d 66, 74 (D.C. Cir. 2014) (statutory discretion to make final decisions in individual cases "is insufficient to create municipal liability [for those decisions] unless the decisionmaker [also] had been granted final policymaking authority under D.C. Law in the [relevant subject-matter] area"). Rather, "an individual must 'speak with final policymaking authority for the local governmental actor' as established by state law." *Allen-Brown*, 54 F. Supp. 3d at 42 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 709 (1989)). "'[W]hen [according to state law] a subordinate's decision is subject to review by the municipality's authorized policymakers,' those

---

[4]    In *Blue*, the Circuit cited with approval *Santiago v. Warminster*, 629 F.3d 121 (3d Cir. 2010), a case in which the Third Circuit affirmed dismissal of a § 1983 municipal liability claim, purportedly based on a final policymaker theory, because the plaintiff failed "'to plead in some fashion that [the police chief] had final policy making authority, as that is a key element of a *Monell* claim.'" 811 F.3d at 20 (quoting *Santiago*, 629 F.3d at 135). The Third Circuit required this of *Santiago* despite recognizing that "whether [the police chief was] a final policymaker is ultimately a legal rather than a factual question." *Santiago*, 629 F.3d at 135, n.11. The Amended Complaint here fails in exactly the same way: "[Plaintiffs] needed to assert the elements of [their policymaker theory but] failed to do so." *Blue*, 811 F.3d at 20.

policymakers 'have retained the authority to measure the official's conduct for conformance with *their* policies.'" *Miner v. District of Columbia*, 87 F. Supp. 3d 260, 266 (D.D.C. 2015) (quoting *Praprotnik*, 485 U.S. at 127) (emphasis in original).

Under District law, all members of the police force, including the Chief of Police, are subordinate to the Mayor and (ultimately) the Council, and thus non-policymakers for purposes of municipal liability. As the Court in *Miner* explained:

> In the District of Columbia, the Mayor is ultimately responsible for the police department, *see* D.C. Code § 5-101.03, and the Mayor appoints a Chief of Police, 'with the advice and consent of the [City] Council," D.C. Code § 5-105.01(a-1)(1), to administer the police department. All police officers are required to "respect and obey the Chief of Police as the head and chief of the police force, subject to the rules, regulations, and general orders of the Council [ ] and the Mayor [ ]." D.C. Code § 5-127.03.

87 F. Supp. 3d at 266. These provisions establish that all police officers and command officials, including the Chief, are subordinate to the policymaking authority of the Mayor, as ultimately constrained by the "rules, regulations, and general orders," which are within the Council's purview to issue. *See id.* ("Thus, by law, police officers below the level of the Chief of police—and, arguably, the Chief herself … are subordinates [under the meaning of Supreme Court precedent]"); *accord Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 91 (D.D.C. 2011) (fire chief and assistant fire chief are not policymakers for municipal liability purposes because the "Mayor and the City Council have expressly reserved supervisory powers to themselves"). Against this backdrop, regardless of any individually named defendants' involvement in MPD's response to the events at issue in

46

plaintiffs' Claims 1, 2, 6, and 12, their actions are not, as a matter of law, attributable to the District for municipal liability purposes.

This conclusion makes particular sense in the context of policing First Amendment assemblies, where the Council has generated comprehensive, express municipal policy governing police conduct. *See* D.C. Code § 5-331.01, *et seq.* It is true that all members of the police force, including the Chief, are authorized to make arrests based on probable cause, *Wesby*, 138 S. Ct. at 587, and use force when reasonably necessary, *Robinson*, 130 F. Supp. 3d at 193 (D.D.C. 2015); however, as the Circuit has reminded, "discretion is insufficient to create municipal liability unless the decision maker had been granted final policy making authority under D.C. law in the area [at issue in plaintiffs' complaint]." *See Singletary*, 766 F.3d at 74 (citing *Pembaur*, 475 U.S. at 480-81, 481–83 & n.12; *Praprotnik*, 485 U.S. at 129-30). Here, against the backdrop of the policies and procedures set forth in the FAAA, that authority was lacking. The Chief and his subordinates were constrained by those policies and procedures when they ordered or acknowledged the MPD response to the violent protest activities on January 20, 2017, Am. Compl. ¶¶ 198–201; any alleged decision that departed from them was not an act of the municipality for purposes of § 1983. *See Singletary*, 766 F.3d at 74 ("The board thus was 'constrained by polices not of [its] making,' and its decision to 'depart[ ]' from those policies by revoking [the plaintiff's] parole based on unreliable hearsay was not an 'act of the municipality' for purposes of § 1983").

47

Even if plaintiffs are correct that Chief Newsham is a final municipal policymaker for the District, their suggestion that his actions on Inauguration Day give rise to municipal liability for Claims 1, 2, 6 and 12 is flawed on other grounds. For starters, even accepting as true that Chief Newsham, "supervis[ed] and direct[ed]" plaintiffs' detention on the street, plaintiffs offer no facts to plausibly demonstrate that he issued any instructions regarding food, water or toilets, *see* Am. Compl. ¶¶ 87–88, 99; nor do plaintiffs contend that the Chief had knowledge of any particular arrestee's conditions. Likewise, assuming, as plaintiffs contend, that Chief Newsham generally "directed" the use of chemical irritants, there is no basis to infer that he had anything to do with any particular use of force by any individual MPD officer against any individual plaintiff. *Id.* ¶¶ 39–40. In other words, plaintiffs' policymaker theory of municipal liability—to the extent it is based on any direct orders from Chief Newsham—is completely lacking any conceivable basis for causation. *See Baker*, 326 F.3d at 1306. To much the same end, there is no basis to infer from the pleadings that Chief Newsham acted with "deliberate indifference to the risk that a violation of [any] particular constitutional or statutory right [would] follow [from his decisions on Inauguration Day]," which standard the Circuit has recently insisted is an independent element of a municipal policymaker claim founded on a policymaker's "single decisions." *Blue*, 811 F.3d at 19 (quoting *Bd. of Cty Comm'rs v. Brown*, 520 U.S. 397, 411 (1997)). Allowing plaintiffs' constitutional claims against the District on these allegations—devoid of causation or any suggestion of deliberate indifference—would be tantamount to

accepting *respondeat superior* as a vehicle for municipal liability under the rubric of § 1983, which the Court is not authorized to do. *Monell*, 436 U.S. at 690.

So too, plaintiffs' effort to hold the District liable for their constitutional injuries on the grounds that Chief Newsham—in his alleged role as final policymaker—ratified the actions of his subordinates shortly after Inauguration Day falls short. *See* Am. Compl. ¶¶ 204–05. Although the D.C. Circuit has not addressed the issue, several other circuits have acknowledged that municipal liability under § 1983 can be based on a final-policymaker-ratification theory; however, "[t]he final policymaker must not only approve the [subordinate's] decision, but also adopt the basis for the decision, and the ratification must be the moving force, or cause, of the alleged constitutional violation." *Dempsey v. City of Baldwin*, 143 F. App'x 976, 986 (10th Cir. 2005) (citing *Praprotnik*, 485 U.S. at 127); *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946–47 (8th Cir. 2017) ("[R]atification requires both knowledge of the alleged constitutional violation, and proof that the policymaker specifically approved the subordinate's act."). Plaintiffs' allegations regarding ratification by Chief Newsham fail under this standard for two main reasons. First, the Chief's general statements in defense of his officers' conduct on Inauguration Day, Am. Compl. ¶¶ 204–05, are not the sort of "specific[ ] approv[al]" required to establish ratification of a non-policymaker's conduct. *See Soltesz*, 847 F.3d at 946. To the contrary, "good faith statements [by a policymaker] made while defending complaints of constitutional violations by [non-policymaker] employees do not generally demonstrate ratification." *Davidson v. City of Stafford*,

49

848 F.3d 384, 395–96 (5th Cir. 2017) (citation omitted). Second, it is impossible for plaintiffs to establish a causal nexus between the Chief's subsequent defense of his officers' conduct—the supposed "ratification," according to plaintiffs' theory—and any of the constitutional violations alleged in Claims 1, 2, 6, and 12. Causation is an essential element of a § 1983 municipal liability claim under this Circuit's precedent, *Baker*, 326 F.3d at 1306, and plaintiffs' theory of the District's liability fails as a matter of law to establish it. All claims against the District under § 1983 should be dismissed with prejudice.

## XI.   CLAIMS 4, 5, 8, 13, AND 14:  Plaintiffs' Negligence *Per Se* Claims Must Fail.

Plaintiffs bring five claims under theories of negligence *per se*.[5]  *See* Am. Compl. ¶¶ 216–22, 230–33, 245–50 (Claims 4, 5, 8, 13, 14). Each of these claims is based on provisions of the FAAA, D.C. Code § 5-331.01 *et seq.*, including provisions on the use of police lines (Claim 4), dispersal orders (Claim 5), use of chemical irritants (Claim 8), access to food (Claim 13), and the processing of arrestees (Claim 14). As set forth below, these claims must fail.

"To establish negligence under D.C. law, a plaintiff must prove a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, and damage to the interests of the plaintiff, proximately caused by the breach."

---

[5]   The District does not waive any arguments that these claims are not properly brought or analyzed under a negligence *per se* framework. *See District of Columbia v. White*, 442 A.2d 159, 162 (D.C. 1982) ("In reviewing appellant's claim, neither the trial court nor this court is bound by plaintiff's characterization of the action as negligence." (citation omitted)); *see also* Caroline Forell, *The Statutory Duty Action in Tort: A Statutory/common Law Hybrid*, 23 Ind. L. Rev. 781, 797–801 (1990) (discussing the difference between negligence *per se* and statutory duty cases).

*Sigmund v. Starwood Urban Retail VI, LLC*, 617 F.3d 512, 514 (D.C. Cir. 2010) (citing *District of Columbia v. Beretta, U.S.A., Corp.,* 872 A.2d 633, 642 n.3 (D.C. 2005) (en banc)). "Violation of a statute or regulation may constitute negligence *per se* only if the statute is meant to promote safety, if the plaintiff is a member of the class to be protected by the statute, and if the defendant is a person upon whom the statute imposes specific duties." *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1039–40 (D.C. 2014) (citations and internal quotation marks omitted); *see also Jarrett v. Woodward Bros.*, 751 A.2d 972, 977 (D.C. 2000) (discussing whether statute could provide "the requisite duty and standard of care"). Plaintiffs' negligence *per se* claims do not meet this standard and thus lack the requisite duty and standard of care, among other deficiencies. These claims must therefore be dismissed.

A. **Plaintiffs May Not Maintain Negligence *Per Se* Claims Against Any Individual Defendants Because the Cited Regulations Do Not Impose Duties on Any Individual Defendants.**

A negligence *per se* claim may only be maintained against "a person upon whom the statute imposes specific duties." *See Night & Day Mgmt.*, 101 A.3d at 1039–40 (citations omitted); *see also McNeil Pharm. v. Hawkins*, 686 A.2d 567, 579 (D.C. 1996) ("The statute must also 'impose specific duties on the defendant.'" (quoting *District of Columbia v. White*, 442 A.2d 159, 164 (D.C. 1982)); *Ginsberg v. Granados*, 963 A.2d 1134, 1141 (D.C. 2009) ("Because the FYCA in no way promotes public safety and imposes no duties on opposing counsel, Ginsberg's negligence *per se* claim must also fail."). The District of Columbia Court of Appeals has thus found

51

that statutes placing burdens on "[a] retail licensee" and "any officer" imposed duties on specific actors. *See Night & Day Mgmt.*, 101 A.3d at 1040 (noting that regulation prohibiting a retail licensee from permitting underage drinking at a licensed establishment could form basis for claim of negligence *per se*); *cf. White*, 442 A.2d 163–64 & n.12 (discussing evidence of detective's violation of statutory provision prohibiting use of excessive force by "[a]ny officer"); *see also Ingram v. Shipman-Meyer*, 241 F. Supp. 3d 124, 152–53 (D.D.C. 2017) (discussing D.C. Code § 5-125.03, which prohibits use of chokeholds by "any police officer"), *appeal dismissed,* No. 17-7074, 2017 WL 5157752 (D.C. Cir. Oct. 31, 2017). Unlike these regulations, the FAAA provisions upon which plaintiffs base their claims of negligence *per se* do not impose specific duties on any individual defendant—as opposed to MPD or the District as a whole—and therefore cannot support a claim for negligence *per se*.

Claim 4 relies upon D.C. Code § 5-331.08, which provides:

> No emergency area or zone will be established by using a police line to encircle, or substantially encircle, a demonstration, rally, parade, march, picket line, or other similar assembly (or subpart thereof) conducted for the purpose of persons expressing their political, social, or religious views except where there is probable cause to believe that a significant number or percentage of the persons located in the area or zone have committed unlawful acts (other than failure to have an approved assembly plan) and the police have the ability to identify those individuals and have decided to arrest them; provided, that this section does not prohibit the use of a police line to encircle an assembly for the safety of the demonstrators.

D.C. Code § 5-331.08 (Use of police lines). On its face, the statute imposes no specific duties on any individual officer; it therefore cannot form the basis for a

claim of negligence *per se*. That other sections of the FAAA place specific burdens on specific actors makes clear that provisions lacking such specificity "do not impose specific duties on [any] defendant." *See Night & Day Mgmt.*, 101 A.3d at 1039–40. *Cf.* D.C. Code § 5-331.06(b)(1) ("The Chief of Police shall…"); D.C. Code § 5-331.16(b)(3) ("A commanding officer…shall…"). In addition, any burden arising from this provision's language cannot logically lie with any individual officer but must instead lie with the District.

Claim 8 suffers a similar defect. Plaintiffs cite D.C. Code § 5-331.16(b), which provides:

> (1) Large scale canisters of chemical irritant shall not be used at First Amendment assemblies absent the approval of a commanding officer at the scene, and the chemical irritant is reasonable and necessary to protect officers or others from physical harm or to arrest actively resisting subjects.
>
> (2) Chemical irritant shall not be used by officers to disperse a First Amendment assembly unless the assembly participants or others are committing acts of public disobedience endangering public safety and security.
>
> (3) A commanding officer who makes the determination specified in paragraph (1) of this subsection shall file with the Chief of Police a written report explaining his or her action within 48 hours after the event.

D.C. Code § 5-331.16(b)(1)–(3). Much like the provision discussed above, this provision places no specific duties on any specific actor. To the contrary, the only specific burden it creates is a reporting requirement for "[a] commanding officer" to

file a written report with the Chief of Police. D.C. Code § 5-331.16(b)(3). As a result, Claim 8 must fail as against all individual defendants.[6]

Claims 5, 13, and 14 all rely upon FAAA provisions that expressly place duties not on any individual but on the MPD as a whole. *See* D.C. Code § 5-331.07(e)(1) ("*[T]he MPD shall* issue at least one clearly audible and understandable order to disperse…." (emphasis added)); D.C. Code § 5-331.12(b)(2) ("*The MPD shall* provide to any person not released within a reasonable time of arrest food appropriate to the person's health." (emphasis added)); D.C. Code § 5-331.12(a)(1) ("*The MPD shall* promptly process…" (emphasis added)).

Because the FAAA provisions upon which plaintiffs base their negligence *per se* claims do not impose any specific duties upon any of the individual defendants, they cannot give rise to claims for negligence *per se* against them. Claims 4, 5, 8, 13, and 14 must therefore be dismissed as against all individual defendants.

### B. The Cited FAAA Provisions Cannot Form the Basis for Negligence *Per Se* Because They Do Not Impose "Specific" Duties.

A statute will support a claim for negligence *per se* "only" if it "imposes specific duties." *Night & Day Mgmt.*, 101 A.3d at 1039–40; *see also McNeil Pharm.*, 686 A.2d at 579. Thus, if a statute provides actors with discretion or essentially restates the common law standard of reasonable care, it cannot form the basis for negligence *per se. See id.* at 1040 (stating that "the statute or regulation must not

---

[6]    To the extent plaintiffs base this claim on D.C. Code § 5-331.16(b)(2), the claim must fail because the Amended Complaint alleges "acts of public disobedience endangering public safety and security." *See, e.g.*, Am. Compl. ¶¶ 21–22 (vandalism), 36 ("unlawful acts"), 46 ("breaking a storefront window"). Accordingly, plaintiffs do not allege a breach of the standard they cite.

merely repeat the common law duty of reasonable care, but must set forth specific guidelines to govern behavior" and finding that requirements using terms "sufficient" and "adequate" grant "considerable discretion and do not specifically outline any standards" to support negligence *per se*); *see also Gadaire v. Orchin*, 197 F. Supp. 3d 5, 14 (D.D.C. 2016);*Chadbourne v. Kappaz*, 779 A.2d 293, 296–97 (D.C. 2001) ("Thus, while the statute sets a general standard of care …, it does not contain the kind of specific guidelines that would allow one to determine whether the statute has been violated without resorting to a common law reasonable care analysis. Thus, we conclude that a negligence per se instruction was not warranted in this case."). The FAAA provisions upon which plaintiffs rely do not meet this standard.

Claim 4 rests on the alleged violation of D.C. Code § 5-331.08. This regulation permits MPD to use police lines to encircle, *i.e.*, "kettle," only "where there is *probable cause* to believe that a *significant number or percentage* of the persons located in the area or zone have committed unlawful acts … and the police have the ability to identify those individuals and have *decided* to arrest them." D.C. Code § 5-331.08 (emphasis added). This regulation simply does not contain specific guidelines sufficient to form the basis for a claim of negligence *per se*.

Probable cause is an inherently non-specific matter. The Supreme Court has described the probable-cause standard as "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which *reasonable and prudent* men, not legal technicians, act." *See Pringle*, 540 U.S. at

370–71 (citations and internal quotation marks omitted) (emphasis added). Similarly, the District of Columbia Court of Appeals has boiled the standard down to "a reasonable ground for belief of guilt." *Perkins v. United States*, 936 A.2d 303, 305–06 (D.C. 2007) (citations omitted). Because this regulation relies on an imprecise standard like probable cause—which itself relies on a generalized conception of reasonableness—it lacks the requisite specificity. This regulation cannot form the basis for negligence *per se* for two additional reasons:  the regulation's use of "a significant number or percentage of persons located in the area or zone" is inherently imprecise, *see Significantly*, OXFORD ENGLISH DICTIONARY (3d ed. 2011) ("1. Highly expressive or suggestive; loaded with meaning…4. Sufficiently great or important to be worthy of attention; noteworthy; consequential, influential."), and the regulation's applicability turns on MPD's exercise of discretion to arrest. *See, e.g., Night & Day Mgmt.*, 101 A.3d at 1039–40.

The regulation relied on for Claim 5, D.C. Code § 5-331.07(e)(1), similarly cannot form the basis for a claim of negligence *per se* because it turns on MPD's exercise of discretion to issue a dispersal order and merely restates a general reasonableness standard. *See* D.C. Code § 5-331.07(e)(1).[7] Claim 5 must also fail

---

[7]  This section provides:

> If and when the *MPD determines* that a First Amendment assembly, or part thereof, should be dispersed, the MPD shall issue at least one clearly audible and understandable order to disperse using an amplification system or device, and shall provide the participants *a reasonable and adequate* time to disperse and a clear and safe route for dispersal.

because plaintiffs do not allege that MPD ever made a determination to disperse any First Amendment assembly; thus, on plaintiffs' own allegations, D.C. Code § 5-331.07(e)(1) simply does not apply.[8]

Claim 8 rests on D.C. Code § 5-331.16(b), which similarly turns on discretionary decisions and merely repeats a general reasonableness standard. *See* D.C. Code § 5-331.16(b)(1) ("reasonable and necessary"); D.C. Code § 5-331.16(b)(2) (implicitly requiring a determination that "acts of public disobedience [are] endangering public safety and security"). And Claims 13 and 14 simply restate general reasonableness standards. *See* D.C. Code § 5-331.12(b)(2) ("reasonable"; "appropriate"); D.C. Code § 5-331.12(a)(1) ("promptly"). This type of language simply does not amount to specific guidance upon which to base a claim of negligence *per se. See, e.g., Thoma v. Kettler Bros.*, 632 A.2d 725, 727 & 728 n.8 (D.C. 1993) (noting that regulation requiring slippery conditions to be "eliminated as soon as possible" did not differ significantly from common law standard of reasonable care and thus did not support negligence *per se*). Accordingly, Claims 4, 5, 8, 13, and 14 must fail.

---

D.C. Code § 5-331.07(e)(1) (emphasis added).

[8]    D.C. Code § 5-331.07 does not require dispersal orders be given in lieu of, or before, arrest. Rather, it permits MPD to respond to unlawful conduct by "dispersing, controlling, or arresting the persons engaged in such conduct." D.C. Code § 5-331.07(c). Moreover, dispersal would be inconsistent with a decision to arrest in accordance with D.C. Code § 5-331.08.

C.     **Plaintiffs Do Not Allege Injuries Proximately Caused by the Violation of Any FAAA Provision and of a Type the FAAA Was Designed to Prevent**.

To prevail under a theory of negligence *per se*, a plaintiff must show that "the violation was the proximate cause of the injuries, and the alleged injuries were of the type which the statute was designed to prevent." *See, e.g.*, *McNeil Pharm.*, 686 A.2d at 578 (citations omitted). "Proximate cause has two components: 'cause-in-fact' and a 'policy element' which limits a defendant's liability when the chain of events leading to the plaintiff's injury is unforeseeable or 'highly extraordinary' in retrospect." *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C. 2002) (quoting *District of Columbia v. Carlson*, 793 A.2d 1285, 1288 (D.C. 2002)). The cause-in-fact prong will be satisfied where the actor's conduct was a substantial factor in bringing about the harm. *See, e.g.*, *Majeska*, 812 A.2d at 951 (citation omitted). However, conclusory allegations do not suffice. *See Johnson v. Sullivan*, 748 F. Supp. 2d 1, 9 (D.D.C. 2010) ("In asserting such a claim, as with any claim, more than speculation is required; mere '[c]onclusory allegations of ... harm do not allege facts that would support causation and injury sufficient to withstand a motion to dismiss.'" (quoting *Herbin v. Hoeffel,* 806 A.2d 186, 196 (D.C. 2002))); *see also Maddox v. Bano*, 422 A.2d 763, 764 (D.C. 1980). The Amended Complaint does not meet this standard.

The Amended Complaint's allegations do not demonstrate that the violation of the cited FAAA provisions was a substantial factor in bringing about plaintiffs' alleged injuries. Claim 4 turns on D.C. Code § 5-331.08, which prohibits police from "kettling" groups "except where there is probable cause to believe that a significant

number or percentage of the persons located in the area or zone have committed unlawful acts … and the police have the ability to identify those individuals and have decided to arrest them." Because probable cause existed to arrest Horse and Lagesse specifically, *see* above Section I, they have not alleged a violation of the cited provision. Because a negligence *per se* claim requires that a violation of the cited regulation be the proximate cause of injury, this claim must fail.

Plaintiffs similarly fail to allege a violation to support Claim 5. Plaintiffs base this claim on D.C. Code § 5-331.07(e)(1), which relates to dispersal of First Amendment assemblies. But this provision only applies when "MPD determines" that a First Amendment assembly should be dispersed; because the Amended Complaint does not allege that MPD ever made such a decision, it does not allege that the provision was triggered, let alone violated. As a result, plaintiffs have not alleged that the violation was the proximate cause of the[ir] injuries. And even if plaintiffs had alleged that violation of the regulation was a substantial factor in causing injury, any injury could not have been "of the type which the statute was designed to prevent." *See McNeil Pharm.*, 686 A.2d at 578. On its face, D.C. Code § 5-331.07(e)(1) is meant to prevent injuries to individuals during dispersal. *See* D.C. Code § 5-331.07(e)(1) ("If and when the MPD determines that a First Amendment assembly, or part thereof, should be dispersed, the MPD … shall provide the participants … a clear and safe route for dispersal."). Because plaintiffs have not alleged that they were injured because of or during an MPD-ordered dispersal, any

injuries could not have been within the scope of D.C. Code § 5-331.07(e)(1)'s protections.

Plaintiffs base Claim 8 upon D.C. Code § 5-331.16(b), which relates to the use of chemical irritants. But because the Amended Complaint alleges unlawful acts and attempts to evade arrest, *see, e.g.*, Am. Compl. ¶¶ 21–22, 36, 46, 59, 64, the allegations do not make out a violation this regulation. In the absence of such a violation, plaintiffs have not alleged a viable claim of negligence *per se*.

Claim 13 relies on D.C. Code § 5-331.12(b)(2), which requires the MPD to "provide to any person not released within a reasonable time of arrest food *appropriate to the person's health*." D.C. Code § 5-331.12(b)(2) (emphasis added). The specific reference to a "person's health" makes clear that this provision is not meant as a duty to provide snacks to prevent "hunger" and "discomfort," *see,* ¶¶ 179, 186, 191, but to protect individuals for whom a delay in food or consumption of inappropriate food would affect the person's *health*, such as diabetics or those with serious allergies. Plaintiffs do not allege that a delay in being fed was inappropriate to their health. As a result, they have not alleged any violation, and this claim must fail.

Plaintiffs' prompt processing claim relies upon D.C. Code § 5-331.12(a)(1). But as discussed below, *see* Section D, that regulation was intended to protect arrestees' Fourth Amendment interest in a prompt probable cause determination and prevent resulting damage to an individual's employment, relationships, and reputation. Because plaintiffs do not allege that this violation caused them these

60

types of injuries, their claim for negligence *per se* based on D.C. Code § 5-331.12(a)(1) must also fail.[9]

### D.   Claim 14 Also Fails Because D.C. Code § 5-331.12(a)(1) is Not a Public Safety Regulation.

A statute or regulation cannot form the basis for a negligence *per se* claim unless it promotes public safety. *Night & Day Mgmt. Butler*, 101 A.3d at 1039–40; *see also Ginsberg v. Granados*, 963 A.2d 1134, 1140 (D.C. 2009); *McNeil Pharm.*, 686 A.2d at 579 ("At a minimum, however, the statute or regulation relied on must promote public safety and have been enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred." (citation and internal quotation marks omitted)). Claim 14 asserts a negligence *per se* claim based on violation of D.C. Code § 5-331.12(a)(1), which states:   "The MPD shall promptly process any person arrested in connection with a First Amendment assembly to determine whether the person is eligible for immediate release pursuant to a lawful release option, and shall promptly release any person so eligible who opts for release." But "[u]nlike statutes held to promote public safety, … [D.C. Code § 5-331.12(a)(1)] in no way relates to the safety of the public at large." *See Ginsberg*, 963 A.2d at 1140 (citing cases applying negligence *per se* theory to statutes prohibiting tavernkeepers from permitting alcohol consumption by underage patrons and traffic regulations governing brakes, among others); *see also White*,

---

[9]   Although Horse alleges that he was unable to sell photographs of the January 20, 2017 demonstrations and could not cover other newsworthy events, he attributes this loss to the confiscation of his photographs and equipment and not to the delay in his on-scene processing. *See* Am. Compl. ¶ 177.

442 A.2d at 164 (finding that statute criminalizing police use of excessive force promoted safety).

On its face, D.C. Code § 5-331.12(a)(1) has no public safety purpose. The provision's legislative history confirms that its purpose is not to promote public safety but to protect arrestees' Fourth Amendment interest in promptly being brought before a neutral magistrate for a determination on probable cause. The "Committee Reasoning" section of the Committee on the Judiciary's report on the FAAA specifically states that "[s]ection 112 [D.C. Code § 5-331.12(a)(1)] reflects the standard contained in *Lively v. Cullilane*, 451 F. Supp. 1000, 1009 (D.D.C. 1978)...." D.C. Comm. Rep., B. 15-968 at 13 (2004). The plaintiffs in *Lively* sought declaratory and injunctive relief prohibiting MPD from detaining arrestees "without presenting them promptly to a judicial officer." *Lively*, 451 F. Supp. at 1002. The *Lively* court identified the "consequences of prolonged detention," noting that "[p]retrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Id.* at 10005. The *Lively* court also identified the liberty interests at stake in a pre-presentment detention as including an individual's freedom of movement, "ability to go to work or carry on his life," and reputation. *Id.* These interests are important but they do not promote public safety. As a result, D.C. Code § 5-331.12(a)(1) cannot serve as the basis for a claim of negligence *per se*, and Claim 14 must therefore fail.

**E.** **Claims 13 and 14 Must be Dismissed as Against Defendants Newsham, Alder, Carroll, and Niepling for Lack of Personal Involvement.**

Plaintiffs bring Claims 13 and 14 against the District and, in their individual capacities, Chief Newsham, Assistant Chief Alder, Commander Carroll, and Lieutenant Niepling. These claims allege negligence *per se* arising from the alleged failure of MPD to provide food (Claim 13) and promptly process arrestees (Claim 14). But "public officials … cannot be held liable in tort for the acts of their subordinates under a *respondeat superior* theory unless they directed or countenanced the tortious acts." *Turner v. D.C.*, 532 A.2d 662, 675 (D.C. 1987) (citation omitted).

Here, plaintiffs have not alleged that any of these individual defendants specifically directed that plaintiffs not be provided with food or specifically countenanced a deprivation of food. Instead, they conclusorily allege that these failures came under the generalized "supervision and direction" of these defendants and that this can be inferred from "[t]he gap in time" until plaintiffs were processed. *See* Am. Compl. ¶¶ 88, 99. This constitutes the type of "unadorned, the-defendant-unlawfully-harmed-me accusation," *see Iqbal*, 556 U.S. at 678, "that is not enough to state a plausible claim for relief against defendant[s] [Newsham, Alder, Carroll, and Niepling] in [their] individual capacity[ies]," *see Smith*, 149 F. Supp. 3d at 135. *See also King*, 640 A.2d at 666 (holding "as a matter of law only the employer, the District of Columbia, could be held liable for the tortious acts of one of its

employees" (citations omitted)). For this reason too, Claims 13 and 14 must be dismissed as against these individual defendants.

XII.   **CLAIM 15:   Plaintiff Gonzalez Fails to State a Claim for Intentional Infliction of Emotional Distress.**

Gonzalez fails to state a claim against defendants Newsham, Alder, Carroll, or Niepling for intentional infliction of emotional distress. "To succeed on the claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes plaintiff severe emotional distress." *Minch v. District of Columbia*, 952 A.2d 929, 940 (D.C. 2008). The conduct must be "so outrageous in character, and so extreme in degree, to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002).

Gonzalez alleges that "Defendants Asst. Chief Robert Alder, Cmdr. Jeffrey Carroll, and Lt. Paul Niepling supervised the continued maintenance of the kettle" during which they communicated with and received orders from the MPD command center, "where Defendant Newsham was overseeing the operation." Am. Compl. ¶ 87. He alleges that "during the many hours" he was detained in the kettle, "under the supervision and direction of Chief Newsham, Assist. Chief Alder, Cmdr. Carroll, and Lt. Niepling failed to provide [him] with food, water, or access to a toilet" despite Gonzalez's request for access to a toilet. *Id.* ¶¶ 88–89.

More important is what Gonzalez fails to allege:   that defendants intentionally held him without access to a toilet. He does not allege defendants

prevented him from using an available bathroom, or that they intentionally kettled the arrestees in a place without a bathroom. He also does not allege he told these defendants he needed access to a toilet. *See id.* ¶¶ 88–89. Finally, Gonzalez does not allege he suffered "severe emotional distress" as a result of having to wait to have access to a bathroom.

Defendants' "failure," *id.* ¶ 88, to provide Gonzalez with a toilet does not rise to the level of conduct that is so outrageous and egregious that it constitutes a claim for intentional infliction of emotional distress.

## CONCLUSION

For the foregoing reasons, plaintiffs' First Amended Complaint should be dismissed with prejudice.

Dated:  March 30, 2018.          Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

TONI MICHELLE JACKSON
Deputy Attorney General
Public Interest Division

*/s/ Fernando Amarillas*
FERNANDO AMARILLAS [974858]
Acting Chief, Equity Section

*/s/ Amanda J. Montee*
AMANDA J. MONTEE [1018326]
MATTHEW R. BLECHER [1012957]
ERIC U. JOHNSON [1030661]
Assistant Attorneys General
441 Fourth Street, N.W., Suite 630 South
Washington, D.C.  20001
(202) 724-5691
(202) 741-8934 (fax)

amanda.montee@dc.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HORSE, *et al.*,<br><br>                    Plaintiffs,<br><br>v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>                    Defendants. | Civil Action No. 17-1216 (ABJ) |

<u>ORDER</u>

Upon consideration of defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, plaintiffs' opposition, and the entire record, it is this _____ day of _____, 2018,

ORDERED, that the Motion to Dismiss is GRANTED, and it is further

ORDERED, that Plaintiffs' First Amended Complaint is DISMISSED WITH PREJUDICE.

_____
THE HONORABLE AMY BERMAN JACKSON
Judge, United States District Court for the District of Columbia