**WARNING: AT LEAST ONE DOCUMENT COULD NOT BE INCLUDED!**
**You were not billed for these documents.**
**Please see below.**

| Document Number | Document Description | Pages | Document Error |
|---|---|---|---|
| Document | Main document | 1 | **DOCUMENT COULD NOT BE RETRIEVED!** **However, it may still be viewable individually.** |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHAY HORSE, *et al.,*

                            Plaintiffs,

                v.

DISTRICT OF COLUMBIA, *et al.,*

                            Defendants.

**REDACTED VERSION OF
SEALED DOCUMENT**

No. 1:17-cv-01216 (ABJ)

**OPPOSITION OF PLAINTIFFS HORSE AND GONZALEZ TO OFFICER JOHN DOE'S
MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

On January 20, 2017, Plaintiffs Shay Horse and Milo Gonzalez were subjected to multiple

constitutional violations by officers of Defendant District of Columbia's Metropolitan Police

Department (MPD). *See generally* ECF 29 (amended complaint). In accordance with this Court's

minute order of March 29, 2018, this opposition assumes familiarity with Plaintiffs' allegations.

Defendant John Doe's motion correctly recounts the relevant procedural history, and he is

right that Plaintiffs Horse and Gonzalez initially misremembered certain aspects of the search that

Defendant John Doe conducted of them at the MPD Police Academy. As Plaintiffs Horse and

Gonzalez explain in their declarations, the reasons for their errors are the conditions under which

they were held, including the extended denial of food and water, and the fact that Plaintiff Horse

mixed up aspects of his experiences with MPD with a similar but more intrusive search undertaken

in the D.C. courthouse the following day at the hands of the United States Marshals. *See* Gonzalez

Decl. ¶¶ 18–24; Horse Decl. ¶ 11. Moreover, Plaintiff Horse's confusion affected Plaintiff

Gonzalez's description of the MPD Academy search because the two discussed their experiences

there. Gonzalez Decl. ¶¶ 22–24.

Once the video of the Police Academy searches refreshed Plaintiffs' recollections, they recognized the need to amend their allegations and did so at the first opportunity — the amended complaint. Defendant is correct that key details regarding this incident are not as Plaintiffs Horse and Gonzalez originally remembered them. However, the broad outline of what happened to them remains the same: each man was unjustifiably poked and prodded in his rear body cavity by Officer Doe despite the absence of probable cause or reasonable suspicion to believe that either man was concealing weapons or contraband in that area.

The video evidence that Defendant Doe submits to support his motion for summary judgment actually confirms the broad outlines of Plaintiffs' allegations: that each man was aggressively searched including in his rectum or anus. Consistent with the Plaintiffs' allegations, the video shows Plaintiff Gonzalez jump in surprise and alarm when he is prodded in his rear end, then appear to exchange words with the officer.

Contrary to Defendant Doe's argument, the allegations of the amended complaint are not so different from those of the initial complaint that they can be dismissed as a sham — particularly where, as here, the Plaintiffs have reasonable explanations for their initial failures of memory and where video evidence confirms the general nature of Plaintiffs' allegations. Some of the details of Plaintiffs' allegations cannot be confirmed by the video, but neither can they be refuted. That is what trial is for — not summary judgment.

Finally, Defendant Doe is incorrect that is he is entitled to qualified immunity; it was clearly established at the time of the search that a manual intrusion into a suspect's rectal cavity as part of a search incident to arrest requires particularized suspicion, of which there was none.

Accordingly, Defendant John Doe's motion to dismiss or for summary judgment should be denied.

2

## I.     The Motion To Dismiss Should Be Denied.

Defendant Doe cites a series of cases to the effect that contradictions between an original and amended complaint justify dismissal of the amended allegations as "false" and "a sham." ECF 55 at 10–14. As one of Defendant's own authorities indicates, however, this Court has rejected a call to dismiss claims on this basis where a "change falls shy of [a] 180 degree change in the allegations . . . and does not fundamentally change the nature of Plaintiff's allegations." *Clay v. Howard Univ.*, 128 F. Supp. 3d 22, 27 (D.D.C. 2015); *accord CopyWatch, Inc. v. Am. Nat'l Red Cross*, 2018 WL 1276997, at *4 (D.D.C. Mar. 12, 2018). Moreover, none of the authorities on which Defendant relies involves a situation in which the court dismissed a claim on the ground of changed allegations even though the proponent of those allegations was able to both (a) credibly explain the discrepancies and (b) support the modified allegations with direct evidence.

Here, as shown immediately below, Plaintiffs' declarations and the video of the incident itself accomplish both of these tasks. Unlike in the usual Rule 12(b)(6) context, it is appropriate to consider these facts outside the pleadings for the purpose of responding to Defendant's "sham-pleading" argument, because that argument by its very nature dispenses with the basic tenet of Rule 12(b)(6) that a plaintiff's allegations must be taken as true. Indeed, one of Defendant Doe's own authorities denied a motion to dismiss an allegedly sham complaint once the plaintiffs "offered an explanation for why" the allegations in their amended complaint "contradict[ed]" those in their original one. *Marvel Enters., Inc. v. Walt Disney Co.*, 2005 WL 8156208, at *3 (C.D. Cal. Feb. 4, 2005). If the Court's consideration of Plaintiffs' declarations and the video of the incident means that Defendant Doe's "sham-pleading" argument should be consolidated with his motion for summary judgment under Fed. R. Civ. P. 12(d) (permitting court to treat a Rule 12(b)(6) motion

as a summary judgment motion where, as here, the parties have had the chance to present evidence), Plaintiffs have no objection.

Plaintiffs Horse and Gonzalez, in their declarations made under penalty of perjury, persuasively explain why they initially misremembered the events at the MPD Academy. By the time the time of the searches at issue, they had both been sprayed with chemical agents by police and then been detained outdoors in cold weather while being denied access to food, water, and restroom facilities for many hours. Gonzalez Decl. ¶¶ 5, 18; Horse Decl. ¶ 11.

The abuses Plaintiffs endured interfered with their recollection of what happened at the MPD Academy. Gonzalez Decl. ¶ 18; Horse Decl. ¶ 11. For Plaintiff Horse, the traumatic events of January 20, 2017 occurred after a night during which he "only got about an hour" of sleep and after a day when, he ate only "a cookie that I had to get out of a trash can[,]. . . a half bottle of Gatorade[,] and a few sips of coffee." Horse Decl. ¶ 11. These conditions prevented him from "retain[ing] [the details of the MPD Academy Search] with precision." *Id.* Moreover, the day after the Inauguration protests, Horse underwent another invasive search at the courthouse. *Id.* ¶ 9. There, officers with the United States Marshals Service "lined the other detainees and me against a wall and demanded that we drop our pants." *Id.* At that point, "one of the officers pushed a finger in my butt and grabbed my testicles," and later, officers "placed shackles on my legs." *Id.* This search occurred just hours after the one at the MPD Academy and, like that incident, "involved intrusive violations of my space and my body." *Id.* ¶¶ 9, 11. When Horse discussed the MPD Academy Search with MPD investigators and in his original complaint, details from Marshals' search affected his recollection of Defendant's conduct. *Id.* ¶ 11.

Plaintiff Gonzalez explains in his declaration that he "often react[s] to trauma by pushing painful memories deep into my mind to avoid dwelling on them," a coping mechanism he "first

4

noticed" that he used during his experience of homelessness. Gonzalez Decl. ¶ 20. Gonzalez relied

on that strategy here, as he "spent several months after my arrest trying to keep the events of

January 20, 2017 out of my mind." *Id.* ¶ 18. This technique may have helped Gonzalez cope with

the increased anxiety and sleeplessness caused by his mistreatment at the hands of MPD. *See Id.*

¶ 19. However, the consequence was that Gonzalez "blend[ed] details of the search with other

events that happened to me at the protests on January 20." *Id.* ¶ 21. For example, Gonzalez initially

remembered Defendant Doe laughing at him during the MPD Academy Search. *See* ECF 1

(Compl.), ¶ 123. But, upon watching the video of that incident, he realized that he had merged his

memories of officers laughing at him at other points during the day with what happened at the

Academy. Gonzalez Decl. ¶ 21. Plaintiff Gonzalez's recollection of the search was also influenced

by his conversations with Plaintiff Horse. The two of them "were searched in the same facility at

around the same time, and subsequently detained in the same room." *Id.* ¶ 23. Consequently, they

"discussed the MPD Academy incident," and, Gonzalez believes that "Shay's description of what

happened to him influenced my recollection of what happened to me." *Id.* ¶ 24.

  As the declarations demonstrate, the circumstances surrounding the arrest and detention of

Plaintiffs Gonzalez and Horse — particularly their lack of food and sleep and being subjected to

police violence — led them to remember events incorrectly and to make mistakes in their initial

statements. Their errors did not reflect an attempt to fabricate a story of abuse but rather a normal

reaction to a traumatic experience.  *See, e.g.*, *Ilunga v. Holder*, 777 F.3d 199, 212 n.4 (4th Cir.

2015) (noting that credibility determinations "should take into account the inherent instability of

memories that are naturally misshapen by time and disfigured by trauma"); *see also* Jacinta M.

Oulton et al., *Memory Amplification for Trauma: Investigating the Role of Analogue PTSD*

*Symptoms in the Laboratory*, 42 J. ANXIETY DISORDERS 60, 60 (2016) ("Specifically, people with

poor adjustment following trauma often come to remember their experience as being more traumatic over time. . . ."); Yina Wei et al., *Synaptic Mechanisms of Memory Consolidation During Sleep Slow Oscillations*, 36 J. OF NEUROSCIENCE 4231, 4231–32 (2016) (summarizing research showing significance of sleep in allowing information and experiences to transform into long-term memory ).

Moreover, the video that Defendant himself submits in support of his summary judgment motion shows that the amended allegations are far from "false" or a "sham." Instead, the video suggests that each Plaintiff was jabbed in his rectum or anus area by Defendant Doe at the MPD Academy, just as Plaintiffs alleged in both the amended and original complaint.[1] Specifically, the video reveals that Plaintiff Horse flinched, Def.'s Ex. H ("Blue Plains Video") at 5:30, and then Plaintiff Gonzalez jumped in surprise and alarm, *id.* at 9:13–14, when Defendant John Doe was searching near each Plaintiff's rear body cavity, movements that are consistent with and support

---

[1] Plaintiffs use "rectum or anus" in response Defendant's hypertechnical objection that they may not have used the anatomically precise terms for the exact part of the body in which they were jabbed. *See* ECF 55, at 16 n.6. Defendant proffers an anatomical illustration in an effort to show that Plaintiff's allegations of being jabbed in the "rectum" might have been imprecise, because technically the "rectum" is further into the body than the "anus." Plaintiffs acknowledge that they are not anatomical experts and so may have mixed up the terms. Regardless of the precise terminology, the gravamen of Plaintiff Horse's and Plaintiff Gonzalez's allegations is clear: that each man's rear body cavity, however termed, was penetrated by Defendant John Doe. Neither summary judgment nor dismissal should depend on Plaintiffs' medical acumen in this regard. *Cf. Dalcourt v. Windham*, 2016 WL 7365430, at *9 n.11 (W.D. La. Nov. 15, 2016), *report and recommendation adopted*, 2016 WL 7365159 (W.D. La. Dec. 15, 2016) (rejecting argument in support of ineffective assistance of counsel claim based on counsel's lack of understanding of the distinction between the terms "anal" and "rectal" because habeas petitioner "does not show how [counsel's] confusion on this issue could have led to any confusion on the part of the jury"); *see generally Coleman v. Peyton*, 340 F.2d 603, 604 (4th Cir. 1965) ("[C]laims of legal substance should not be forfeited because of a failure to state them with technical precision."); *United States v. Altmeyer*, 113 F. Supp. 854, 856 (W.D. Pa. 1953) ("It seems that the chief quarrel of the defendants is with the sufficiency of the language used by the draftsman of the indictment in averring the facts. Even if the language were conceded to be lacking in technical accuracy and precision, the defects in that respect, since they do not warrant a dismissal, would be simply a matter of form and not of substance.").

Plaintiffs' allegations. In addition, the video shows Plaintiff Gonzalez turn and speak to the officer right after he jumps, *id.* at 9:15–9:22 — conduct consistent with expression of concern and discomfort about the way the officer is touching him. *Accord* Gonzalez Decl. ¶ 12 (recalling protesting to the officer that he was being too aggressive). Although the video does not show the precise extent of each inspection — the camera is too far away for it to capture Defendant Doe's finger motions, *see* Blue Plains Video at 5:12–5:32; 8:08–9:25, and, during his search, Plaintiff Gonzalez is positioned in front of the camera, obscuring the location of Defendant Doe's hands, *see id.* at 8:08–9:25 — that limitation simply reinforces the need to determine the particulars of the searches through a trial, rather than resolve the case through a motion to dismiss. In any event, this video evidence demonstrates that Plaintiffs' amended allegations about the search at the Blue Plains facility are clearly not a sham.

This Court should decline Defendant's invitation to extend the "sham allegation" line of cases beyond the narrow circumstances of "180 degree" and "fundamental" changes to complaint allegations. A broader scope for courts to dismiss complaints as "shams" would create awkward incentives for parties to try to stick with their initial allegations even when they discover them to be incorrect in certain respects — with the result that litigation is unnecessarily extended as parties fight over contentions no party fully believes and that plaintiffs are encouraged to be less than fully forthright in amending their pleadings lest they run the risk of having their allegations viewed as a "sham."

Moreover, an unforgiving attitude toward changes risks unfairness to people in traumatizing situations who might misremember details because they have experienced violence or because they are deprived of basic needs around the time of the alleged misconduct (as were Plaintiffs here). Witnesses need not even be under such pressure to succumb to the fallibility of

human memory: "Few honest witnesses testify at any length without at least occasional lapses of memory or needs for correction or clarification. Disregarding as a sham every correction of a memory failure or variation in a witness's testimony requires far too much from lay witnesses and would usurp the trier of fact's role in determining which portion of the testimony was most accurate and reliable." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571–72 (7th Cir. 2015) (citation and internal quotation marks omitted).

The motion to dismiss should therefore be denied.

## II.   Summary Judgment Should Be Denied.

Defendant Doe claims entitlement to summary judgment on the ground that "[t]he Blue Plains video disproves Plaintiffs' excessive force allegations and establishes that Officer John Doe did not violate the Fourth Amendment." ECF 55 at 15. But the video does no such thing.

Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In assessing Defendant's motion, the court must "examine the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the nonmoving party." *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016). It is appropriate to consider video evidence, *Scott v. Harris*, 550 U.S. 372, 381 (2007), but granting summary judgment based on a video is proper only where one side's "version of events is so utterly discredited by [the video evidence in] the record that no reasonable jury could have believed him." *Id.* at 380. Accordingly, as with other summary judgment evidence, courts continue to "view any relevant gaps or uncertainties left by videos in the light most favorable to the [non-moving party]." *Latits v. Phillips*, 878 F.3d 541, 544 (6th Cir. 2017). For instance, in *Fenwick v. Pudimott*, the D.C. Circuit declined to "view[] the facts in the light depicted by the videotape" where the video was "blurry and soundless," unlike the one in *Scott*, which "quite clearly" portrayed the events at issue. 778 F.3d 133, 137–38 (D.C. Cir. 2015) (internal citations and quotation

marks omitted; alteration in original). Failing to view ambiguous video footage in the light most favorable to the non-moving party would cause a court to encroach on the "'jury functions of making '[c]redibility determinations, . . . weighing . . . the evidence, and drawing . . . legitimate inferences from the facts." *Robinson*, 818 F.3d at 8 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)) (alterations in original).

Alternatively, Defendant claims entitlement to summary judgment based on qualified immunity. As established by the Supreme Court, "the two pertinent questions in determining whether qualified immunity applies are (1) whether a constitutional right would have been violated on the facts alleged; and (2) whether the right was clearly established at the time of the violation." *Dickey v. United States*, 174 F. Supp. 3d 366, 369 (D.D.C. 2016) (citation and internal quotation marks omitted). These inquiries may be taken in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### A.  The Material Facts Are in Genuine Dispute.

The parties disagree on the scope of the search that Defendant conducted at the MPD Academy. As discussed, Plaintiff Horse's sworn declaration states that he is "confident of the fact that Officer Doe" pushed a finger into his anus through his clothing.  Horse Decl. ¶ 7, 12. Plaintiff Gonzalez has similarly submitted a sworn declaration stating that he "clearly remember[s] feeling the pressure of the officer's fingers or hand in my anus and on my testicles." Gonzalez Decl. ¶ 13.[2] In characterizing his inspection as a "standard clothed pat-down search," ECF 55 at 2, Defendant has depicted a far less intrusive search than the one Plaintiffs have alleged and supported with evidence. The D.C. Circuit recognized such a distinction in *United States v. Rodney*, where it distinguished "a search of body cavities" from a "traditional frisk search," by noting that "a

---

[2] Doe asserts that the video wholly discredits Plaintiff Gonzalez's allegation that Doe "reached inside [his] underwear." ECF 55 at 17 (citing Am. Compl. ¶ 171–72). The video does no such thing. *See* Blue Plains Video at 9:13. Nonetheless, after reflecting on the matter, Plaintiff Gonzalez is not certain whether Doe reached inside his pants. *See* Gonzalez Decl. ¶ 13.

generalized consent to a body search for drugs" "authorized" the latter but could not have been interpreted to "validate" the former. 956 F.2d 295, 298 (D.C. Cir. 1992) (Thomas, J.).

Because the constitutionality of Defendant's search turns on its intrusiveness, *see, e.g., Dickey*, 174 F. Supp. 3d at 370 ("[W]here a search incident to arrest is unusually intrusive, the search may be deemed unreasonable and therefore in violation of the Fourth Amendment"), the dispute about the scope of Defendant's inspections at the MPD Academy is clearly material. *See Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 246 (D.D.C. 2018) (material means "capable of affecting the substantive outcome of the litigation").

The dispute is also "genuine for Rule 56 purposes" because "a 'reasonable' jury could find for the non-moving party." *Anderson*, 477 U.S. at 258. Plaintiffs' first-hand declarations are, on their own, competent evidence capable of establishing a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(4); *accord Powers-Bunce v. District of Columbia*, 576 F. Supp. 2d 67, 71 (D.D.C. 2008) (granting summary judgment based on uncontested declaration). Defendant Doe, instead of submitting a declaration with his own account of the facts, points to changes in Plaintiffs' accounts over time as undermining their credibility, *see* ECF 55 at 11–14, but the decision whether to credit Plaintiffs' testimony despite its inconsistencies is a quintessential jury function. *Robinson*, 818 F.3d at 8–9.

Moreover, Plaintiffs' declarations do not stand alone. Indeed, far from undermining Plaintiffs' allegations, the Blue Plains Video corroborates them. As discussed, the footage depicts both Plaintiffs flinching when Defendant has his hands near their respective rear body cavities. Blue Plains Video at 5:30 (search of Plaintiff Horse); *id.* at 9:13–14 (search of Plaintiff Gonzalez). Although the video does not show precisely where Defendant placed his hand when he searched these areas, the "uncertainties left by the video[]" must be viewed "in the light most favorable to

the Plaintiffs," *Latits*, 878 F.3d at 544. Construing the video in this manner, a reasonable jury could easily conclude that both Plaintiffs flinched because Defendant probed their anuses or rectums.

Defendant argues that, at least with respect to Plaintiff Horse, such a finding is foreclosed by the fact that Defendant had his hand near Horse's buttocks for a short period of time. ECF 55 at 16. That argument is a non sequitur. The brevity of an unauthorized intrusion into a person's body cavity does not render it authorized. In any event, the short duration of the search does not "blatantly contradict[]" Plaintiff Horse's declaration, *Scott*, 550 U.S. at 380, and consequently, the dispute should go to a jury.

The video also supports other aspects of Plaintiffs' declarations. For example, Plaintiff Gonzalez maintained that Defendant Doe told him to "spread my legs" and then asked him "spread them wider." Gonzalez Decl. ¶ 10. Consistent with that statement, the video shows Gonzalez move his legs apart and, after Doe appears to say something to him, move them further apart. Blue Plains Video at 9:08–9:12. From that footage, a reasonable juror could conclude that Doe made the command that Gonzalez attributed to him. And, because Doe would have had little need to issue such an instruction if he solely intended to pat down the back of Gonzalez's body, a juror could further infer that Doe proceeded to probe Gonzalez's rear body cavity and grab his testicles. Likewise, the recording shows that, after he flinched, Gonzalez turned and said something to Doe, *id.* at 9:15–9:22; *accord* Gonzalez Decl. ¶ 12 — supporting the inference that Gonzalez complained about Doe's search, which in turn, supports Gonzalez's contention that he had something to complain about.

*[REDACTED MATERIAL]*

*[REDACTED MATERIAL]*

*[REDACTED MATERIAL]*

*[REDACTED MATERIAL]*

*[REDACTED MATERIAL]*

*[REDACTED MATERIAL]*

Based on the video, Plaintiffs' declarations, and *[REDACTED]*, Plaintiffs have easily satisfied their burden to support their factual allegations with competent evidence. The dispute that remains is for a jury to resolve.

**B. The Fourth Amendment Barred Officer Doe from Probing Plaintiffs' Anuses During a Search Incident to Arrest without Any Individualized Suspicion that He Would Discover Evidence, Contraband, or Weapons by Doing So.**

Construed in the light most favorable to the Plaintiffs, the record shows that Defendant Doe performed an unconstitutional search at the MPD Academy. The Fourth Amendment protects "the right of the people to be secure in their persons . . . against unreasonable searches and seizures." Accordingly, "[i]n most instances, searches must be supported by a warrant obtainable upon a showing of probable cause." *United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005). Although the warrant and probable cause requirements do not apply when the search occurs incident to a

lawful arrest, "where a search incident to arrest is unusually intrusive, the search may be deemed unreasonable and therefore in violation of the Fourth Amendment." *Dickey v. United States*, 174 F. Supp. 3d 366, 369–70 (D.D.C. 2016). Because Plaintiffs have alleged that Defendant engaged in a "sexually intrusive search" — specifically, touching each plaintiff's anus or rectum and Plaintiff Gonzalez's testicles, Gonzalez Decl. ¶ 11; Horse Decl. ¶ 7 — the reasonableness of Defendant's conduct turns on the factors established by *Bell v. Wolfish*, 441 U.S. 520 (1979). *See Dickey*, 174 F. Supp. 3d at 370 (applying *Bell* framework to assess allegedly "sexually intrusive search" incident to arrest). Specifically, the reasonableness of the search depends on "[1] the scope of the particular intrusion, [2] the manner in which it is conducted, [3] the justification for initiating it, and [4] the place in which it is conducted." *Id.* (quoting *Bell*, 441 U.S. at 559).

Beginning with the first factor, Defendant explored Plaintiffs' most sensitive body parts. That was particularly true for Plaintiff Gonzalez, who felt Defendant's hands press on his testicles. Gonzalez Decl. ¶ 11. More significantly, Doe also searched beneath the surface of each plaintiff's body by pressing his finger into each of their anuses or rectums through their clothing. That invasion exceeded the scope of what the search-incident-to-arrest doctrine authorized him to do.

In *Schmerber v. California*, 384 U.S. 757 (1966), the Court outlined the justifications for "search[ing] the person of the accused when legally arrested," but observed that these "considerations . . . have little applicability with respect to searches involving intrusions beyond the body's surface. The interest in human dignity and privacy which the Fourth Amendment protects forbids such intrusions . . . [i]n the absence of a clear indication that . . . evidence will be found. . . ." *Id.* at 769–70.

Applying this analysis to manual body cavity searches conducted incident to an arrest, the District of Columbia Court of Appeals made clear that in terms of justification (the third *Bell* factor)

such an inspection requires at least articulable suspicion, if not probable cause. *See United States v. Scott*, 987 A.2d 1180, 1197 (D.C. 2010). In *Scott*, the court held that an officer performing a search incident to an arrest may conduct "a visual body cavity inspection (but not a physical intrusion) if particularized reasonable suspicion exists to justify that step." *Id.* at 1194, 1197. The court then considered and declined the appellant's invitation to adopt a probable cause standard for visual body cavity inspections. *Id.* at 1197. In doing so, the court noted that while *Schmerber* had required such a level of suspicion for "intrusions into the human body," "heightened privacy and health concerns" resulted in a "qualitative difference" between visual and manual body cavity searches, "warrant[ing] a difference in the level of justification required." *Id.* (internal citations and quotation marks omitted). The court then endorsed the conclusion of the New York Court of Appeals: "Because a manual cavity search is more intrusive" than a visual one, "we believe it should be subject to a stricter legal standard." *Id.* (quoting *People v. Hall*, 886 N.E.2d 162, 166-67 (N.Y. 2008)). This analysis strongly suggests that manual body cavity searches require probable cause. In any event, the D.C. Court of Appeals' conclusion that such searches must be "subject to a stricter legal standard" than reasonable suspicion means *a fortiori* that they cannot be justified absent reasonable suspicion at the very least. And *Scott* certainly establishes than an officer cannot commit such invasions without any suspicion at all.

The holding in *Scott* is in accord with the consensus from jurisdictions around the country, which have required some quantum of particularized suspicion for manual body cavity searches. *See, e.g.*, *Gonzalez v. City of Schenectady*, 728 F.3d 149, 162 n.7 (2d Cir. 2013) (upholding lawfulness of manual body cavity search of arrestee because officers had probable cause to conduct it); *Spencer v. Roche*, 659 F.3d 142, 147 (1st Cir. 2011) ("Applying this balancing test, we have upheld digital searches of a vagina and rectum when supported by probable cause and

appropriately carried out by medical professionals."); *Evans v. Stephens*, 407 F.3d 1272, 1279–80 (11th Cir. 2005) (holding that officer must have "at least . . . reasonable suspicion" to conduct strip search incident to arrest and noting that "the actual standard [may be] higher . . . especially where, as here, the search includes touching genitalia and penetrating anuses"); *Lucero v. Bush*, 737 F. Supp. 2d 992, 1008 (D.S.D. 2010) (holding manual body cavity search unconstitutional where officer had inadequate suspicion "that plaintiff was holding contraband within the recesses of her body"); *Hall*, 886 N.E. 2d at 165, 168 (defining manual body cavity search as a search that "includes some degree of touching or probing of a body cavity that causes a physical intrusion beyond the body's surface" and holding that officers can only conduct such searches if they have "particular, individualized facts known . . . that justify subjecting an arrestee to these procedures"); *see also Laughter v. Kay*, 986 F. Supp. 1362, 1374–75 (D. Utah 1997) (requiring probable cause for a "manual body cavity search"; although case involved a prison visitor, court suggested that standard was general).

The searches of Plaintiffs Horse and Gonzalez were not justified by any particularized suspicion whatsoever. It is wholly implausible to imagine that non-violent political protestors spent the morning of Inauguration Day marching around downtown Washington with drugs or other contraband carefully concealed in their body cavities on the off-chance that they would get arrested based on the conduct of other demonstrators and then have the opportunity to distribute drugs inside a D.C. detention facility (even assuming that anyone had any interest in doing so, which is likewise implausible). Unsurprisingly, Defendant Doe has not defended his conduct by referencing any basis for suspecting that searching Horse's or Gonzalez's anus or rectum, or, for that matter, Gonzalez's testicles, would have yielded evidence, contraband, or weapons; nor has he mentioned any security concerns related to detaining them. *See* ECF 55 at 15–18. Instead, he has relied solely

on the search-incident-to-arrest exception and the authority to search for weapons and contraband that it confers. *See id.* But under the consensus of authorities cited (including precedent from the D.C. Court of Appeals), that is plainly insufficient: particularized suspicion is required. Defendant had none.

The fact that Defendant searched Plaintiffs through their clothing does not relieve him of the requirement of particularized suspicion. When distinguishing a "manual body cavity search" from a visual one, the D.C. Court of Appeals noted in *Scott* that the former term refers to an inspection "involving any touching or probing of a [genital or anal] body cavity that causes a physical intrusion beyond the body's surface." 987 A.2d at 1194 (internal citation and quotation marks omitted). This definition makes no exceptions for instances where the intrusion was made through clothing or only lasted a relatively short period of time. The reason that the court relied on this expansive definition is likely that even a brief search conducted through pants can still "create the risk of physical pain or injury" and implicate "heightened privacy and health concerns" that justified its distinction between visual and manual body cavity searches. *Id.* at 1197 (internal citations omitted). A reasonable jury could conclude that both plaintiffs experienced pain from the search by considering the video itself, *see* Blue Plains Video at 5:30 (showing Plaintiff Horse reacting to Defendant Doe's intrusion into his rear body cavity); 9:13–14 (showing Plaintiff Gonzalez recoiling from the prodding by Officer Doe), and from Plaintiff Horse's allegation that he experienced anal soreness after the search, ECF 29 (amended complaint) ¶ 180.

Although the first and third *Bell* factors — the scope of the intrusion combined with its lack of justification — suffice to demonstrate the unconstitutionality of Defendant Doe's conduct, the second and fourth *Bell* factors (the manner and place of the search) further demonstrate the "privacy and health concerns," *Scott*, 987 A.2d at 1197, implicated by Defendant Doe's intrusions

as well as the overall unreasonableness of his actions. With respect to health, Defendant is not a doctor. In fact, because this search violated MPD policy, *see* MPD General Order 502.01 (Mar. 28, 2014), *available at* https://go.mpdconline.com/GO/GO_502_01.pdf — a fact discussed in more depth below — a reasonable jury could conclude that Defendant received no training to conduct this type of search at all. Courts have considered the medical expertise of the person conducting a cavity search when evaluating its reasonableness. *See*, *e.g.*, *United States v. Fowlkes*, 804 F.3d 954, 964 (9th Cir. 2015) (holding that officers acted unreasonably in removing contraband from suspect's anus, in part, because "they did not seek the guidance or assistance of medical personnel"); *Roche*, 659 F.3d at 147 (noting that the court has "upheld digital searches" when "appropriately carried out by medical professionals").

With respect to privacy, Defendant searched at least Plaintiff Horse at a time and in a place where other detainees and officers were present. Based on the video, a reasonable jury could conclude that other detainees had an opportunity to watch as Plaintiff Horse experienced an invasion of his bodily autonomy. Blue Plains Video at 5:12–32. Additionally, the video supports the inference that two female officers walked past Horse at the moment Defendant inserted his finger in Horse's rectum or anus. *Id.* at 5:30. Defendant's insensitivity to the non-private nature of his search, and the possibility that people of a different gender would witness it, further demonstrates its unreasonableness. *See Pitts v. District of Columbia*, 177 F. Supp. 3d 347, 375 (D.D.C. 2016) ("It is also clear that strip and/or cavity searches must also be conducted in private.").

Unreasonable in scope, manner, and place, and devoid of justification, Defendant's search of Plaintiffs Horse and Gonzalez violated their Fourth Amendment rights.

**C. Plaintiffs' Right Not to Endure Probes of their Anuses or Rectums Absent Individualized Suspicion Was Clearly Established on January 20, 2017.**

A right is clearly established when the "the state of the law [at the time] of the incident gave [the defendants] fair warning that their alleged [misconduct] . . . was unconstitutional." *Hope v. Pelzer*, 536 U.S. 739, 741 (2002). The plaintiff must show that "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand what he is doing violates that right." *Allen v. Brown*, 185 F. Supp. 3d 1, 10 (D.D.C. 2016) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (first alteration in original)). This rule does not mean that immunity applies "unless the very action in question has previously been held unlawful," *id.* (quoting *Anderson*, 483 U.S. at 640), nor does it require the proponent to identify "a case directly on point," *id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). "The unconstitutionality of outrageous conduct obviously will be unconstitutional . . . . But even as to action less than an outrage, officials can still be on notice that their conduct violates established law in novel factual circumstances." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377–78 (2009) (citations, source's alteration marks, and internal quotation marks omitted). Moreover, although proponents of a right cannot "define clearly established law at a high level of generality," *al-Kidd*, 563 U.S. at 742, "general statements of law are not inherently incapable of giving fair and clear warning," *Hope*, 536 U.S. at 740 (citation and internal quotation marks omitted).

In assessing whether a right was clearly established, courts in this circuit look to "cases from the Supreme Court, the D.C. Circuit Court of Appeals, and other courts for principles 'exhibiting a consensus view.'" *Brown v. Short*, 729 F. Supp. 2d 125, 140 (D.D.C. 2010) (quoting *Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008)).

The consensus of authorities has spoken to the circumstances here with particularity, declaring that officers need at least articulable suspicion, if not probable cause, to conduct a manual

body cavity search incident to an arrest. This conclusion is reflected in cases from the First, Second, and Eleventh Circuits, additional district court decisions, and the highest courts of New York and the District of Columbia. *See supra* Part II.B.

The D.C. Court of Appeals' analysis in *United States v. Scott* is particularly apt. That case issued from the highest court in this jurisdiction in January 2010, long before the events at issue here. 987 A.2d at 1180. It involved officers conducting a search incident to arrest. *Id.* at 1197. And it informed officers that, even in that context, "manual body cavity search[es] . . . should be subject to a stricter legal standard" than reasonable suspicion, the standard for visual cavity searches. *Id.* (quoting *Hall*, 886 N.E.2d at 166-67). This discussion may constitute dicta but, "even dicta may clearly establish a right." *Estate of Escobedo v. Bender*, 600 F.3d 770, 786 (7th Cir. 2010) (citing *Anderson*, 483 U.S. at 640); *see also Carey v. Nev. Gaming Control Bd.*, 279 F.3d 873, 882 n.8 (9th Cir. 2002) (relying on, among other authorities, "Supreme Court dicta" in holding right clearly established).  No reasonable officer could have read *Scott* and concluded it lawful to intrude into Plaintiffs' anuses or rectums without any articulable suspicion whatsoever.

Authorities like *Scott* have defined the right at issue with the proper level of particularity. These cases do not require officers to apply a generalized balancing test whose application in various factual circumstances may be subject to doubt absent cases with similar or analogous facts. *Cf. Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." (citation and internal quotation marks omitted)). Instead, *Scott* and the larger consensus of which it is a part set forth a bright line rule (articulable suspicion is required to conduct manual body cavity searches) that applies in a specific context (searches incident to arrests). Faced with that

context and that rule, Defendant John Doe invaded Plaintiffs' body cavities without any suspicion whatsoever. Thus, "[t]he contours of the right [were] sufficiently clear that a reasonable official would understand what he is doing violates that right." *Allen*, 185 F. Supp. 3d at 10 (quoting *Anderson*, 483 U.S. at 640 (first alteration in original)).

The fact that Officer Doe penetrated Plaintiffs through their clothes does not aid him. As a recent case from this Court shows, it was clearly established at least by 2016 that unreasonably touching a person's private parts, even through clothes, is an unconstitutional search. *See Dickey v. United States*, 174 F. Supp. 3d 366, 371–72 (D.D.C. 2016) (denying qualified immunity on unreasonable search claim for fondling arrestee's genitals through clothes, and rejecting defendant's proposed framing of question as "whether it was clearly established that Officer Alexander was prohibited from alleged touching or manipulating the Plaintiff's genitals through multiple layers of clothing"); *see also Grissom v. District of Columbia*, 853 F. Supp. 2d 118, 120 125–126 (D.D.C. 2012) (denying motion to dismiss Fourth Amendment claim where security guard rubbed hand-held metal detector over plaintiff's breasts and genital area over her clothing).

In addition to case law, MPD regulations notified Officer Doe that his conduct was forbidden. A regulation is "[r]elevant" to whether officers had "fair warning that their conduct violated the Constitution." *Hope*, 536 U.S. at 741. Here, MPD General Order 502.01 (Mar. 28, 2014), *available at* https://go.mpdconline.com/GO/GO_502_01.pdf, governs "Transportation and Searches of Prisoners," and defines "[p]risoner" to include "[a] person who has been arrested and is being held, transported, treated, booked, or otherwise detained pending arraignment . . . or is otherwise being processed or handled." *Id.* at 3. The General Order provides that "**[u]nder no circumstances** shall [MPD] members perform 'body cavity' searches." *Id.* at 9 (bold and underlining in original). Indeed, the Order makes clear that a body cavity search of a prisoner's

genital and/or rectal cavities may only be "*conducted by a physician at a medical facility* to retrieve contraband, weapons, or evidence of a crime that may be concealed within these areas." *Id*. at 2 (emphasis added). This absolute prohibition on manual body cavity searches put Defendant Doe on notice that searching Horse's and Gonzalez's anuses or rectums could violate their rights. At very least, the regulation demonstrates that, by conducting those searches, Officer Doe acted in a "plainly incompetent" manner "or knowingly violate[d] the law," placing him outside the category of officers qualified immunity exists to shield. *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Defendant's arguments in favor of qualified immunity are unpersuasive. His assertion that, at the relevant time, it was "not clearly established that an officer's brief touching of an arrestee's groin during a search is unlawful," ECF 55 at 17, mischaracterizes the right at issue in a manner that plays down the allegation that Defendant Doe probed Plaintiff Gonzalez's testicles and omits the allegation that he searched both Plaintiffs' anuses or rectums. Indeed, the groundless rectal cavity searches, on their own, violated Plaintiffs' clearly established rights.

The cases Defendant cites do not support a contrary conclusion. One case, *United States v. Russell*, 664 F.3d 1279 (9th Cir. 2012) quotes *Terry v. Ohio*'s dictum that a pat down can include a search "around the groin and area about the testicles." *Id.* at 1283 (quoting 392 U.S. 1, 17 n.13 (1968)). *Terry*, however, makes no mention of manual body cavity searches, *see* 392 U.S. at 17 n.13, and the D.C. Circuit has expressly stated that such an inspection goes beyond what a defendant can expect to endure during a standard frisk. *United States v. Rodney*, 956 F.2d 295, 298 (D.C. Cir. 1992) (Thomas, J.). Moreover, *Russell* itself only concerned a search of the "groin area," not the suspect's anus or buttocks. *See Russell*, 664 F.3d at 1281.

Two of the remaining three cases Defendant cites similarly do not involve an intrusion into the suspect's anus. *See Lamore v. Vermont*, 2013 WL 3560969, at *4 (D. Vt. July 11, 2013) (analyzing search that "involved contact with [plaintiff's] genitals"); *Scalpi v. Amorim*, 2018 WL 1606002, at *18 (S.D.N.Y. Mar. 29, 2018) (assessing search of genitals and breasts).

In Defendant's remaining case, a prisoner alleged that the officer, among other things, "rubbed up and down the crack of his buttocks," *Jacks v. Dyberg*, 2013 WL 2351334, at *5 (C.D. Cal. May 16, 2013), but the court did not characterize this conduct as involving penetration, *see id.* at 8 ("Viewing the evidence in the light most favorable to plaintiff, the mere fact that defendant rubbed plaintiff's groin, buttocks, and penis multiple times is not sufficient in itself to make the search unreasonable."). Unlike the searches of Plaintiffs Horse and Gonzalez, which were unauthorized, the search in *Jacks*, conducted as the prisoner was "about to leave the jail for court," was "routine" and mandated by prison "policies and procedures." *Id.* at 5. Moreover, in holding that the officer did not violate the suspect's rights, the court emphasized that the search was justified by the "legitimate goals of maintaining institutional security and ensuring the safety of inmates, corrections personnel, and court officials." *Id.* at 8.

In sum, Officer Doe conducted a suspicionless, degrading, and unauthorized search when he pushed his finger into Plaintiffs Horse's and Gonzalez's body cavities and probed Plaintiff Gonzalez's testicles. The Fourth Amendment does not tolerate such conduct today nor did it at the time of the incident.

## CONCLUSION

Defendant John Doe's motion to dismiss or for summary judgment on Claim 16 should be denied.

Respectfully submitted,

*/s/ Scott Michelman*
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff*
American Civil Liberties Union Foundation
   of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel. 202-457-0800
Fax 202-457-0805
smichelman@acludc.org

January 17, 2019                    Counsel for Plaintiffs

*Admitted to practice in New York but not D.C. Practicing in D.C. under supervision of a D.C.
Bar member while application to D.C. Bar under consideration, pursuant to D.C. Ct. App. R. 49
(c)(8).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SHAY HORSE, *et al.*,<br><br>                              Plaintiffs,<br><br>          v.<br><br>DISTRICT OF COLUMBIA, *et al.*,<br><br>                              Defendants. | **REDACTED VERSION OF**<br>**DOCUMENT UNDER SEAL**<br><br>No. 1:17-cv-01216 (ABJ) |

**STATEMENT OF PLAINTIFFS HORSE AND GONZALEZ AS TO GENUINE ISSUES
NECESSARY TO BE LITIGATED AND RESPONSE TO DEFENDANT'S STATEMENT
OF FACTS TO WHICH THERE IS NO GENUINE DISPUTE**

Pursuant to Fed. R. Civ. P. 56(c) and Local Civil Rule 7(h)(1), Plaintiffs Horse and

Gonzalez submit the following Statement.

1.       Paragraph 8 of Defendant's Statement is inaccurate insofar as it maintains that

Defendant never inserted his finger in Plaintiff Horse's anus or rectum. That assertion is

contradicted by Plaintiff Horse's declaration at ¶ 7 ("Officer John Doe . . . stuck his finger inside

my butt[] through the loosely-fitting jeans I was wearing[,] . . . pok[ing] me in my anus") and ¶ 12

("I am confident of . . . the fact that Officer John Doe invasively probed my butt at the Police

Academy on January 20."). Defendant's Statement is further controverted by Def. Ex. H (Blue

Plains Video) at 5:30 (showing Plaintiff Horse flinch) and

*[REDACTED MATERIAL]*

1

*[REDACTED MATERIAL]*

2.  Paragraphs 5, 6, and 8 of Defendant's Statement (describing the search of Plaintiff Horse) are incomplete in that they omit the facts that, during the search, Defendant told Plaintiff Horse not to flinch, Horse Decl. ¶ 7, and that Defendant "did not find any weapons or contraband during his search," *id.* ¶ 8. Also missing from Defendant's Statement is the fact that Defendant searched Plaintiff Horse in front of other officers and arrestees. *See* Blue Plains Video at 5:12–5:32. That includes two female officers who walked past Plaintiff Horse at the moment Defendant Doe was inspecting his rear body cavity. *Id.* at 5:30.

3.  Paragraph 13 of Defendant's Statement is inaccurate insofar as it asserts that Defendant never searched Plaintiff Gonzalez's testicles or inserted his finger in Plaintiff Gonzalez's anus or rectum. Plaintiff Gonzalez's declaration contests that point at ¶ 11 ("I felt his finger poke my anus and felt his hand touching my testicles.") and ¶ 26 ("I don't have any doubt that at the [P]olice [A]cademy after my arrest when my hands were restrained behind my back, an officer stuck his finger into my buttocks and probed my testicles."). The Blue Plains Video corroborates Plaintiff Gonzalez on this point at 9:13–14 (showing Plaintiff Gonzalez flinch while Defendant stands with his hands behind Plaintiff Gonzalez's rear body cavity), as does the *[REDACTED MATERIAL]* discussed in ¶ 1 of this Statement.

4.  Paragraphs 10, 11, and 13 of Defendant's Statement (describing search of Plaintiff Gonzalez) are also incomplete in that they omit the facts that, while standing behind Plaintiff Gonzalez, Defendant told him not to resist, Gonzalez Decl. ¶ 10, and that Defendant's search did not reveal any weapons or contraband, *id.* ¶ 14. Defendant's Statement also fails to acknowledge that Defendant told Plaintiff Gonzalez to "spread [his] legs" and then told him to "spread them

2

wider," *id.* ¶ 10; Blue Plains Video at 9:08–9:12 (showing Gonzalez widen stance and then widen it further), and that Plaintiff Gonzalez complained to Defendant that he was being too aggressive, Gonzalez Decl. ¶ 12; Blue Plains Video at 9:15–9:22 (showing Gonzalez turn toward Defendant as if to say something).

5. The remaining paragraphs in Defendant's Statement are undisputed.

6.  Thus, there exists a genuine dispute concerning (1) whether Defendant searched Plaintiff Horse's anus or rectum at the MPD Academy, and (2) whether Defendant searched Plaintiff Gonzalez's testicles and anus or rectum at the MPD Academy.

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Scott Michelman*
Scott Michelman (D.C. Bar No. 1006945)
Arthur B. Spitzer (D.C. Bar No. 235960)
Michael Perloff*
American Civil Liberties Union Foundation
  of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
Tel. 202-457-0800
Fax 202-457-0805
smichelman@acludc.org

</div>

January 17, 2019               Counsel for Plaintiffs

*Admitted to practice in New York but not D.C. Practicing in D.C. under supervision of a D.C. Bar member while application to D.C. Bar under consideration, pursuant to D.C. Ct. App. R. 49 (c)(8).

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHAY HORSE, *et al.*,

               Plaintiffs,

   v.

DISTRICT OF COLUMBIA, *et al.*

               Defendants.

Civil Action No. 17-1216 (ABJ)

## DECLARATION OF MILO GONZALEZ

1. My name is Milo Gonzalez. I am an adult resident of New York. I have personal knowledge of the matters set forth herein, and I am competent to make this declaration.

2. On January 20, 2017, officers with the District of Columbia Metropolitan Police Department (MPD) arrested me as part of a mass arrest of demonstrators protesting the inauguration of Donald Trump as President.

3. MPD officers detained me on a downtown Washington, D.C., street, for approximately seven hours before transporting me to a detention facility.

4. During my detention on the street and subsequent transportation to a detention facility, MPD officers did not provide me with food, water, or access to a bathroom.

5. I estimate that I was denied access to a bathroom for 9–10 hours and was denied food and water for 10–11 hours during my detention and transportation by MPD officers on January 20.

6. In the evening of January 20, MPD officers drove me to a detention facility, which I now know to be the Metropolitan Police Academy located on Blue Plains Drive SW.

1

7. After speaking with an officer at a processing station, I was directed to the center of a what appeared to be a mock city street.

8. There, an MPD officer, whom I understand is called "John Doe" in the amended complaint for this case, conducted a pat down search of my body. He wore gloves when he searched me.

9. Throughout the search, I stood upright with my hands bound with zipties behind my back. I believe that my belt was unbuckled.

10. Partway through the search, Officer John Doe asked me to spread my legs. I did that. He then told me to spread them wider, and I did. I heard him tell me not to resist.

11. I felt his finger poke my anus and felt his hand touching my testicles.

12. Officer Doe's actions caused me to flinch and to say to Officer Doe that he was being too aggressive.

13. I do not remember if Officer John Doe reached his hand inside my pants or instead searched my anus and genitals through my pants. But I clearly remember feeling the pressure of the officer's fingers or hand in my anus and on my testicles.

14. Officer John Doe's search did not discover any weapons or contraband, because I didn't have any.

15. During the approximately two-year period since the search, my memory of this incident has not been consistent. Specifically, in the spring and summer 2017, I thought I recalled several details about the search that I now believe were incorrect.

16. On September 7, 2017, I gave an interview to officers from MPD's internal affairs divisions. At that time, I recounted the incident to the best of my recollection.

17. However, after watching the video of the incident in the fall of 2017, I realized that some of my initial memories regarding the search were mistaken.

18. One of the main reasons that my initial memory of the incident was not accurate is that I spent several months after my arrest trying to keep the events of January 20, 2017 out of my mind. My experience on that day was deeply upsetting to me. In addition to enduring the intrusive search I have described, I was detained outdoors for hours, sprayed with chemical irritants, and denied food and bathroom access for an extended period of time.

19. Those events made it difficult for me to sleep, caused me to experience increased anxiety, and prevented me from returning to protests—an activity in which I used to engage frequently.

20. I often react to trauma by pushing painful memories deep into my mind to avoid dwelling on them, a strategy I first noticed that I used when I was struggling with homelessness a few years ago.

21. Relying on this coping mechanism here caused me to blend details of the search with other events that happened to me at the protests on January 20 and their aftermath. For example, I originally recalled that Officer John Doe laughed at me when conducting the search. Although I still clearly recall other officers laughing at me at other points during my detention, I realized after watching video footage of the search that I may have merged those memories with my recollection of what occurred at the Metropolitan Police Academy.

22. Similarly, upon watching the video, I recognized that I had mistakenly recalled that officers asked me to remove my pants before conducting the search. This notion, I now believe, arose from conversations with Shay Horse.

23. Shay and I rode to the MPD Academy together. We were searched in the same facility at around the same time, and subsequently detained in the same room.

24. Shay and I discussed the MPD Academy incident and I believe that, when we did so, Shay's description of what happened to him influenced my recollection of what happened to me.

25. As soon as I saw the video footage of the search, I realized that some of my allegations in the original complaint were based on that confusion. My allegations in the amended complaint are correct to the best of my current recollection and belief.

26. I don't have any doubt that at the police academy after my arrest when my hands were restrained behind my back, an officer stuck his finger into my buttocks and probed my testicles.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 10 , 2019

Milo Gonzalez

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HORSE, *et al.*,

               Plaintiffs,

    v.

DISTRICT OF COLUMBIA, *et al.*

               Defendants.

Civil Action No. 17-1216 (ABJ)

## DECLARATION OF SHAY HORSE

1. My name is Shay Horse. I am a resident of New York. I have personal knowledge of the matters set forth in this declaration and I am competent to make it.

2. I came to Washington, D.C. to photograph the protests of Donald Trump's Inauguration.

3. On January 20, as I was engaged in this work, officers with D.C.'s Metropolitan Police Department (MPD) detained me for about seven hours in an outdoor blockade.

4. After sunset, a police vehicle finally picked me up. Along with several other arrestees, I rode in the vehicle to what I know now to be the Metropolitan Police Department Academy.

5. Inside, after I spoke briefly with a person working a processing table, an officer escorted me to the middle of what seem like a giant warehouse set up to look to look like a city street.

6. While I stood with my hands ziptied together, an officer (called "John Doe" in the amended complaint in this case) frisked me.

7. Toward the end of the search, Officer John Doe walked behind me and told me not to flinch. Then, he stuck his finger inside my butt, through the loosely-fitting jeans I was

1

wearing. My jeans were baggy enough that the effect of his jamming his finger into the seat of my jeans was to poke me in my anus.

8. Officer John Doe did not find any weapons or contraband during his search, because I didn't have any.

9. I was detained overnight. The next day, I was taken to the Superior Court Courthouse. At one point, several other detainees and I were being taken through an L-shaped hallway near the parking garage by officers with the United States Marshals Service. The officers lined the other detainees and me against a wall and demanded that we drop our pants. Then, through my underwear, one of the officers pushed a finger in my butt and grabbed my testicles. After the officer completed the search, and I had pulled my pants up, the officers placed shackles on my legs.

10. My memories of the search by Officer John Doe at the Police Academy have not remained consistent in all the details since the event occurred. When I first spoke publicly about the incident, when the original complaint in this case was filed, and in speaking with MPD internal affairs investigators, I mixed up some of the details of the Police Academy search by Officer John Doe with the details of the search by U.S. Marshals at the courthouse.

11. I believe I confused the two incidents because both involved intrusive violations of my space and my body, and because what I endured on January 20 made it difficult for me to keep my focus throughout the day and retain details with precision. I was detained outside for hours, pepper sprayed multiple times, and denied food, water, and bathroom access for most of the day. The night before the protests, I stayed up late preparing another assignment and only got about an hour of sleep. During the day, the only thing I

had to eat was a cookie that I had to get out of a trash can and the only things I had to drink were a half a bottle of Gatorade and a few sips of coffee. I also did not get much sleep the night after I was arrested.

12. When I saw video footage of the Police Academy search, I realized that I had confused some details of the U.S. Marshals search with some details of the MPD search. I am confident of the facts stated in this declaration, especially the fact that Officer John Doe invasively probed my butt at the Police Academy on January 20.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 10, 2019

Shay Horse

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHAY HORSE, *et al.*,

                         Plaintiffs,

        v.

DISTRICT OF COLUMBIA, *et al.*,

                         Defendants.

No. 1:17-cv-01216 (ABJ)

[Proposed]
**ORDER**

Upon consideration of Defendant John Doe's Motion to Dismiss, or in the Alternative, for Summary Judgment, Plaintiffs' opposition thereto, and the entire record in this case, it is hereby

ORDERED, that the Motion to Dismiss is DENIED, and it is further

ORDERED, that the Motion for Summary Judgment is DENIED.

Date: _____                    _____
                                    AMY BERMAN JACKSON
                                    United States District Judge