UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SHAY HORSE, *et al.,*

Plaintiffs,

v.

DISTRICT OF COLUMBIA, *et al.,*

Defendants.

No. 1:17-cv-01216 (ABJ)

## NOTICE OF FILING OF REDACTED DOCUMENT

Defendant Officer John Doe hereby files his public, redacted version of his Reply in

support of his Motion to Dismiss or for Summary Judgment.  A sealed, unredacted version of

this Reply was filed January 31, 2019, at ECF No. 60.

January 31, 2019

Respectfully submitted,

/s/ *Joseph A. Gonzalez*
Joseph A. Gonzalez (D.C. Bar No. 995057)
SCHERTLER & ONORATO, LLP
901 New York Avenue, N.W.
Suite 500
Washington, D.C.  20001
Telephone:  202-628-4199

*Counsel for Defendant John Doe*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHAY HORSE, *et al.*, | **REDACTED VERSION OF** |
| Plaintiffs, | **SEALED DOCUMENT** |
| v. | No. 1:17-cv-01216 (ABJ) |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

**DEFENDANT OFFICER JOHN DOE'S REPLY IN SUPPORT
OF HIS MOTION TO DISMISS, OR IN THE
ALTERNATIVE MOTION FOR SUMMARY JUDGMENT**

Defendant Officer John Doe, through undersigned counsel, hereby replies to Plaintiffs'

Opposition to the Motion to dismiss Count 16 of Plaintiffs' First Amended Complaint or, in the

alternative, for summary judgment on Count 16.

**ARGUMENT**

I.   **The Court should strike Plaintiffs' search allegations and dismiss Count 16.**

A.   **The allegations against Officer John Doe qualify as bad faith "sham"
allegations because they "fundamentally changed" from the initial
Complaint to the Amended Complaint.**

Officer John Doe established in his opening brief that Plaintiffs' Amended Complaint

radically altered the substance of their initial Complaint with respect to the Officer John Doe

allegations.  Unlike the initial Complaint, the Amended Complaint had no mention of lining up

Plaintiffs, dropping their pants, and systematically sexually assaulting them in a graphic tale that

included, "yelp[s]," "grabb[ing] Mr. Horse's testicles," wiggling finger insertions, and dirty

gloves, as five to ten officers stood by and "laughed."  Compl. ¶¶ 116, 119, 123-25.  However,

Plaintiffs now contend that Officer John Doe has overstated the differences between the two

1

complaints and therefore the differences do not warrant dismissal pursuant to the sham pleadings doctrine.  *See* Plaintiffs' Opposition, ECF No. 57 at 2-3.

As an initial matter, Plaintiffs are speaking out of two sides of their mouth.  They have already conceded that "key details regarding this incident are not as Plaintiffs Horse and Gonzalez originally remembered them."  *Id*. at 2.  The fact that they felt the need to amend their complaint and then subsequently the need to explain the differences with lengthy (and improbable) declarations solidifies the point.  If the changes were not "key," then the amendments and subsequent declarations would not have been necessary.

But the deeper flaw in Plaintiffs' argument lies in their suggestion that the doctrine permits contradiction as long as it falls short of "180 degree change."  Although *Clay v. Howard Univ.*, 128 F. Supp. 3d 22 (D.D.C. 2015) uses this phrase in dicta, the test focuses on whether the new allegations "fundamentally change the nature" of the allegations.  *Id*. at 27.  For example, in *CopyWatch, Inc. v. Am. Nat'l Red Cross*, 299 F. Supp. 3d 189 (D.D.C. 2018), the defendants argued sham allegations because the amended complaint "omits any reference of an agreement reached on August 10, 2015, and instead alleges that a similar agreement to perform an audit occurred at the earlier June 2015 meeting."  *Id*. at 196.  But the court disagreed, reasoning "[i]t is conceivable that the parties reached an understanding regarding the audit report in the June 2015 meeting and reaffirmed it in August 2015, when the MOU was executed."  *Id*.  Thus, "the allegations in both complaints could be true, and the amendment does not *fundamentally change* the nature of Plaintiff's allegations."  *Id*.; *see also Clay*, 128 F. Supp. 3d at 26 (finding consistency between complaints because the amended complaint simply reflected "increased certainty that there was indeed a fraud being perpetrated").

There is no such consistency between the complaints in this case.  Officer John Doe could not have "put his finger into Mr. Horse's rectum, through his underwear … and wiggled it around for several seconds," (Compl. ¶ 119) yet also "patted Mr. Horse down and then jabbed into Mr. Horse's rectum, through his pants," (Am. Compl. ¶ 168).  Either Horse's pants were pulled down or they were not.  Either Horse sustained a several second inch-deep finger wiggling insertion or he did not.  Similarly, either both Plaintiffs were lined up as a group against a wall and sexually assaulted with dirty gloves, amid officers laughing, or they were not.  Unlike *CopyWatch*, there is no way "the allegations in both complaints could be true[.]"  *CopyWatch*, 299 F. Supp. 3d at 196.  Thus, there was a "fundamental change" between the complaints in this case because both versions cannot logically be true.  *Id.*

Plaintiffs attempt to side-step this conclusion by asserting that "the broad outline of what happened to them remains the same."  Opp. at 2.  But conceptually this is no different than insisting on "180 degree change."  Reducing the degree of detail in order to recast the allegations as more abstract will inevitably result in different versions merging into same "broad outline" of what happened.  That is why determining "fundamental change" depends not on *post hoc* abstractions, but on how precise a plaintiff chose to be in the first place.  In other words, if Horse and Gonzalez chose to articulate the core features of their claim with such graphic specificity, scrutiny of their claims should be subject to that same level of specificity.  Not only does the case law bear that out, but also this approach resonates with the primary concern of the sham pleading doctrine— that a "plaintiff [can]not, in good faith, have so diametrically reversed his recollection and position between the time of the filing of his original complaint and that of his [] amended pleading."  *Bradley v. Chiron Corp.*, 136 F.3d 1317, 1324 (Fed. Cir. 1998).  The

differences between the two complaints smack of such bad faith and expose a fundamental

change between them.  The Court should dismiss the Officer John Doe allegations in Count 16.

    **B.**    **The sham pleading analysis occurs pursuant to Rule 12(b)(6) and thus does not ordinarily involve extrinsic evidence such as declarations.**

Instead of analyzing the inconsistency between their pleadings, Plaintiffs' briefing

focuses on explaining away the inconsistency.  While not problematic in concept, it is in

execution.  Plaintiffs provide declarations detailing "merged" and "confused" recollections of

their arrests in a puzzling (and counterproductive) effort to bolster the credibility of their

allegations.  They assert that the Court may consider these declarations because a sham pleading

argument "by its very nature dispenses with the basic tenet of Rule 12(b)(6) that a plaintiff's

allegations must be taken as true."  Opp. at 3.  As their solitary legal support for this proposition,

they cite to a case where plaintiffs successfully defeated a sham allegation challenge when they

"offered an explanation for why" the pleadings were inconsistent.  *Marvel Enter., Inc. v. Walt

Disney Co.*, 2005 WL 8156208, at *3 (C.D. Cal. Feb. 4, 2005).

This argument is unfaithful to the case law and relies on flawed logic.  The sham

pleading doctrine exists as a specific carve out of the general rule that "[o]rdinarily, an amended

complaint supersedes the original."  *McManus v. Williams*, 519 F. Supp. 2d 1, 5 (D.D.C. 2007);

*see InterGen N.V. v. Grina*, 344 F.3d 134, 144 (1st Cir. 2003) ("That is not to say that statements

made in a superseded complaint are null and void for all purposes.").  It allows a court to

compare allegations and "strike obviously false and sham allegations that have changed from the

complaint to the amended complaint."  *Clay*, 128 F. Supp. 3d at 26.  But the act of comparison

does not open the flood gates to a bevy of evidence extrinsic to the complaints, thereby

converting a motion to dismiss into a motion for summary judgment.  The fact that courts

routinely decide sham allegation arguments under 12(b)(6) proves as much.[1]  Moreover, the fact

that courts consider a plaintiff's explanation in making those determinations does not mean that

this consideration involves anything besides the complaints, let alone self-serving declarations.

Indeed, a review of the sham pleading decisions in this jurisdiction demonstrates that a plaintiff's

explanation occurs only in the context of their counsel's analysis of the alleged differences.  The

same holds true of their point case, *Marvel Enter., Inc.*  Plaintiffs' invitation to rely on their

declarations rests on an expansion of the word "explanation" unsupported by the case law.

Accordingly, while the Court has the discretion to rely on Plaintiffs' declarations (and

thus the other evidence as well), it need not wade into these waters and could decide this issue

under Rule 12(b)(6), just as other courts do.

### C.      Plaintiffs' declarations underscore that the nature of the sham pleading.

Even if the Court does choose to rely on Plaintiffs' declarations in determining whether

they have provided a reasonable explanation, the declarations fail to do so.  In both declarations,

Plaintiffs openly and repeatedly admit a stunning inability to recollect basic facts.  Gonzalez

states:

- "my memory of this incident has not been consistent" Gonzalez Decl. ¶ 15;

- "some of my initial memories regarding the search were not accurate" *Id*. at ¶ 17;

- "my initial memory of the incident was not accurate" *Id*. at ¶ 18;

- I have "blend[ed] details of the search with other events" *Id*. at ¶ 21.

---

[1]      Additionally, converting all sham pleading arguments into motions for summary judgment has the potential to undermine the doctrine by converting every sham claim into a credibility determination for a jury.  Every plaintiff could defeat the argument by simply submitting a declaration to the effect of "I know I contradicted myself, but I swear I am telling the truth now," which is precisely what Plaintiffs have done.

Gonzalez also concedes that he has a "coping mechanism," which predisposes him to inaccurate recollections. *Id.* He even concedes that his allegation regarding the removal of his pants "arose from conversations with Shay Horse," thus admitting that they coordinated their stories. *Id.* at ¶ 21. But even worse, Horse's declaration demonstrates their *continued* coordination. Horse, just like Gonzalez, admits that his account has "not remained consistent," that he was also suffering from a lack of sleep and food, and that he has also "mixed up some details" of his search with other police interactions that took place that day. Horse Decl. ¶¶ 10, 11.

While technically these qualify as explanations, they are remarkably terrible. Essentially, Plaintiffs argue that the Court can now trust in the accuracy of their revised recollection of the search because their ability to recall the search was so poor. This runs counter to both common sense and the applicable law. *See Bradley*, 136 F.3d at 1324 (refusing to accept explanation for inconsistency because the "original and first amended complaints were written a year earlier [than the inconsistent complaint] and thus represented a fresher recollection"). Admissions of blended recollections, coordinated stories, gaps in memory, and a psychological predisposition to inaccuracy do not make someone credible. Rather, these suggest that once Plaintiffs saw the video they engaged in a "transparent attempt to conform the facts to the requirements of the cause of action." *Id.* Plaintiffs have admitted as much. *See* Gonzalez Decl. ¶ 17. ("after watching the video … I realized that some of my initial memories regarding the search were mistaken"). Indeed, it would be more accurate for Plaintiffs to state that "after watching the video … I realized I had been caught in a lie."

### D.     Purported "trauma" does not excuse blatant dishonesty.

Plaintiffs also make an argument that their "trauma" resulted in confused recollections, which, according to Plaintiffs, the court recognized as a mitigating factor in *Ilunga v. Holder*,

6

777 F.3d 199 (4th Cir. 2015).  *See* Opp. at 5.  However, *Ilunga* concerned dramatically different circumstances than here.  The plaintiff "suffered daily torture" in a Congolese prison where "guards stabbed him and poured battery acid in the wounds … shocked him with an electrical club, routinely whipped him, and raped him."  *Ilunga*, 777 F.3d at 204.

Finally, Plaintiffs make a related heart-strings policy argument that "an unforgiving attitude toward changes risks unfairness to people in traumatizing situations." Opp. at 7.  But this disregards that the sham pleading doctrine underscores the importance of truthfulness in the legal system and, among many others doctrines, serves to vindicate this interest.  Plaintiffs also fail to recognize that whatever inaccuracy "forgiveness" that a trauma might engender, the facts of this case do not warrant any such presumption.  While Plaintiffs now cast themselves as meekly confused, their interviews with MPD betrayed no hesitation, confusion, or meekness.  Rather, over the course of two interviews lasting more than 40 minutes each they confidently related a detailed tale of sexual assault, while their attorney sat right beside them.  This included a claim that Horse felt "rape[d]" as he felt "the bulbous-ness of the two knuckles" enter his anus (ECF No. 55, Ex. B, Horse interview at 28:25, 32:20-38) and that Gonzalez had both his penis and testicles "fondled" (Gonzalez Interview 20:56).  The clarity and confidence with which they related these accounts during an official MPD investigation undercuts any claim of distorted memories that ripened into eventual recollection.  *See Bradley*, 136 F.3d at 1324 (where the court refused to accept the plaintiff's claim of "eventual recollection").[2]

---

[2]     It should also be noted that while Plaintiffs claim to have "recovered" their recollection of their respective searches, it appears that they have taken no steps to inform MPD that their interview contained misrepresentations.

## II.     **The Court Should grant Officer John Doe Summary Judgment.**

### A.     **Plaintiffs' have improperly attempted to characterize the searches as manual body cavity searches.**

In his motion for summary judgment, Officer John Doe established that the video evidence of his search disproves Plaintiffs' allegations.  *See Harris v. Allison*, 2016 WL 3166296, at *2 (D.D.C. June 6, 2016).  The video showed that he patted down Horse's buttocks for *only one second*.  *See* Blue Plains video at 5:12–5:31. Gonzalez' search was slightly longer, but it clearly shows, contrary to his allegations, that Officer John Doe patted down Gonzalez' groin and buttocks area from the *outside* of his pants.[3]  The law permits such searches incident to arrest.  *See United States v. Russell*, 664 F.3d 1279 (9th Cir. 2012) ("The Supreme Court has long recognized that searching a suspect's person may consist of 'a careful exploration of the outer surfaces of a person's clothing all over his or her body.'") (quoting *Terry v. Ohio,* 392 U.S. 1, 16 (1968)); *see also id*. ("The officer must feel with sensitive fingers every portion of the prisoner's body.  A thorough search must be made of the prisoner's arms and armpits, waistline and back, *the groin and area about the testicles,* and entire surface of the legs down to the feet.") (emphasis added by *Russell*).  Accordingly, Officer John Doe is entitled to qualified immunity because (1) he did not commit a Fourth Amendment violation and (2) it is not clearly established that an officer's brief touching of an arrestee's groin during a search is unlawful.

---

[3]       Gonzalez still will not commit himself to an account of his search.  He alleged in the Amended Complaint that "Officer John Doe reached inside Mr. Gonzalez's underwear," (¶ 174) but now provides yet another version where he states "I do not remember whether Officer John Doe reached his hand inside my pants[.]"  Gonzalez Decl. ¶ 13.  Even worse, he states in his declaration that this latest account is "correct to the best of my *current* recollection," thus reserving the possibility of yet another change.  *Id.* at ¶ 25 (emphasis added).

Plaintiffs argue that this analysis misses the mark because Officer John Doe performed a manual body cavity search, as opposed to a standard search incident to arrest. Opp. at 16-17. From this assumption, they argue that his search was unlawful under clearly established law because a manual body cavity search requires at least particularized suspicion of contraband, which Officer John Doe chose not to discuss in his motion. Opp. at 17-18. However, it is Plaintiffs that miss the mark. While they spill much ink in trying to convince the Court that the video depicts a body cavity search, the numerous cases they cite prove otherwise.

For example, Plaintiffs heavily rely on dicta in *United States v. Scott*, 987 A.2d 1180 (D.C. 2010) throughout their brief for the proposition that Officer John Doe's search required at least reasonable suspicion. Opp. at 16, 21. But this case involved "a visual body cavity inspection" where the officers stripped the arrestee naked and "instructed [him] to place his hands on his chest, turn with his back toward them, and bend forward from the waist" to expose his anus. *Scott*, 987 A.2d at 1186-87. One of their other citations, *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005), at least involved a body cavity search, but other than that has no further relevance to their argument or this case. There, the officers put the arrestee in a "choke hold and held him against the wall" after he refused to remove his underwear, where upon the officers did so themselves, and "stuck [him] in [his] anus" with a "baton-like cold black object." *Id*. at 1276-77; *see also Lucero v. Bush*, 737 F. Supp. 2d 992, 1001 (D.S.D. 2010) (where after her arrest, the officer took the plaintiff to a portable toilet and "digitally penetrated [plaintiff], both vaginally and anally").

This exposes the flaw in Plaintiffs' reasoning. They cite to numerous cases regarding the law of body cavity searches, but never establish that the search performed by Office John Doe qualifies as a body cavity search. In fact, comparison of the facts in these cases to this case

conclusively establishes that Officer John Doe's search was not a body cavity search, as the

hallmark of a body cavity search is that the arrestee is at least partially nude and the body

actually entered.  Moreover, the only case Plaintiffs cite to that did not involve a nude arrestee,

explicitly rejected a similar attempt to leverage a pat down into a manual body search:

> In his opposition brief, [the plaintiff] argues that Officer Alexander's search was
> extremely atypical and best described as a manual body cavity search. [the plaintiff]
> attempts to overstate his case. … [T]he alleged surface touching of genitalia during
> a pat-down search incident to arrest that does not probe any body cavity does not
> constitute a manual body cavity search.

*Dickey v. United States*, 174 F. Supp. 3d 366, 371 n. 2 (D.D.C. 2016) (internal citations and

quotations removed).  The allegations in *Dickey* were also far worse than here because the

plaintiff alleged that his "genitals and penis were 'fondled' six times …, three times when

Officer Alexander used kevlar gloves, and three times when Officer Alexander used latex

gloves." *Id*. at 368.  The video shows nothing comparable with respect to Officer John Doe's

search.  And Plaintiffs' declarations, even if credited, describe nothing comparable.  *See Kisela*

*v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("Use of excessive force is an area of the law in which

the result depends very much on the facts of each case, and thus police officers are entitled to

qualified immunity unless existing precedent squarely governs the specific facts at issue.").

Thus, because there was no body cavity search, the premise of Plaintiffs' argument fails and thus

so too their conclusion.

   Accordingly, Officer John Doe is entitled to qualified immunity because his search was

neither unreasonable under the Fourth Amendment, nor clearly unlawful under existing

precedent.

*[REDACTED]*

*[REDACTED]*

## CONCLUSION

For the foregoing reasons, Count 16 of Plaintiffs' First Amended Complaint should be dismissed with prejudice and Officer John Doe dismissed from the case or, in the alternative, this Court should grant judgment in favor of Officer John Doe on Claim 16.

January 31, 2019

Respectfully submitted,

/s/ *Joseph A. Gonzalez*
Joseph A. Gonzalez (D.C. Bar No. 995057)
SCHERTLER & ONORATO, LLP
901 New York Avenue, N.W.
Suite 500
Washington, D.C.  20001
Telephone:  202-628-4199

*Counsel for Defendant John Doe*